UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:20-cv-25313

UNITED STATES OF AMERICA,

Plaintiff,

vs.                                                     JURY TRIAL DEMANDED

REAL PROPERTY LOCATED AT 55 PUBLIC SQUARE,
CLEVELAND, OHIO, WITH ALL APPURTENANCES,
IMPROVEMENTS, AND ATTACHMENTS THEREON,
AND ANY RIGHT TO COLLECT AND RECEIVE ANY
PROFIT, RENT, INCOME, AND PROCEEDS
THEREFROM,

Defendant.

_____/

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its undersigned attorneys and in accordance with Rule G

of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, brings

this complaint for forfeiture *in rem* and alleges the following:

### NATURE OF THE ACTION

1.      This is a civil action *in rem* to forfeit assets that facilitated, were involved in, and

are traceable to an international conspiracy to launder money embezzled and fraudulently obtained

from PrivatBank.

2.      The misappropriated funds were used to purchase real property in Cleveland, Ohio,

namely, a 22-story office building located at 55 Public Square in Cleveland, Ohio, 44113 (together

with all appurtenances, improvements, and attachments thereon, and any right to collect and receive any profit, rent, income, and proceeds therefrom, the "Defendant Asset").

3.     The United States seeks forfeiture of the Defendant Asset pursuant to 18 U.S.C. § 981(a)(1)(C), because the Defendant Asset is traceable to violations of U.S. law and specified unlawful activity, including violations of 18 U.S.C. §§ 1956, 1957, 2314, and 2315.

4.     The United States also seeks forfeiture of the Defendant Asset pursuant to 18 U.S.C. § 981(a)(1)(A), because the Defendant Asset was involved in one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957.

5.     The specified unlawful activity includes fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the transportation, receipt, concealment, possession, sale, and disposal of misappropriated money in international commerce (18 U.S.C. §§ 2314 and 2315); and conspiracy to commit those actions.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

7.     Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A), because acts and omissions giving rise to the forfeiture took place in the Southern District of Florida.  Those include, but are not limited to, entities involved in the criminal activity having a principal place of business in Miami, those entities conducting business in Miami, and entities and individuals using Miami addresses to conduct the criminal activity.

## PEOPLE AND ENTITIES

8.     The Plaintiff is the United States of America.

9.      The Defendant Asset is an office building located at 55 Public Square in Cleveland, Ohio, 44113, with all appurtenances, improvements, and attachments thereon, as well as any right to collect and receive any profit, rent, income, and proceeds therefrom.[1]

10.     PrivatBank is a Ukrainian financial institution located in Ukraine, with a branch in Cyprus and an affiliated entity in Latvia, among other places.  PrivatBank is one of the largest banks in Ukraine.  From 2003 to 2016, it accounted for approximately 25% of the banking sector in the country, and held deposits in excess of $6 billion, which comprised approximately 33% of individual deposit accounts in Ukraine.  Extensive audits by the National Bank of Ukraine ("NBU") in 2016 uncovered a scheme by the bank's owners to steal over $5 billion from the bank via the issuance of fraudulent loans.  As a result of the massive theft and fraud, PrivatBank was nationalized in December 2016.

11.     Ihor Kolomoisky is a billionaire Ukrainian oligarch.  He controls businesses in many sectors of the Ukrainian economy, including metals, energy, and media, under the umbrella of the "Privat Group."  Before the nationalization of PrivatBank, he was one of the two primary owners of the bank, holding more than 40% of the bank's shares, and was a member of the bank's Supervisory Board.  He exercised extensive control over the bank and its activities.  Kolomoisky was the governor of Dnipropetrovsk province in Ukraine from 2014 to 2015.

12.     Gennadiy Boholiubov is another Ukrainian oligarch who shares in the ownership of many business entities with Kolomoisky under the Privat Group.  He was the second major shareholder of PrivatBank along with Kolomoisky.  Before nationalization, he owned more than 40% of PrivatBank and was a member of PrivatBank's Supervisory Board.  He, together with Kolomoisky, exercised extensive control over the bank and its activities.

---

[1]      A full legal description of the property is included in Attachment A.

13.     Mordechai Korf, also known as "Motti," is a Miami-based business associate of Kolomoisky and Boholiubov.  He helped to acquire and manage the Ukrainian oligarchs' business empire in the United States.  Along with Kolomoisky and Boholiubov, Korf was a part owner of dozens of U.S. entities, for which he often acted as President and CEO.  The companies owned and controlled by Korf generally share variations of the name "Optima."   Korf was also a part owner of PrivatBank's Latvia affiliate.

14.     Uriel Laber is another Miami-based associate of Kolomoisky and Boholiubov, and is Korf's business partner.  He worked with Korf to acquire and manage U.S.-based entities for Kolomoisky and Boholiubov under the "Optima" umbrella of companies.  Laber also serves on the supervisory board of Ukrnafta, a Ukrainian oil and gas company, in which Privat Group has a significant share.  Like Korf, Laber was a part owner of PrivatBank's Latvia affiliate.

15.     The interests of Mordechai Korf, Uriel Laber, Ihor Kolomoisky, and Gennadiy Boholiubov may be adversely affected by these proceedings.

## FACTUAL ALLEGATIONS

16.     Over the course of more than a decade, Ihor Kolomoisky and Gennadiy Boholiubov used their control of PrivatBank to steal billions of dollars of the bank's funds.  The magnitude of the fraud and theft was so great that NBU was forced to bail out the bank by providing $5.5 billion in order to stave off economic crisis for the whole country.

17.     The idea was simple: Kolomoisky and Boholiubov requested money from PrivatBank, which (based on their control and ownership) they always received, and rarely paid it back, except by taking out additional loans from PrivatBank.

18.     The mechanics of the scheme were complex.  Kolomoisky and Boholiubov used a substantial collection of companies they owned or controlled to apply for loans from PrivatBank.

An army of functionaries at PrivatBank then papered and processed the loans as if they were legitimate. A "special" credit committee at the bank approved the loans, despite misrepresentations in the applications. The loan proceeds were then divided, combined, and transferred through a vast network of companies, generally using accounts at PrivatBank's Cyprus branch, to disguise their nature, source, ownership, and control. Eventually, the money was sent all over the world. When the loans came due, other loans were used to pay off the old loans, or, in some cases, they were repaid with income from the investment of the misappropriated funds.

19.     Kolomoisky and Boholiubov further laundered the money by investing in the United States. They enlisted Mordechai Korf and Uriel Laber, who had previously run businesses in Ukraine and the U.S., for that purpose. Korf and Laber established a network of companies, generally under some variation of the name "Optima," to acquire businesses and real estate in the U.S. using the misappropriated money from PrivatBank.

20.     Using Korf and Laber's network, Kolomoisky and Boholiubov spent prolifically: they purchased more than five million square feet of commercial real estate in Ohio, steel plants in Kentucky, West Virginia, and Michigan, a cellphone manufacturing plant in Illinois, and commercial real estate in Texas.

21.     In 2008, they purchased 55 Public Square in Cleveland, Ohio. The money used to purchase 55 Public Square was directly traceable to a loan obtained from PrivatBank by Kolomoisky and Boholiubov. The money was the proceeds of embezzlement, misappropriation, and fraud.

## I.   Kolomoisky And Boholiubov Stole Billions From PrivatBank

### A.   Kolomoisky and Boholiubov Controlled PrivatBank.

22.   Kolomoisky and Boholiubov founded PrivatBank in 1992.  By 2008, and through 2016, each owned roughly 45% of the bank.

23.   Kolomoisky and Boholiubov exercised control over PrivatBank as its majority shareholders.  The "general meeting" of shareholders was the highest decision-making authority of PrivatBank, and Kolomoisky and Boholiubov controlled approximately 90% of the "votes." Through that authority, they could, among many other things, appoint and remove members of the Supervisory Board and the Audit Committee, and change the bank's bylaws.

24.   Kolomoisky and Boholiubov also exercised control through their domination of PrivatBank's Supervisory Board.  From at least 2010 to mid-2015, Kolomoisky and Boholiubov were two of the three members of the Supervisory Board, and Boholiubov was the Chairman.  That gave them unchecked power over the Board's decisions.[2]

25.   The Supervisory Board was tasked with the selection and removal of members of PrivatBank's management.  Kolomoisky and Boholiubov used that authority to install their lieutenants in key roles at PrivatBank—particularly in positions that controlled disbursement of the bank's money.  One of those individuals was Manager 1.  Another was Manager 2, who was frequently referred to as "Kolomoisky's Treasurer" or his right-hand man.  Manager 2 served as the Head of PrivatBank's Investment Business and as First Deputy Chairman of PrivatBank's

---

[2]     In late 2015, as discussions with NBU began, and nationalization became a possibility, additional members were added to the Supervisory Board.  Yet Kolomoisky and Boholiubov continued to control the Supervisory Board and the bank—as majority shareholders, they had the power to appoint and remove members of the Supervisory Board.

Management Board from 2002 until December 2016.  In those positions, he acted at the direction and for the benefit of Kolomoisky and Boholiubov.[3]

26.     The Supervisory Board also had the responsibility to approve high-value loans and was obligated to protect the bank's interests.  Contrary to those interests, the Board routinely signed off on loan applications to entities owned and controlled by Kolomoisky and Boholiubov.

27.     The Supervisory Board was further charged with selecting the bank's auditor and determining the agenda for audits.  It thus fell to Kolomoisky and Boholiubov, and their hand-selected subordinates, to ensure that the bank complied with Ukrainian law and that no one was pilfering its resources.

28.     Kolomoisky and Boholiubov had a reputation in Ukraine that led employees of PrivatBank to follow orders.  Kolomoisky in particular was known for ruthlessness and even violence that inspired loyalty—while he was governor of Dnipropetrovsk province, he was known to have paid armed goons to take over the offices of a state-owned oil company.  The employees of the bank understood that management's instructions were Kolomoisky and Boholiubov's orders, and orders were followed.

29.     If employees did express dissent, they would lose their bonuses, have work taken away, or simply be fired.  Those consequences were particularly harsh in context:  PrivatBank offered the highest paying jobs in the region.

---

[3]     Manager 2 also assisted in managing Kolomoisky and Boholiubov's investment of the misappropriated funds from PrivatBank in the US.  For instance, he was involved in a decision to lend funds to Warren Steel Holdings LLC, a business in Ohio that was ultimately beneficially owned by Kolomoisky, Boholiubov, Korf, and Laber.

30.     During the nationalization process in 2016, NBU and its representatives dealt primarily with Kolomoisky and Boholiubov in negotiating the terms of the agreement.  NBU and others understood that Kolomoisky and Boholiubov were in control.

31.     At the end of the nationalization process, Kolomoisky and Boholiubov signed a letter on December 16, 2016 personally taking responsibility for the changes that PrivatBank was required to undertake.

**B.      Kolomoisky and Boholiubov Embezzled Money and Defrauded the Bank.**

32.     Despite having significant wealth, Kolomoisky and Boholiubov devised a scheme to take the bank's funds—money entrusted to it by ordinary depositors—for themselves.

33.     To that end, they converted a department within PrivatBank to service accounts for them and their companies.  The department was called "BOK," or "Business Client Management," and was headed by Manager 1.

34.     Kolomoisky and Boholiubov, with the assistance of Manager 1, Manager 2, and others, caused PrivatBank (via BOK) to issue billions of dollars in loans to companies they owned or controlled ("related parties").   The related parties included, among others, Zaporozhye Ferroalloy Plant ("ZFZ"), Nikopol Ferroalloy Plant ("NZF"), and Ordzhonikidze Mining & Processing Plant ("OGZK"), all of which were owned by Kolomoisky and Boholiubov.

35.     For instance, loan applications totaling more than $126 million were submitted under NZF's name in 2010 alone.  Examples include:

| Loan Number | Date | Amount |
|---|---|---|
| 4N10122D | 7/1/2010 | $14,000,000 |
| 4N10130D | 7/1/2010 | $14,000,000 |
| 4N10121D | 7/1/2010 | $14,000,000 |
| 4N10149D | 8/2/2010 | $14,000,000 |
| 4N10221D | 9/1/2010 | $14,000,000 |

| 4N10224D | 9/1/2010 | $14,000,000 |
| 4N10220D | 9/1/2010 | $14,000,000 |
| 4N10261D | 10/1/2010 | $14,000,000 |
| 4N10263D | 10/1/2010 | $14,000,000 |

36. During the same period, loan applications totaling more than $21 million were submitted under ZFZ's name. Examples include:

| Loan Number | Date | Amount |
| --- | --- | --- |
| 4Z10282D | 10/1/2010 | $1,000,000 |
| 4Z10283D | 11/1/2010 | $9,300,000 |
| 4Z10269D | 10/1/2010 | $1,000,000 |
| 4Z10270D | 10/1/2010 | $1,000,000 |
| 4Z10330D | 11/30/2010 | $9,300,000 |

37. And in 2010 and 2011, loan applications totaling approximately $90 million dollars were submitted under OGZK's name. Examples include:

| Loan Number | Date | Amount |
| --- | --- | --- |
| 4O10091D | 4/1/2010 | $50,000,000 |
| 4O11037D | 2/1/2011 | $40,000,000 |

38. Kolomoisky and Boholiubov also caused hundreds of millions of dollars in loans to be issued to entities they owned that conducted little or no business at all, and which effectively existed only to steal from PrivatBank and launder the misappropriated funds. Examples include:

| Loan Number | Date | Amount |
| --- | --- | --- |
| CY001I/4 | 2/4/2013 | $20,000,000 |
| CY00XC/12 | 2/18/2015 | $3,132,000 |

39. By the time the bank was nationalized in 2016, approximately 97% of the corporate loans outstanding were to businesses owned or controlled by Kolomoisky and Boholiubov.

40.     Unlike the other 3% of loans—the legitimate loans—the related parties' loan applications and files were prepared by PrivatBank employees working as part of BOK, a separate department of the bank.

41.     The loan applications were almost always fraudulent.  The most glaring misrepresentation was the stated "purpose" of the loan.  Loan applications included a section requiring the applicant to describe the loan's purpose.  The applications submitted by the related parties generally claimed that the purpose was to fund ongoing operations of the business entity applying for the loan.  Instead, the money was sent wherever Kolomoisky and Boholiubov wanted, and was often used *by a completely different entity*, for whatever purpose they devised.  Those misrepresentations were material: the loan agreements stated that the loans must be used for the purpose stated in the application.

42.     For instance, the application for Loan No. 4Z1195D for $14,850,500 stated that the loan's purpose was "funding ongoing operations" of ZFZ, which produced ferroalloys in Ukraine.  Instead, a significant portion of the loan was used by Pavanti Enterprises Limited ("Pavanti"), a Kolomoisky-owned entity with an account at PrivatBank Cyprus, to purchase a commercial building in downtown Cleveland, Ohio.

43.     Other examples of misrepresentations related to the purpose of the loan include:

| Loan No. | Amount | Misrepresentation of the Loan's Purpose |
|---|---|---|
| CY001I/4 | $20,000,000 | The stated purpose of the loan was "the replenishment of floating assets . . . including, for manganese ore;" instead, the funds were used to purchase Kentucky Electric Steel, a steel plant in Kentucky. |
| 4N1212D | $12,000,000 | The stated purpose of the loan was "[f]unding ongoing operations" related to the production of ferroalloys in Ukraine; instead, the funds were used to purchase One Cleveland Center, a commercial high rise in Cleveland, Ohio. |
| 4N09128D | $14,000,000 | The stated purpose of the loan was "[f]inancing current activities" related to the production of ferroalloys in Ukraine; instead, a portion of the funds were sent to Korf and Laber's personal accounts. |

| 4A1531D | $60,000,000 | The stated purpose of the loan was "[f]unding ongoing operations" related to wholesale and retail trade; instead, a portion of the funds was used to purchase a Motorola manufacturing facility in Harvard, Illinois. |

44.　　Those misrepresentations constituted a fraud by and on PrivatBank. PrivatBank was put at serious financial risk and was harmed because of those lies, which violated Ukrainian law and PrivatBank's internal policies.

45.　　The applications contained additional misrepresentations.  Generally, they stated that the loans would be repaid with income earned through current business activities.  Instead, in many instances, the loans were repaid with the proceeds of other loans.

46.　　Again, there are numerous examples of that fraudulent activity, which include:

| Loan No. | Amount | Misrepresentation of the Source of Repayment |
| --- | --- | --- |
| 4N09129D | $14,000,000 | The loan application stated that the loan would be repaid via funds earned through ferroalloy production; instead, it was repaid with funds from two other loans. |
| 4D09111I | 500,000,000 Ukrainian Hryvnia ("UAH")[4] | The loan application stated that the loan would be repaid via funds earned through ongoing operations; instead, it was repaid with funds from two loans to other related parties. |

47.　　Those misrepresentations constituted a fraud by and on PrivatBank.  The source of loan repayment was material as a part of the bank's risk assessment.  Although on paper, certain loans were paid when they came due, in reality, they were being paid through the issuance of additional debt, and so PrivatBank was simply recycling the loans and increasing its losses.

48.　　Additionally, the loan applications contained misrepresentations related to the collateral securing the loan.  Like the source of loan repayment, the nature and value of collateral was material to the bank's decision to issue a loan.

---

[4]　　Eight months after the loan was issued, the loan amount was increased to 750,000,000 UAH, or approximately $92 million at the 2009 exchange rate.

49.     For example, the application for Loan No. CY001I/4 for $20 million by Veroni Alloys LLC ("Veroni"), a Kolomoisky-owned shell entity, referenced collateral in the form of the goods to be traded based on contracts between Veroni and Halefield Holdings Limited ("Halefield"), another shell company owned and controlled by Kolomoisky and Boholiubov. The contract provided that Veroni would purchase $122,500,000 of Australian manganese ore from Halefield and sell it to Hangli International Holdings Limited ("Hangli"), another shell entity controlled by Kolomoisky and Boholiubov. No such purchases or sales of Australian manganese occurred.

50.     Frequently, the "loans" taken by Kolomoisky and Boholiubov's entities were lines of credit—a source of funds that could be drawn on whenever convenient. The lines of credit, by their terms, were supposed to be used to fund ongoing business of the entities that received them. However, they functioned instead as slush funds—a big pot of money that Kolomoisky and Boholiubov drew on for whatever purpose they wanted, and often used to send cash to the United States for investment by unrelated entities.

51.     For instance, Loan No. 4Z10330D was a line of credit for $9,300,000 to ZFZ, an entity owned by Kolomoisky and Boholiubov. Between December 2010 and December 2011, ZFZ debited over $19.9 million against the line of credit.

52.     As discussed above, Kolomoisky and Boholiubov often repaid the lines of credit by taking out additional loans. In the case of Loan No. 4Z10330D, nearly $8 million of the repayment came from other loan proceeds.

53.     When Kolomoisky and Boholiubov's entities applied for those "second tier" loans, they did not disclose that they would use them to pay back prior loans. PrivatBank was never

made whole—it simply kept lending more money to pay back old loans, which eventually led to the more than $5 billion shortfall.

54.    At PrivatBank, there were two different committees that reviewed loan applications.  There was an "active credit committee," which was responsible for consumer credit.  The members of the committee met in person, deliberated about the bank's lending activity, and considered PrivatBank's written policies.  They required documentation and conducted inquiries before issuing loans.

55.    Kolomoisky and Boholiubov went to a different credit committee to get their loans approved.  That was a "remote" or "electronic" credit committee, which reviewed applications for related party loans.  The committee did not meet in person to discuss the loans; rather, it held electronic "meetings" via a system called PrivatDoc.

56.    The "electronic" committee consisted of certain PrivatBank employees who were otherwise entirely uninvolved in the loan approval process.  Those employees understood that their role was simply to "sign" the loan electronically.  Rather than conducting a thorough inquiry, members of the electronic credit committee simply hit "approve" whenever they received a loan application from one of Kolomoisky or Boholiubov's companies.  They conducted no analysis or evaluation of the loans or associated documents as required by bank policy, and they were expected not to do so.

57.    That lack of review is thrown into particularly sharp relief by the treatment of collateral for loans to Kolomoisky and Boholiubov's entities.  In multiple instances, PrivatBank employees noted that additional work was needed to verify the collateral, and yet the loan was approved the very same day, without further investigation or amendment.

58.     Examples of the electronic credit committee disregarding collateral requirements for loans for Kolomoisky and Boholiubov's entities, which would have been applied by the regular credit committee, include:

| Loan No. | Amount | Misrepresentation of the Collateral |
|----------|--------|-------------------------------------|
| 4N09129D | $14,000,000 | Internal paperwork noted that collateral had not been provided for the loan; nevertheless, the loan was approved that same day and signed by Boholiubov as chairman of the Supervisory Board. |
| 4A1532D | $46,500,000 | Internal paperwork noted that it needed information on contracts referenced as collateral and could only approve the loan once that was received; nevertheless, the loan was approved that same day. |
| 4O10091D | $50,000,000 | Internal paperwork noted that work was underway to increase collateral; nevertheless, the loan was approved that same day. |
| 4N11415D | $13,500,000 | Internal paperwork noted that work was underway to increase collateral; nevertheless, the loan was approved that same day. |

59.     The dual approach—one for entities owned and controlled by Kolomoisky and Boholiubov, and one for most everyone else—was also evident in the loan packages. While legitimate loan packages might contain "a huge book" of documents analyzing collateral for a loan, the package for multi-million-dollar loans to Kolomoisky and Boholiubov's entities might have as little as "just one page."

60.     Kolomoisky and Boholiubov's misappropriation of the bank's funds constituted embezzlement and conversion.  The funds had been entrusted to the bank by ordinary depositors and legitimate businesses; Kolomoisky and Boholiubov siphoned them off and never expected to pay the money back.[5]

---

[5]     In fact, just before the bank was nationalized, loans to entities owned or controlled by Kolomoisky and Boholiubov were restructured, effectively delaying the repayment of outstanding debt for almost another decade.

61.     Kolomoisky and Boholiubov's misappropriation of the bank's funds also constituted a fraud on the bank.  The many material misrepresentations allowed them to take the money to use as they wanted, without restriction, and hid the misuse of funds from regulators, depositors, auditors, and others.

62.     Kolomoisky and Boholiubov's also constituted a fraud by the bank, because the bank gave funds entrusted to it to Kolomoisky and Boholiubov's entities, putting the depositors at great risk and misusing their money.

**C.      Kolomoisky and Boholiubov's Actions Violated Ukrainian Law.**

63.     Kolomoisky and Boholiubov's conduct violated numerous provisions of the Ukrainian Criminal Code, including the following:

64.     Article 190, which prohibits "Taking possession of somebody else's property or obtaining the property title by deceit or breach of confidence (fraud)."

65.     Article 191, which prohibits "Misappropriation, embezzlement or conversion of property by abuse of office."

66.     Article 209, which prohibits laundering the proceeds of a crime.

67.     Article 218-1, which makes it illegal to drive a bank into insolvency.

68.     Article 219, which makes it illegal to drive a business entity into insolvency.

69.     Article 220-2, which prohibits the falsification of financial documents and reports of a financial organization.

70.     Article 222, which prohibits fraud with financial resources.

71.     Article 364-1, which prohibits the abuse of power by an official of a private legal entity.

**D.      Kolomoisky and Boholiubov Laundered the Loan Proceeds.**

72.     Once the loan or line of credit funds were disbursed, they were quickly combined, divided, and comingled in a labyrinth of accounts all over the world.  The dizzying series of transfers was designed to disguise the nature, location, source, ownership, and control of the fraudulently obtained loan proceeds.

73.     The entities used to transfer the funds were often shell companies—they did no business and had no offices or employees; they existed only to disguise money by shuttling it from place to place.

74.     Many of the shell companies used the same address.  For instance, in "Know Your Customer" records provided to PrivatBank, at least 56 separate entities claimed to be located at Archiepiskopou Makariou Ill Avenue, 155 Proteas House in Limassol, Cyprus.  They also used the same few registered agents repeatedly: Icaza, Gonzalez Ruiz & Aleman (BVI) Trust Limited was listed as the registered agent for 21 separate shell entities, and Equity Management & Accountancy Corp was listed as the registered agent for 16 shell entities.  The same two authorized signers (neither of whom was Kolomoisky or Boholiubov) together appear for 48 different shells entities.

75.     In the same records, Kolomoisky and Boholiubov were listed as the beneficial owners of 35 shell entities that were used to transfer money misappropriated from PrivatBank.  At least 96 entities used in those transactions shared a secretary, director, signer, registered agent, shareholder, or address with one of the entities overtly owned by Kolomoisky and Boholiubov, and many shared multiple individuals in common.

76.     PrivatBank employees were directed to act as officers and directors of those shell companies and were instructed by their PrivatBank supervisors to sign documentation to that

effect.  At least 59 different shell entities listed PrivatBank employees in such roles.  However, those employees were not bona fide officers and directors—they exercised no duties and responsibilities of officers and directors of the companies, which were empty shells.

77.    Once the funds were taken from PrivatBank, they were transferred quickly among dozens of accounts held in the names of shell entities at the Cyprus branch of PrivatBank.  Multiple transfers often occurred within minutes.

78.    NBU conducted a review of the Cyprus branch of PrivatBank as part of its investigation and determined that it was an instrument used to launder money for Kolomoisky and Boholiubov.  NBU found that the branch's assets were overwhelmingly fictional; that the branch's loan portfolio consisted almost exclusively of oversize loans to entities owned and controlled by Kolomoisky and Boholiubov; that the collateral provided was insufficient and did not meet regulatory requirements; and that the purpose of the loans issued by the branch was to hide the ultimate beneficiaries and the source of funds.  NBU determined that the management of PrivatBank's Cyprus branch was controlled by PrivatBank in Ukraine—in other words, by Kolomoisky and Boholiubov.

79.    One example of the Cyprus branch's role in laundering the misappropriated funds is the cycling of the funds disbursed as Loan No. CY001I/4 to Veroni.  On February 4, 2013, $20 million from the loan was disbursed into Veroni's account at PrivatBank's Cyprus branch.  As with the other loans, its purpose and use were misrepresented to the bank.  The purpose was listed as "replenishment of floating assets for payments according to contracts, including for manganese ore."  Instead, the funds went to purchase a steel plant in Kentucky.  But before the money was transferred to the United States, the loan proceeds were deposited and then withdrawn from the accounts of 13 different shell entities in a total of 17 transactions at PrivatBank's Cyprus branch—

all in only 8 minutes.  The transactions served no business purpose; they were designed entirely to hide the source and nature of the funds.

## II.     Korf And Laber Created A Vast Network Of Companies To Launder The Stolen Money And Invest It In The United States

80.     The laundering did not stop in Cyprus.  Kolomoisky and Boholiubov recruited their American counterparts, Korf and Laber, for the next step.  Korf and Laber established a complex system of entities in order to facilitate the laundering of the misappropriated funds, and to invest the funds in property and businesses in the United States.

81.     The companies often used a variation of the name "Optima"—Optima Ventures, Optima Group, etc.  The "Optima Family" of companies had a convoluted ownership structure that constantly shifted as new entities were created to move money, disguise ownership of assets, and otherwise launder funds.

82.     The Optima Family included (among many others) the following entities, which were created, owned, or managed by Korf and Laber:

a.     Optima International of Miami, Inc. ("Optima International") was founded by Korf and Laber in 1994.  Korf and Laber were the initial owners, and they sold shares of Optima International and its subsidiaries to entities owned or controlled by Kolomoisky.

b.     Optima Group, LLC ("Optima Group") was incorporated on August 8, 2008 in Delaware.  It is owned[6] by Kolomoisky, Boholiubov, Korf, and Laber.  Korf had authority to direct Optima Group's funds but discussed those decisions with both Kolomoisky and Boholiubov.

---

[6]     Throughout Paragraph 86 and its subsections, "owned" means "ultimately beneficially owned."  Kolomoisky, Boholiubov, Korf, and Laber "owned" entities both directly and indirectly, through a collection of other entities.

c.  Optima Ventures LLC ("Optima Ventures") was incorporated on January 1, 2008 in Delaware.  Optima Ventures was owned by Kolomoisky, Boholiubov, Korf, and Laber.  It was the primary vehicle used to acquire property in the United States with misappropriated funds from PrivatBank.  Through that activity, it became the largest holder of commercial real estate in Cleveland, Ohio.  Korf and Laber established many entities under Optima Ventures to acquire properties, including:

i.  Optima 55 Public Square, LLC ("Optima 55 Public Square"), used, as discussed in detail below, to acquire the building at 55 Public Square in Cleveland, Ohio.

ii.  Optima One Cleveland Center, LLC, used to acquire the building at One Cleveland Center in Cleveland, Ohio.

iii.  Optima 1375, LLC, used to transfer ownership of One Cleveland Center in 2010.

iv.  Optima 1300, LLC, used to acquire the AECOM Building in Cleveland, Ohio.

v.  Optima 777, LLC, used to acquire the Crowne Plaza Hotel (now known as the Westin Hotel) in Cleveland, Ohio.

vi.  Optima Stemmons, LLC, used to acquire the Stemmons Tower building at 8777 North Stemmons Freeway in Dallas, Texas.

vii.  Optima 7171, LLC ("Optima 7171"), used to acquire the CompuCom Campus located at 7505 and 7171 Forest Lane in Dallas, Texas.[7]

---

[7]  This property is the subject of a civil forfeiture complaint in this District, No. 20-cv-23278-MGC.

viii.     Optima 500, LLC, used to acquire the PNC Plaza building at 500 West Jefferson Street in Louisville, Kentucky.[8]

ix.     Optima 925, LLC, used to acquire the Huntington Building at 925 Euclid Avenue in Cleveland, Ohio.

d.     Georgian American Alloys, Inc. ("Georgian American Alloys") was incorporated on February 14, 2012 in Delaware.  Georgian American Alloys was owned by Kolomoisky, Boholiubov, Korf, Laber, and one of their business associates. Approximately 35% of their ownership was through Optima Group.  Georgian American Alloys was the umbrella under which Kolomoisky, Boholiubov, Korf, and Laber owned and managed several ferroalloys producers and traders in the United States:

i.     CC Metals and Alloys LLC, a Delaware company with a ferroalloy plant in Calvert City, Kentucky.

ii.     Georgian American Alloys Sarl, a Luxembourg entity.

iii.     Felman Production, LLC ("Felman Production"), a Delaware company with a ferroalloy plant in New Haven, West Virginia.  Felman Production had a bank account at PrivatBank's Cyprus branch, received loans from PrivatBank, and transferred over $225 million to and from entities owned and controlled by Kolomoisky and Boholiubov from 2008 to 2014.

iv.     Felman Trading Inc., a New Jersey company and global supplier of manganese and ferroalloys.

---

8     This property is the subject of a civil forfeiture complaint in this District, No. 20-cv-23279-MGC.

e.      Optima Acquisitions, LLC ("Optima Acquisitions") was incorporated on June 25, 2008 in Delaware.  Optima Acquisitions is owned in thirds by Kolomoisky, Boholiubov, and Korf, and was used to acquire companies in the United States using money misappropriated from PrivatBank, including Optima Specialty Steel, Inc. and Steel Rolling Holdings, Inc.

f.      Optima Specialty Steel, Inc. ("Optima Specialty") was a wholly owned subsidiary of Optima Acquisitions created in 2008.  Using Optima Specialty and funds misappropriated from PrivatBank, Korf and Laber acquired or created Michigan Seamless Tube LLC, Niagara LaSalle Corporation, KES Acquisition Company d/b/a Kentucky Electric Steel, and Corey Steel Company.

g.      Warren Steel Holdings, LLC ("Warren Steel") was incorporated on November 19, 2001 in Delaware.  Warren Steel is owned by Kolomoisky and Boholiubov and one of their former business partners.  Warren Steel ran a steel mill in Warren, Ohio and was managed by Korf.

h.      Optima 1375 II, LLC ("Optima 1375 II") was incorporated on September 7, 2017 in Delaware in order to receive ownership of One Cleveland Center from Optima 1375.  According to Korf and Laber, it is owned by them (50% each), but on information and belief, it is controlled by Kolomoisky and Boholiubov.  The transfer was designed to obscure the ownership of One Cleveland Center and to further disguise the source of the funds for the building.

i.      Optima 925 II LLC ("Optima 925 II") was incorporated on June 4, 2015 in Ohio.  Optima 925 transferred its ownership of the Huntington Building to Optima 925 II, which subsequently merged with a third-party purchaser to acquire the building.  Optima

925 II was created in order to obscure Kolomoisky and Boholiubov's ownership interest in the building.

j.      Felman Trading Americas, Inc. was incorporated in Delaware on April 9, 2018.  According to Korf and Laber, it is owned by them (50% each), but on information and belief, it is controlled by Kolomoisky and Boholiubov.  It was created to obscure Kolomoisky and Boholiubov's ownership interest in Felman Trading Inc.

83.     Korf and Laber used the Optima Family as a single, giant pot of money.  They transferred funds back and forth between the different entities—that is why, for instance, Korf arranged for a manganese ore importer to pay for the restructuring of a commercial real estate building in Kentucky.  Korf discussed transfers with Kolomoisky and Boholiubov, and they approved the use of the money.

84.     There are many examples of this "slush fund" approach to related business entities (which was similar to Kolomoisky and Boholiubov's approach to PrivatBank).  On one occasion, Korf directed that Optima Acquisitions loan approximately $19 million to Warren Steel.  When the loan came due, Korf, with the approval of Kolomoisky and Boholiubov, issued new loans from another related entity to pay back Optima Acquisitions.

85.     In yet another example, Optima Ventures loaned money to Warren Steel, which then took a loan from Felman Trading Inc. to pay back the initial loan.

86.     Those inter-entity loans for tens of millions of dollars occurred despite it not being the entities' business to make loans to other companies.

87.     The transactions allowed Kolomoisky, Boholiubov, Korf, and Laber to launder the money, to promote the continued misappropriation of funds from PrivatBank, and to disguise the ownership, nature, and source of funds.

88.     A majority of the members of the Optima Family of companies had their principal place of business at the same suite of offices at 200 South Biscayne Boulevard in Miami, Florida. As Korf and Laber's resources expanded, they moved from the 30th floor to the 36th and finally the 55th floor—the penthouse.

89.     Korf and Laber played critical roles in the scheme to launder proceeds of unlawful activity.  They interacted directly with PrivatBank management, including Manager 1, Manager 2, and Manager 3 (head of the PrivatBank Credit Committee), regarding loans.  They also had personal relationships with PrivatBank's management, including Manager 1 and Manager 3.  Korf and Laber requested loans for Optima Family members and received them.

90.     And Korf and Laber benefitted from their roles in the scheme.  In certain cases, misappropriated funds from PrivatBank went into Korf and Laber's personal accounts.  For instance, from September 2009 through April 2010, over $13 million was transferred from Optima International's account to accounts in the name of Korf, Laber, and their families.  And funds from Optima International were used to pay for Korf and Laber's personal expenses.

91.     Korf and Laber took many steps to hide the identity and ownership of their "partners," and the fact that the money they spent under the Optima name had initially come from PrivatBank loans.  Among other things, they (1) made quick transfers of funds among entities, which served no business purpose; (2) used misleadingly similar names of entities and changed those names with no legitimate business purpose; (3) used a convoluted ownership structure of their many entities to hide the true beneficial ownership of assets; and (4) changed the ownership structure of the Optima Family of companies as Kolomoisky and Boholiubov's crimes in Ukraine were made public.

### III.     Optima Purchased 55 Public Square With Funds Misappropriated From PrivatBank

92.     In 2008, Korf, Laber, Kolomoisky, and Boholiubov purchased 55 Public Square, the Defendant Asset, in Cleveland, Ohio.  The building, built in 1958, is a 22-story, 430,000 square foot office tower located in Cleveland's business district.

93.     At the time, 55 Public Square was owned by Willett Companies LLC via Willsquare Holdings LLC and the holding company 55 Public Square LLC.

94.     To acquire the property, Korf and Laber incorporated Optima 55 Public Square in Delaware on April 29, 2008 and registered it in Ohio on May 5, 2008.  The mailing address was 200 South Biscayne Boulevard, Miami, Florida.  Optima 55 Public Square was a wholly owned subsidiary of Optima Ventures, which also operates from 200 South Biscayne Boulevard, Miami, Florida.

95.     Optima International, which is located at the same Miami office, entered into a purchase and sale agreement with 55 Public Square LLC on March 6, 2008.  Optima 55 Public Square was then substituted as the purchaser.

96.     On July 10, 2008, Optima 55 Public Square completed the purchase of the Defendant Asset for $34,000,000.  Korf signed the paperwork associated with the purchase.

97.     The purchase included Optima 55 Public Square's assumption of the outstanding mortgage of $21,844,014.41 from 55 Public Square LLC, Loan Number 03-0250448.

98.     It also included a payment of $12,832,838.76 in cash, which covered various closing fees.  That payment, as explained below, included funds misappropriated from PrivatBank.

## A. The Money Used to Purchase 55 Public Square Was Proceeds of Fraud and Embezzlement.

99.     The funds used to purchase the Defendant Asset came from a loan from PrivatBank to Southern Mining and Processing Plant Joint Stock Company[9] ("Southern Mining").  Southern Mining was an iron mining and processing operation based in Dnipropetrovsk province, Ukraine, where Kolomoisky was later named governor and where PrivatBank and many of Kolomoisky's other business interests were located.  Southern Mining was partially owned and controlled by Kolomoisky via several shell companies.  The entity held accounts at PrivatBank Ukraine.

100.    On June 27, 2008, Southern Mining withdrew approximately 136,080,826 UAH, or approximately $28,769,730,[10] from the proceeds of a loan it received from PrivatBank.

101.    The stated purpose of the loan in the loan application materials was the financing of Southern Mining's business activities, namely, mining and processing iron ore in Ukraine. Those representations were false—the funds were instead used by an entirely unrelated entity, Optima 55 Public Square, to purchase the Defendant Asset, an office building in Cleveland.

102.    The loan proceeds were combined, divided, and transferred through multiple PrivatBank Ukraine and PrivatBank Cyprus accounts in a matter of days to hide their source, and the fact that they had been misappropriated.

103.    On June 26, 2008, the day before the loan draw, Southern Mining sent approximately 465,619,574 UAH in a series of five transactions over the course of three minutes from two of its accounts at PrivatBank Ukraine to an account at PrivatBank Ukraine in the name of Energy Alliance Group LLC.  Another 193,000,000 UAH was transferred into the same Energy

---

[9]     Company names in Russian or Ukrainian are translated or transliterated.

[10]    The exchange rate in late June 2008 was approximately 4.73 UAH to 1 U.S. dollar.

Alliance Group LLC account via two transactions on June 26 and June 27, 2008 from a PrivatBank account in the name of Kremenchuk Steel Plant.

104.     On June 27, 2008, in three transactions that occurred from approximately 5:28-5:29 PM, Southern Mining transferred the 136,080,826 UAH in misappropriated loan funds from its loan account to the Energy Alliance Group LLC account and comingled it with the funds that had arrived over the previous day from Southern Mining and Kremenchuk Steel Plant.

105.     Moments later, the now-comingled funds, which included the loan proceeds, were transferred in a series of seven transactions from the Energy Alliance Group LLC account into an account at PrivatBank Ukraine in the name of Demol-Service Private Enterprise.

106.     Almost immediately after the funds arrived in the Demol-Service Private Enterprise account, a portion of the funds was transferred in a series of five transactions to an account at PrivatBank Ukraine in the name of Company Budtorhtrans LLC.

107.     Approximately three hours later, a portion of the funds was transferred from the Company Budtorhtrans LLC account to an account at PrivatBank Ukraine in the name of Stels LLC.

108.     The funds waited in the Stels LLC account for approximately a week as the closing date for the purchase of 55 Public Square neared.  Then, from July 4 to July 10, 2008, approximately 135,000,000 UAH was sent from the Stels LLC account through accounts in the names of five different entities held at PrivatBank Ukraine and PrivatBank Cyprus.  In the process, the funds were converted into U.S. dollars (approximately $30 million), which eventually arrived in an account in the name of Bonham Business Corp at PrivatBank's Cyprus branch.

109.    On July 10, 2008, the date of the closing, a portion of the comingled funds completed an additional set of transfers through PrivatBank Cyprus that further obscured its original source and identity:

    a.    At 6:01 PM, $12.8 million was transferred from the PrivatBank Cyprus account in the name of Bonham Business Corp to an account in the name of Grammel Holdings Inc.  Prior to the incoming transfer, the Grammel Holdings Inc account had a balance of approximately $187,000.

    b.    At 6:32 PM, $12.86 million was transferred from the account in the name of Grammel Holdings Inc to an account in the name of Ralkon Commercial Ltd, which was beneficially owned by Kolomoisky and Boholiubov.  Prior to the incoming transfer, the Ralkon Commercial Ltd account had a balance of approximately $41,000.

    c.    Within seconds, also at 6:32 PM, that $12.86 million was transferred from the account in the name of Ralkon Commercial Ltd to an account in the name of Pavanti, which was owned by Kolomoisky.  Prior to the incoming transfer, the Pavanti account had a balance of $114.

    d.    Finally, at 7:08 PM, the misappropriated $12.86 million was transferred from the Pavanti account at PrivatBank Cyprus to Fidelity National Title Insurance, with the transfer details indicating "For Purchase of Building on Behalf of Optima 55 Public Square LLC Acc. To Agr. DD 06.03.08."[11]

110.    Thus, on July 10, 2008, loan money, which ostensibly had been provided to fund the ongoing operations of Southern Mining, a Ukrainian mining company, was used by Optima 55

---

[11] Shortly after closing, $20,507.24 of overage was refunded to Optima's attorney.

Public square, with which it had no formal relationship, to purchase the Defendant Asset, an office building in Cleveland.

111.    The applications for, receipt of, and use of those loan funds constituted embezzlement and conversion of PrivatBank's money.  They also constituted a fraud by and on PrivatBank.  The transfers of the money from and within Ukraine to and within Cyprus, and eventually to the United States, were transfers in international commerce and constituted money laundering.  The purchase of the Defendant Asset also constituted both a transfer and receipt of the misappropriated funds in international commerce and money laundering.

112.    The intermediate transfers of the proceeds of the embezzlement and fraud served no legitimate business purpose.  They were designed to conceal and disguise the nature, location, source, ownership, and control of the fraudulently obtained loan proceeds.

113.    The Defendant Asset was purchased with the proceeds of the embezzlement and fraud, and therefore became proceeds of those crimes.  It was also involved in and facilitated the laundering of the misappropriated funds from PrivatBank.

**B.     Optima 55 Public Square Undertook Additional Money Laundering Transactions.**

114.    From 2009 to 2020, over $7.5 million was transferred from accounts in the name of Optima 55 Public Square to accounts in the name of Optima Ventures, which served as a clearinghouse for transfers among the Optima entities.  Korf and Laber used Optima 55 Public Square as they did all of the Optima entities: for mixing money misappropriated from PrivatBank, for funding other Optima entities, and for sending proceeds to their Ukrainian patrons.

115.    For instance, on February 9, 2016, Optima 55 Public Square transferred $95,000 to Optima Ventures.  On that same day, the money was transferred to Optima 500 LLC, which owned the PNC Plaza building in Louisville, Kentucky, and to Optima Harvard Facility LLC.

116.     On September 30, 2016, in three separate transactions, Optima 55 Public Square transferred $268,000 to Optima Ventures, where the money was comingled with funds from Optima 500 and Optima Stemmons, among others.  That same day, $1.5 million of the comingled funds was sent to Pavanti's account at PrivatBank Cyprus.  Approximately two months later, a portion of those funds was transferred through various other entities owned by Kolomoisky.  Additionally, a portion of the funds was transferred to an account in Kolomoisky's name at PrivatBank Cyprus.

117.     Those transactions, essentially recouping and reusing the proceeds of the embezzlement and fraud that had been used to purchase the real estate, were money laundering transactions.  Optima 55 Public Square and the Defendant Asset were mechanisms and conduits for the movement of proceeds of crime.

**C.     55 Public Square Was Used As Collateral for Loans that Were not Repaid.**

118.     In 2015, Optima 55 Public Square defaulted on the mortgage it had assumed in purchasing the Defendant Asset.  Following negotiations, in May 2015, the amount owed was reduced from approximately $19.6 million to $16 million, plus all funds held in escrow at the time (approximately $1 million).  That negotiated agreement gave Korf, Laber, and their Ukrainian patrons a more than $2 million windfall.

119.     Optima of course did not need the accommodation—it had ready access to cash.  To pay back the mortgage, Optima Ventures, rather than Optima 55 Public Square, made an initial $14 million payment to the loan holder on May 13, 2015.  The majority of the funds for that payoff, approximately $13.4 million, came from Grizal Enterprises Limited ("Grizal"), which is owned by Boholiubov and based in the British Virgin Islands.

120.     The $13.4 million was transferred back to Grizal from the Optima network in

September 2015.  Approximately $12.8 million came from the sale of the property owned by Optima 925 II, the Huntington Bank building in Cleveland.  The rest came from Optima 777, which owns the Westin Hotel in Cleveland.

121.    Optima Ventures provided the remainder of the funds for the payoff of the mortgage, approximately $2 million, in January 2016.  Optima Ventures obtained the funds from four other Optima entities, including Optima 7171, which owned the CompuCom Campus in Dallas.  Only $165,000 of the funds used to pay off the mortgage came from Optima 55 Public Square itself.

122.    In April 2017, Optima 55 Public Square took out a new loan from The Battery Group LLC ("The Battery Group") for $10 million.  Prior to securing the loan, Optima Ventures made a deposit of $125,000 on November 14, 2016.  The loan was guaranteed by Korf and was secured by a lien on 55 Public Square.  The loan proceeds were not used for the improvement or operation of 55 Public Square, however.  Instead, they were fed back into the cycle of transfers among the various Optima entities.  The loan money was initially deposited into an Optima Ventures bank account, and from there, was transferred to Optima Acquisitions, and then to Optima Specialty Steel.  Optima 55 Public Square made interest payments on the loan from June 2017 to April 2018.

123.    In November 2017, Optima 55 Public Square took out yet another loan against the Defendant Asset, this time for $8.5 million from 55 Bridge Lending LLC ("55 Bridge Lending").  55 Bridge Lending was created by Optima's attorneys and was funded by unwitting Cleveland-based investors.  Again, the loan proceeds were not used for the benefit of 55 Public Square—they were instead used for other Optima entities.  Specifically, the funds went to refinance properties in Cleveland owned by Optima 1300 and Optima 1375.

124.     In May 2018, Optima 55 Public Square took out another loan from 55 Bridge Lending—bringing the total owed to 55 Bridge Lending to $18.5 million.  A portion of those funds was used to pay back the previous loan taken from The Battery Group.

125.     As with the many loans taken from PrivatBank, Optima 55 Public Square did not pay back the loans from 55 Bridge Lending.  As of the date of this Complaint, Optima 55 Public Square was in default, and 55 Bridge Lending had filed a foreclosure action.  The outstanding amount of the loan is approximately $14.5 million.

126.     The use of the Defendant Asset as collateral to secure loans, and the other transfers associated with the loans, further laundered the misappropriated funds from PrivatBank.  The financing activity involved property traceable to illicit proceeds, specifically 55 Public Square, which facilitated and promoted the laundering scheme.

127.     On December 22, 2020, Optima 55 Public Square entered into a contract to sell the Defendant Asset for $17 million.  The sale would have allowed Optima 55 Public Square to re-convert the proceeds from the original fraud and embezzlement into cash, and resulted in a transfer of more than $10,000 of those proceeds.

## FIRST CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(C)

128.     Paragraphs 1 through 127 above are incorporated by reference as if fully set forth herein.

129.     The Defendant Asset is property that constitutes, or is derived from, proceeds traceable to (i) a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (ii) the international transportation and transfer of stolen, converted, or fraudulently obtained money or property valued over $5,000 (18 U.S.C.

§ 2314); and (iii) the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), all of which are specified unlawful activities under 18 U.S.C. §§ 1956(c)(7)(A) and 1956(c)(7)(B)(iii), or a conspiracy to commit such offenses.

130.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

131.    Paragraphs 1 through 127 above are incorporated by reference as if fully set forth herein.

132.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1957.  Specifically, the Defendant Asset is involved in or is traceable to monetary transactions in criminally derived property of a value greater than $10,000, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315).

133.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

18 U.S.C. § 981(a)(1)(A)

134.    Paragraphs 1 through 127 above are incorporated by reference as if fully set forth herein.

135.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Specifically, the Defendant Asset is involved in or traceable to financial transactions involving the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), and with the intent to promote the carrying on of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

136.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF

18 U.S.C. § 981(a)(1)(A)

137.    Paragraphs 1 through 127 above are incorporated by reference as if fully set forth herein.

138.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

Specifically, the Defendant Asset is involved in or traceable to financial transactions involving the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), and which was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

139.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FIFTH CLAIM FOR RELIEF

18 U.S.C. § 981(a)(1)(A)

140.    Paragraphs 1 through 127 above are incorporated by reference as if fully set forth herein.

141.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2)(A). Specifically, the Defendant Asset was, or is traceable to funds that were, transported, transmitted, or transferred to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of the specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or

34

fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315).

142.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## SIXTH CLAIM FOR RELIEF

18 U.S.C. § 981(a)(1)(A)

143.    Paragraphs 1 through 127 above are incorporated by reference as if fully set forth herein.

144.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2)(B)(i). Specifically, the Defendant Asset was, or is traceable to funds that were, transported, transmitted, or transferred to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or

property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315).

145.     Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## SEVENTH CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

146.     Paragraphs 1 through 127 above are incorporated by reference as if fully set forth herein.

147.     The Defendant Asset is involved in, or is traceable to property involved in, a conspiracy to launder the proceeds of specified unlawful activities in violation of 18 U.S.C. § 1956(h).

148.     Specifically, the Defendant Asset is involved in, or is traceable to funds that were involved in, a conspiracy:

    a.     To engage or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), in violation of 18 U.S.C. § 1957;

b.      To conduct or attempt to conduct financial transactions which involve the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), and with the intent to promote the carrying on of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(A)(i);

c.      To conduct or attempt to conduct financial transactions which involve the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), and which was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

d.      To conduct or attempt to conduct financial transactions which involve the proceeds of specified unlawful activities with the intent to promote the carrying on of the specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the

international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315) in violation of 18 U.S.C. § 1956(a)(2)(A).

e.    To transport, transmit, or transfer to a place in the United States from or through a place outside the United States, knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

149.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, Plaintiff, the United States of America, requests:

1.    The Defendant Asset be proceeded against according to the law and the rules of this Court, and that due notice be given to all the interested parties to appear and show cause why forfeiture should not be decreed.

2.     The Court, for the reasons set forth herein, adjudge and decree that the Defendant Asset be forfeited to the United States of America and disposed of in accordance with existing laws, together with costs, and for such other relief as this Court deems proper and just.

## DEMAND FOR JURY TRIAL

The United States hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

December 30, 2020                    DEBORAH CONNOR, CHIEF
                                     MONEY LAUNDERING & ASSET RECOVERY
                                         SECTION

                    By:     /s/ *Shai D. Bronshtein*
                            Shai D. Bronshtein, Trial Attorney (ID No. A5502665)
                            Michael C. Olmsted, Senior Trial Attorney
                            Peter Steciuk, Trial Attorney
                            Mary Butler, Chief, International Unit
                            Criminal Division
                            United States Department of Justice
                            1400 New York Avenue NW
                            Washington, DC 20005
                            Telephone: (202) 616-5950
                            Shai.Bronshtein@usdoj.gov


                            ARIANA FAJARDO ORSHAN
                            UNITED STATES ATTORNEY

                            /s/ *Adrienne E. Rosen*
                            Adrienne E. Rosen
                            Assistant United States Attorney
                            Court ID No. A5502297
                            U.S. Attorney's Office
                            99 Northeast Fourth Street, 7th Floor
                            Miami, Florida 33132-2111
                            Telephone: (305) 961-9338
                            Adrienne.Rosen@usdoj.gov

## <u>VERIFICATION</u>

Matthew M. Hoke, being of legal age, verifies, and pursuant to 28 U.S.C. § 1746(2), declares and states as follows:

1.     I am a supervisory special agent with the FBI and am assigned to the investigation in this case.

2.     I have reviewed the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and, as to those matters, I believe them to be true.

3.     The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation of this case, together with others, as a supervisory special agent.

I hereby declare under penalty of perjury that the foregoing is true and correct.



Matthew M. Hoke
Supervisory Special Agent

Attachment A

LEGAL DESCRIPTION

Parcel No. 1

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio and known as being
Sublot Nos. 19, 20 and 21, part of Sublot Nos. 18 and 22, part of Alleys Nos. 1 and 2 (now
vacated) all in Simon Perkins Subdivision of part of Original Two Acre Lot Nos. 55, 56 and 57,
as shown by the recorded plat in Volume F of Deeds, Pages 264 and 265 of Cuyahoga County
Records, part of Broome Court N.W. (now vacated), and part of Original Two Acre Lot Nos. 58
and 59, and bounded and described as follows:

Beginning at a point in the centerline of St. Clair Avenue N.W., 99 feet wide, at its intersection
with the centerline of West 3rd Street, formerly Seneca Street, 99 feet wide, and from which
point an iron monument found in the centerline of West 3rd Street bears South 34 deg. 03' 42"
East, 0.10 feet; thence North 55 deg. 56' 37" East along the centerline of St. Clair Avenue,
132.92 feet to a nail set at its intersection with the Northeasterly line of said Original Lot No. 57;
thence South 34 deg. 03' 33" East along the Northeasterly line of said Original Lot No. 57, 49.50
feet to a drill hole set at its intersection with the Southeasterly line of St. Clair Avenue, and the
principal place of beginning of the parcel herein described; thence North 55 deg. 56' 37" East
along the Southeasterly line of St. Clair Avenue, 66.59 feet to a drill hole set at its intersection
with the Southwesterly line of a parcel of land conveyed to First Union Real Estate Equity and
Mortgage Investments by deed recorded in Volume 98-01915, Page 30; thence South 34 deg.
03'23" East along the Southwesterly line of said land conveyed to First Union Real Estate Equity
and Mortgage Investments, 173.74 feet to its intersection with the Southeasterly line of said land
so conveyed; thence North 55 deg. 53'12" East along the Southeasterly line of said land
conveyed to First Union Real Estate Equity and Mortgage Investments, being also the centerline
of vacated Broome Court N.W., formerly 16.5 feet wide, 142.80 feet to a nail set at its
intersection with the Southwesterly line of a parcel of land acquired by the City of Cleveland by
means of said vacation of Broome Court N.W.; thence South 34 deg. 06' 48" East along the
Southwesterly line of said land acquired by the City of Cleveland, 8.25 feet to a nail set at its
intersection with the Northwesterly line of a parcel of land conveyed to the City of Cleveland for
the widening of West 2nd Place by deed recorded in Volume 9085, Page 430 of Cuyahoga
County Records; thence South 55 deg. 53'12" West along the Northwesterly line of said land
conveyed to the City of Cleveland, 6 feet to a nail set at its intersection with the Southwesterly
line of said land so conveyed; thence South 34 deg. 03' 04" East along the Southwesterly line of
said land conveyed to the City of Cleveland, 153.89 feet to its intersection with the
Northwesterly line of Frankfort Avenue N.W., 45 feet wide, from which point a nail set bears
North 55 deg. 55' 06" East, 6.00 feet; thence South 55 deg. 55' 06" West along the
Northwesterly line of Frankfort Avenue N.W., 286.76 feet to a drill hole set at its intersection
with the Northeasterly line of West 3rd Street; thence North 34 deg. 03' 42" West along the
Northeasterly line of West 3rd Street, 253.05 feet to its intersection with the Southeasterly line of
a parcel of land conveyed to Prime Properties Limited Partnership by deed recorded in Volume
91-4116, Page 33 of Cuyahoga County Records, and from which point a drill hole set bears
South 55 deg. 54' 58" West 1 foot; thence North 55 deg. 54' 58" East along the Southeasterly
line of said land conveyed to Prime Properties Limited Partnership, being also the Southeasterly

line of Sublot No. 17 in said Simon Perkins Subdivision and its Northeasterly prolongation, 83.41 feet to a drill hole set at its intersection with the Northeasterly line of said land so conveyed; thence North 34 deg. 03' 33" West along the Northeasterly line of said land conveyed to Prime Properties Limited Partnership, being also the Northeasterly line of said Original Lot No. 57, 82.78 feet to the principal place of beginning, and containing 65,688 square feet or 1.5080 acres of land.

Parcel No. 2

A Non-Exclusive Easement appurtenant to Parcel No. 1 over the following described premises:

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio and known as being part of Original Two Acre Lot No. 59, and bounded and described as follows:

Beginning at a point in the Northwesterly line of Frankfort Avenue, N.W., 45 feet wide, at its intersection with the Southwesterly line of a parcel of land conveyed to the City of Cleveland by deed recorded in Volume 6488, Page 224 of Cuyahoga County Records; thence South 55 deg. 55' 06" West along the Northwesterly line of Frankfort Avenue, 6 feet to its intersection with the Northeasterly line of a parcel of land conveyed to Robert F. Black, et al, Trustees of First Union Realty, by deed recorded in Volume 10664, Page 461 of Cuyahoga County Records; thence North 34 deg. 03' 04" West along the Northeasterly line of said land conveyed to Robert F. Black, et al, 153.89 feet to its intersection with the Southeasterly line of Broome Court N.W., 16.5 feet wide, now vacated; thence North 55 deg. 53' 12" East along the Southeasterly line of Broome Court, now vacated, 6 feet to its intersection with the Southwesterly line of said land conveyed to the City of Cleveland; thence South 34 deg. 03' 04" East along the Southwesterly line of said land conveyed to the City of Cleveland, 153.90 feet to the place of beginning.

Parcel No. 3

Together with the rights in and to the Pedestrian Bridge Easement, the Utility Easement and the City Delivery Easement set forth in that Reciprocal Easement Agreement by and between 55 Public LLC and The City of Cleveland, Ohio, dated August 28, 2003 and recorded as Cuyahoga County Recorder's Document No. 200308290199 and described by metes and bounds as follows:

Situated in the City of Cleveland, County of Cuyahoga, and State of Ohio, and known as being part of Original Two Acre Lot 58 and part of Broome Court N.W. (now vacated), and bounded and described as follows:

Beginning at the most southerly corner of a parcel of land conveyed to CEI Venture LLC by deed recorded as A.F.N. 200102220641 of Cuyahoga County Records;

Thence North 55 degrees 53 minutes 12 seconds East along the southeasterly line of said land conveyed to CEI Venture LLC, 49.20 feet to its intersection with the southwesterly line of an overhead pedestrian bridge, and the principal place of beginning of the easement herein described;

2

Thence North 34 degrees 03 minutes 23 seconds West along the southwesterly line of said overhead bridge, 6.03 feet to its intersection with the southeasterly face of an existing building;

Thence North 55 degrees 53 minutes 12 seconds East along the southeasterly face of said existing building, 8.30 feet to its intersection with the northeasterly face of said overhead bridge;

Thence South 34 degrees 03 minutes 23 seconds East along the northeasterly face of said overhead bridge, 6.03 feet to its intersection with the southeasterly line of said land conveyed to CEI Venture LLC;

Thence South 55 degrees 53 minutes 12 seconds West along the southeasterly line of said land conveyed to CEI Venture LLC, 8.30 feet to the principal place of beginning.

Utility Easement Area:

Situated in the City of Cleveland, County of Cuyahoga, and State of Ohio, and known as being part of Original Two Acre Lot 59 and part of Broome Court N.W. (now vacated), and bounded and described as follows:

Beginning at the most easterly corner of a parcel of land conveyed to CEI Venture LLC by deed recorded as A.F.N. 200102220641 of Cuyahoga County Records;

Thence South 55 degrees 53 minutes 12 seconds West along the southeasterly line of said land conveyed to CEI Venture LLC, 26.48 feet to a point;

Thence North 34 degrees 03 minutes 04 seconds West, 2.43 feet to a point in the northwesterly edge of an existing asphalt alley turnout;

Thence northeasterly along the curved northwesterly edge of said existing turnout, being the arc of a curve deflecting to the left, 9.91 feet to a point, said arc having a radius of 16.73 feet, a central angle of 33 degrees 56 minutes 28 seconds, and a chord which bears North 38 degrees 07 minutes 57 seconds East, 9.76 feet;

Thence North 16 degrees 08 minutes 38 seconds East along the westerly edge of said existing turnout, 15.25 feet to a point;

Thence North 1 degree 33 minutes 19 seconds West along the westerly edge of said existing turnout, 10.18 feet to its intersection with the northeasterly line of said land conveyed to CEI Venture LLC;

Thence South 34 degrees 03 minutes 04 seconds East along the northeasterly line of said land conveyed to CEI Venture LLC, 23.74 feet to the place of beginning.

City Delivery Court Easement Area:

Situated in the City of Cleveland, County of Cuyahoga, and State of Ohio, and known as being part of Original Two Acre Lots 58 and 59 and part of Broome Court N.W. (now vacated), and bounded and described as follows:

Beginning at the most southerly corner of a parcel of land conveyed to CEI Venture LLC by deed recorded as A.F.N. 200102220641 of Cuyahoga County Records;

Thence North 34 degrees 03 minutes 23 seconds West along the southwesterly line of said land conveyed to CEI Venture LLC, 6.03 feet to its intersection with the southeasterly line of an existing building;

Thence North 55 degrees 53 minutes 12 seconds East along the southeasterly line of said existing building, 58.13 feet to a point;

Thence easterly along the curved northerly line of an existing alley, being the arc of a curve deflecting to the left, 5.65 feet to a point, said arc having a radius of 3.60 feet, a central angle of 90 degrees 00 minutes 00 seconds, and a chord which bears South 79 degrees 06 minutes 48 seconds East, 5.09 feet;

Thence North 55 degrees 53 minutes 12 seconds East along the northwesterly line of said existing alley, 59.59 feet to a point;

Thence northeasterly along the curved northwesterly line of said existing alley, being the arc of a curve deflecting to the left, 9.91 feet to a point, said arc having a radius of 16.73 feet, a central angle of 33 degrees 56 minutes 28 seconds, and a chord which bears North 38 degrees 07 minutes 57 seconds East, 9.76 feet;

Thence North 16 degrees 08 minutes 38 seconds East along the westerly line of said existing alley turnout, 15.25 feet to a point;

Thence North 1 degree 33 minutes 19 seconds West along the westerly line of said existing alley turnout, 10.18 feet to its intersection with the northeasterly line of said land conveyed to CEI Venture LLC;

Thence South 34 degrees 03 minutes 04 seconds East along the northeasterly line of said land conveyed to CEI Venture LLC, 23.74 feet to its intersection with the southeasterly line of said land so conveyed;

Thence South 55 degrees 53 minutes 12 seconds West along the southeasterly line of said land conveyed to CEI Venture LLC, 147.80 feet to the place of beginning.

4

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*  NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a)  PLAINTIFFS

UNITED STATES OF AMERICA

**(b)**  County of Residence of First Listed Plaintiff

*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*

(See Attachment)

### DEFENDANTS

REAL PROPERTY LOCATED AT 55 PUBLIC SQUARE, CLEVELAND, OHIO, WITH ALL APPURTENANCES, IMPROVEMENTS, AND ATTACHMENTS THEREON, AND ANY RIGHT TO COLLECT AND RECEIVE ANY PROFIT, RENT, INCOME, AND PROCEEDS THEREFROM

County of Residence of First Listed Defendant

Attorneys *(If Known)*

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II.  BASIS OF JURISDICTION  *(Place an "X" in One Box Only)*

☑ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*  and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT  *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☑ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans | ☐ 345 Marine Product Liability | | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excl. Veterans) | | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

## V.  ORIGIN  *(Place an "X" in One Box Only)*

☑ 1  Original
Proceeding

☐ 2  Removed from State Court

☐ 3  Re-filed
(See VI below)

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district *(specify)*

☐ 6  Multidistrict Litigation Transfer

☐ 7  Appeal to District Judge from Magistrate Judgment

☐ 8  Multidistrict Litigation – Direct File

☐ 9  Remanded from Appellate Court

## VI.  RELATED/ RE-FILED CASE(S)

*(See instructions):*  a) Re-filed Case  ☐ YES  ☐ NO   b) Related Cases  ☑ YES  ☐ NO

JUDGE: Cooke   DOCKET NUMBER: 1:20-cv-23278, 23279

## VII.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:

LENGTH OF TRIAL via  5   days estimated (for both sides to try entire case)

## VIII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☑ Yes  ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE
December 30, 2020

SIGNATURE OF ATTORNEY OF RECORD

/s Shai D. Bronshtein

| FOR OFFICE USE ONLY : RECEIPT # | AMOUNT | IFP | JUDGE | MAG JUDGE |
|---|---|---|---|---|

**ATTORNEYS FOR PLAINTIFF**

DEBORAH CONNOR, CHIEF
MONEY LAUNDERING & ASSET RECOVERY SECTION

Shai D. Bronshtein, Trial Attorney (ID No. A5502665)
Michael C. Olmsted, Senior Trial Attorney
Peter Steciuk, Trial Attorney
Mary Butler, Chief, International Unit
Criminal Division
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20005
Telephone: (202) 616-5950
Shai.Bronshtein@usdoj.gov


ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Adrienne E. Rosen
Assistant United States Attorney
Court ID No. A5502297
U.S. Attorney's Office
99 Northeast Fourth Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9338
Adrienne.Rosen@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  1:20-cv-25313**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.**

**REAL PROPERTY LOCATED AT 55 PUBLIC**
**SQUARE, CLEVELAND, OHIO, WITH ALL**
**APPURTENANCES, IMPROVEMENTS, AND**
**ATTACHMENTS THEREON, AND ANY RIGHT TO**
**COLLECT AND RECEIVE ANY PROFIT, RENT,**
**INCOME, AND PROCEEDS THEREFROM,**

**Defendant.**

_____/

**CIVIL COMPLAINT COVER SHEET**

1.      Did this matter originate from a matter pending in the Northern Region of the United States
         Attorney's Office prior to October 14, 2003?          ____ Yes  _X_ No

2.      Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?          _____ Yes  _X_  No

                                    Respectfully submitted,

DATED: December 30, 2020            DEBORAH CONNOR, CHIEF
                                    MONEY LAUNDERING & ASSET RECOVERY
                                        SECTION

                       By:      /s/ Shai D. Bronshtein
                                Shai D. Bronshtein, Trial Attorney (ID No. A5502665)
                                Mary Butler, Chief, International Unit
                                Michael C. Olmsted, Senior Trial Attorney
                                Peter Steciuk, Trial Attorney
                                Criminal Division
                                United States Department of Justice
                                1400 New York Avenue NW
                                Washington, DC 20005
                                Telephone: (202) 616-5950
                                Shai.Bronshtein@usdoj.gov


                                ARIANA FAJARDO ORSHAN
                                UNITED STATES ATTORNEY

                                /s/ Adrienne E. Rosen
                                Adrienne E. Rosen
                                Assistant United States Attorney
                                Court ID No. A5502297
                                U.S. Attorney's Office
                                99 Northeast Fourth Street, 7th Floor
                                Miami, Florida 33132-2111
                                Telephone: (305) 961-9338
                                Adrienne.Rosen@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:20-cv-25313

UNITED STATES OF AMERICA,

Plaintiff,

vs.

REAL PROPERTY LOCATED AT 55 PUBLIC
SQUARE, CLEVELAND, OHIO, WITH ALL
APPURTENANCES, IMPROVEMENTS, AND
ATTACHMENTS THEREON, AND ANY RIGHT TO
COLLECT AND RECEIVE ANY PROFIT, RENT,
INCOME, AND PROCEEDS THEREFROM,

Defendant.

_____/

NOTICE OF VERIFIED COMPLAINT FOR FORFEITURE *IN REM*
AGAINST REAL PROPERTY

To:    OPTIMA 55 PUBLIC SQUARE, LLC AND ALL OTHER PERSONS WHO MAY
CLAIM AN INTEREST IN THE DEFENDANT PROPERTY.

1.      DATE OF NOTICE:  December 30, 2020

2.      FORFEITURE COMPLAINT:   On December 30, 2020, the United States of

America filed a Verified Complaint for Forfeiture *In Rem*, seeking forfeiture, pursuant to

18 U.S.C. § 981, in the United States District Court for the Southern District of Florida, of real

property commonly known as 55 Public Square, Cleveland, Ohio (the "defendant property"), and

more particularly described in Attachment A.

3.      FILING OF A VERIFIED CLAIM:   Pursuant to Rule G(5)(a)(ii) of the

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, in order to

avoid forfeiture of the defendant property, any person who asserts an interest in the defendant

property must file a verified claim within 35 days after the date of this notice or the date of delivery,

1

if personally served.

4.     CONTENTS OF VERIFIED CLAIM:  Pursuant to Rule G(5)(a), the claim must (A) identify the specific property claimed; (B) identify the claimant and state the claimant's interest in the property; and (C) be signed by the claimant under penalty of perjury (*see* 28 U.S.C. § 1746).

5.     FILING OF AN ANSWER:  If you file a verified claim, you must then file an answer to the complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure within 20 days after filing the verified claim.

6.     FILING WITH COURT AND SERVICE ON UNITED STATES:  The verified claim and answer must be filed with The Office of the Clerk, United States District Court, Southern District of Florida, 400 North Miami Avenue, Miami, Florida 33128, and a copy of the claim and answer or motion must be sent to AUSA Adrienne E. Rosen, United States Attorney's Office, 99 NE 4th Street, 7th Floor, Miami, Florida 33132.

7.     In accordance with 18 U.S.C. § 985(c)(1)(B), this Notice shall be posted on the defendant property and served on the property owner, along with a copy of the Verified Complaint for Forfeiture *In Rem*.

**Failure to follow the requirements set forth above may result in judgment by default taken against you for the relief demanded in the Complaint. You may wish to seek legal advice to protect your interests.**

                                                  Respectfully submitted,

DATED: December 30, 2020          DEBORAH CONNOR, CHIEF
                                                  MONEY LAUNDERING & ASSET RECOVERY
                                                       SECTION

                              By:     /s/ *Shai D. Bronshtein*
                                                  Shai D. Bronshtein, Trial Attorney (ID No. A5502665)
                                                  Mary Butler, Chief, International Unit
                                                  Michael C. Olmsted, Senior Trial Attorney

Peter Steciuk, Trial Attorney
Criminal Division
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20005
Telephone: (202) 616-5950
Shai.Bronshtein@usdoj.gov

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

/s/ *Adrienne E. Rosen*
Adrienne E. Rosen
Assistant United States Attorney
Court ID No. A5502297
U.S. Attorney's Office
99 Northeast Fourth Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9338
Adrienne.Rosen@usdoj.gov

Attachment A

LEGAL DESCRIPTION

Parcel No. 1

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio and known as being
Sublot Nos. 19, 20 and 21, part of Sublot Nos. 18 and 22, part of Alleys Nos. 1 and 2 (now
vacated) all in Simon Perkins Subdivision of part of Original Two Acre Lot Nos. 55, 56 and 57,
as shown by the recorded plat in Volume F of Deeds, Pages 264 and 265 of Cuyahoga County
Records, part of Broome Court N.W. (now vacated), and part of Original Two Acre Lot Nos. 58
and 59, and bounded and described as follows:

Beginning at a point in the centerline of St. Clair Avenue N.W., 99 feet wide, at its intersection
with the centerline of West 3rd Street, formerly Seneca Street, 99 feet wide, and from which
point an iron monument found in the centerline of West 3rd Street bears South 34 deg. 03' 42"
East, 0.10 feet; thence North 55 deg. 56' 37" East along the centerline of St. Clair Avenue,
132.92 feet to a nail set at its intersection with the Northeasterly line of said Original Lot No. 57;
thence South 34 deg. 03' 33" East along the Northeasterly line of said Original Lot No. 57, 49.50
feet to a drill hole set at its intersection with the Southeasterly line of St. Clair Avenue, and the
principal place of beginning of the parcel herein described; thence North 55 deg. 56' 37" East
along the Southeasterly line of St. Clair Avenue, 66.59 feet to a drill hole set at its intersection
with the Southwesterly line of a parcel of land conveyed to First Union Real Estate Equity and
Mortgage Investments by deed recorded in Volume 98-01915, Page 30; thence South 34 deg.
03'23" East along the Southwesterly line of said land conveyed to First Union Real Estate Equity
and Mortgage Investments, 173.74 feet to its intersection with the Southeasterly line of said land
so conveyed; thence North 55 deg. 53'12" East along the Southeasterly line of said land
conveyed to First Union Real Estate Equity and Mortgage Investments, being also the centerline
of vacated Broome Court N.W., formerly 16.5 feet wide, 142.80 feet to a nail set at its
intersection with the Southwesterly line of a parcel of land acquired by the City of Cleveland by
means of said vacation of Broome Court N.W.; thence South 34 deg. 06' 48" East along the
Southwesterly line of said land acquired by the City of Cleveland, 8.25 feet to a nail set at its
intersection with the Northwesterly line of a parcel of land conveyed to the City of Cleveland for
the widening of West 2nd Place by deed recorded in Volume 9085, Page 430 of Cuyahoga
County Records; thence South 55 deg. 53'12" West along the Northwesterly line of said land
conveyed to the City of Cleveland, 6 feet to a nail set at its intersection with the Southwesterly
line of said land so conveyed; thence South 34 deg. 03' 04" East along the Southwesterly line of
said land conveyed to the City of Cleveland, 153.89 feet to its intersection with the
Northwesterly line of Frankfort Avenue N.W., 45 feet wide, from which point a nail set bears
North 55 deg. 55' 06" East, 6.00 feet; thence South 55 deg. 55' 06" West along the
Northwesterly line of Frankfort Avenue N.W., 286.76 feet to a drill hole set at its intersection
with the Northeasterly line of West 3rd Street; thence North 34 deg. 03' 42" West along the
Northeasterly line of West 3rd Street, 253.05 feet to its intersection with the Southeasterly line of
a parcel of land conveyed to Prime Properties Limited Partnership by deed recorded in Volume
91-4116, Page 33 of Cuyahoga County Records, and from which point a drill hole set bears
South 55 deg. 54' 58" West 1 foot; thence North 55 deg. 54' 58" East along the Southeasterly
line of said land conveyed to Prime Properties Limited Partnership, being also the Southeasterly

line of Sublot No. 17 in said Simon Perkins Subdivision and its Northeasterly prolongation, 83.41 feet to a drill hole set at its intersection with the Northeasterly line of said land so conveyed; thence North 34 deg. 03' 33" West along the Northeasterly line of said land conveyed to Prime Properties Limited Partnership, being also the Northeasterly line of said Original Lot No. 57, 82.78 feet to the principal place of beginning, and containing 65,688 square feet or 1.5080 acres of land.

Parcel No. 2

A Non-Exclusive Easement appurtenant to Parcel No. 1 over the following described premises:

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio and known as being part of Original Two Acre Lot No. 59, and bounded and described as follows:

Beginning at a point in the Northwesterly line of Frankfort Avenue, N.W., 45 feet wide, at its intersection with the Southwesterly line of a parcel of land conveyed to the City of Cleveland by deed recorded in Volume 6488, Page 224 of Cuyahoga County Records; thence South 55 deg. 55' 06" West along the Northwesterly line of Frankfort Avenue, 6 feet to its intersection with the Northeasterly line of a parcel of land conveyed to Robert F. Black, et al, Trustees of First Union Realty, by deed recorded in Volume 10664, Page 461 of Cuyahoga County Records; thence North 34 deg. 03' 04" West along the Northeasterly line of said land conveyed to Robert F. Black, et al, 153.89 feet to its intersection with the Southeasterly line of Broome Court N.W., 16.5 feet wide, now vacated; thence North 55 deg. 53' 12" East along the Southeasterly line of Broome Court, now vacated, 6 feet to its intersection with the Southwesterly line of said land conveyed to the City of Cleveland; thence South 34 deg. 03' 04" East along the Southwesterly line of said land conveyed to the City of Cleveland, 153.90 feet to the place of beginning.

Parcel No. 3

Together with the rights in and to the Pedestrian Bridge Easement, the Utility Easement and the City Delivery Easement set forth in that Reciprocal Easement Agreement by and between 55 Public LLC and The City of Cleveland, Ohio, dated August 28, 2003 and recorded as Cuyahoga County Recorder's Document No. 200308290199 and described by metes and bounds as follows:

Situated in the City of Cleveland, County of Cuyahoga, and State of Ohio, and known as being part of Original Two Acre Lot 58 and part of Broome Court N.W. (now vacated), and bounded and described as follows:

Beginning at the most southerly corner of a parcel of land conveyed to CEI Venture LLC by deed recorded as A.F.N. 200102220641 of Cuyahoga County Records;

Thence North 55 degrees 53 minutes 12 seconds East along the southeasterly line of said land conveyed to CEI Venture LLC, 49.20 feet to its intersection with the southwesterly line of an overhead pedestrian bridge, and the principal place of beginning of the easement herein described;

2

Thence North 34 degrees 03 minutes 23 seconds West along the southwesterly line of said overhead bridge, 6.03 feet to its intersection with the southeasterly face of an existing building;

Thence North 55 degrees 53 minutes 12 seconds East along the southeasterly face of said existing building, 8.30 feet to its intersection with the northeasterly face of said overhead bridge;

Thence South 34 degrees 03 minutes 23 seconds East along the northeasterly face of said overhead bridge, 6.03 feet to its intersection with the southeasterly line of said land conveyed to CEI Venture LLC;

Thence South 55 degrees 53 minutes 12 seconds West along the southeasterly line of said land conveyed to CEI Venture LLC, 8.30 feet to the principal place of beginning.

Utility Easement Area:

Situated in the City of Cleveland, County of Cuyahoga, and State of Ohio, and known as being part of Original Two Acre Lot 59 and part of Broome Court N.W. (now vacated), and bounded and described as follows:

Beginning at the most easterly corner of a parcel of land conveyed to CEI Venture LLC by deed recorded as A.F.N. 200102220641 of Cuyahoga County Records;

Thence South 55 degrees 53 minutes 12 seconds West along the southeasterly line of said land conveyed to CEI Venture LLC, 26.48 feet to a point;

Thence North 34 degrees 03 minutes 04 seconds West, 2.43 feet to a point in the northwesterly edge of an existing asphalt alley turnout;

Thence northeasterly along the curved northwesterly edge of said existing turnout, being the arc of a curve deflecting to the left, 9.91 feet to a point, said arc having a radius of 16.73 feet, a central angle of 33 degrees 56 minutes 28 seconds, and a chord which bears North 38 degrees 07 minutes 57 seconds East, 9.76 feet;

Thence North 16 degrees 08 minutes 38 seconds East along the westerly edge of said existing turnout, 15.25 feet to a point;

Thence North 1 degree 33 minutes 19 seconds West along the westerly edge of said existing turnout, 10.18 feet to its intersection with the northeasterly line of said land conveyed to CEI Venture LLC;

Thence South 34 degrees 03 minutes 04 seconds East along the northeasterly line of said land conveyed to CEI Venture LLC, 23.74 feet to the place of beginning.

City Delivery Court Easement Area:

Situated in the City of Cleveland, County of Cuyahoga, and State of Ohio, and known as being part of Original Two Acre Lots 58 and 59 and part of Broome Court N.W. (now vacated), and bounded and described as follows:

Beginning at the most southerly corner of a parcel of land conveyed to CEI Venture LLC by deed recorded as A.F.N. 200102220641 of Cuyahoga County Records;

Thence North 34 degrees 03 minutes 23 seconds West along the southwesterly line of said land conveyed to CEI Venture LLC, 6.03 feet to its intersection with the southeasterly line of an existing building;

Thence North 55 degrees 53 minutes 12 seconds East along the southeasterly line of said existing building, 58.13 feet to a point;

Thence easterly along the curved northerly line of an existing alley, being the arc of a curve deflecting to the left, 5.65 feet to a point, said arc having a radius of 3.60 feet, a central angle of 90 degrees 00 minutes 00 seconds, and a chord which bears South 79 degrees 06 minutes 48 seconds East, 5.09 feet;

Thence North 55 degrees 53 minutes 12 seconds East along the northwesterly line of said existing alley, 59.59 feet to a point;

Thence northeasterly along the curved northwesterly line of said existing alley, being the arc of a curve deflecting to the left, 9.91 feet to a point, said arc having a radius of 16.73 feet, a central angle of 33 degrees 56 minutes 28 seconds, and a chord which bears North 38 degrees 07 minutes 57 seconds East, 9.76 feet;

Thence North 16 degrees 08 minutes 38 seconds East along the westerly line of said existing alley turnout, 15.25 feet to a point;

Thence North 1 degree 33 minutes 19 seconds West along the westerly line of said existing alley turnout, 10.18 feet to its intersection with the northeasterly line of said land conveyed to CEI Venture LLC;

Thence South 34 degrees 03 minutes 04 seconds East along the northeasterly line of said land conveyed to CEI Venture LLC, 23.74 feet to its intersection with the southeasterly line of said land so conveyed;

Thence South 55 degrees 53 minutes 12 seconds West along the southeasterly line of said land conveyed to CEI Venture LLC, 147.80 feet to the place of beginning.

4