# Exhibit A

**EXECUTION COPY**

**AGREEMENT OF PURCHASE AND SALE**

**by and between**

**OPTIMA 55 PUBLIC SQUARE LLC, a Delaware limited liability company ("Seller")**

**and**

**KD 55 PUBLIC SQUARE LLC, an Ohio limited liability company ("Purchaser")**

## <u>LIST OF EXHIBITS AND SCHEDULES</u>

EXHIBITS

    Exhibit A - Legal Description
    Exhibit B – Intentionally deleted
    Exhibit C - Form of General Assignment
    Exhibit D - Form of Limited Warranty Deed
    Exhibit E - Form of notice letter to tenants

SCHEDULES

    Schedule 1.1.2(a) - Rent Roll (Leases)
    Schedule 1.1.2(b) - Security Deposits
    Schedule 1.1.4 - List of Personal Property
    Schedule 1.1.5 - List of Pending Insurance Claims and Tenant Claims
    Schedule 1.1.5(a) - Trade Names
    Schedule 1.1.5(b) - List of Service Contracts
    Schedule 1.1.5(c) - List of Licenses and Permits
    Schedule 2.2 – Allocation of Purchase Price
    Schedule 7.1.6 - Defaults
    Schedule 7.1.8 - Violations
    Schedule 7.1.10 - Employees
    Schedule 9.2 - Summary of Insurance

EXECUTION COPY

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (the "**Agreement**") is made and entered into as of the _____ day of December, 2020 (the "**Effective Date**"), by and between OPTIMA 55 PUBLIC SQUARE LLC, a Delaware limited liability company (hereinafter referred to as "**Seller**") and KD 55 PUBLIC SQUARE LLC, an Ohio limited liability company, and its permitted assigns (hereinafter referred to as "**Purchaser**").

In consideration of the mutual promises, covenants and agreements hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

### ARTICLE I.
### Sale of Property

**1.1**    **Sale of Property**.  Seller hereby agrees to sell, assign and convey to Purchaser and Purchaser agrees to purchase from Seller, Seller's right, title and interest, if any, in and to the following:

**1.1.1**    **Land and Improvements**.  That certain real property lying and being situated in the City of Cleveland, Cuyahoga County and State of Ohio, known as permanent parcel numbers 101-07-004, 101-07-006 and 101-07-007 (101-07-006 and 101-07-007 consolidated with and part of 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) being more particularly described on Exhibit A attached hereto and incorporated herein by reference thereto (the "**Land**"), together with any improvements, structures and facilities located at, on or affixed to the Land (including, without limitation, that certain building located at 55 Public Square, Cleveland, Ohio, and the associated parking facilities (the "**Improvements**");

**1.1.2**    **Leases**.  All space leases, cell tower leases, antenna leases, subleases, licenses and other occupancy agreements, together with any and all amendments, modifications or supplements thereto affecting the Property (as hereinafter defined) including, but not limited to, (a) space leases as shown on the rent roll attached hereto as Schedule 1.1.2(a) (the "**Rent Roll**"), (b) Approved New Leases (defined in Section 9.5), if any, and (c) (i) all prepaid rent attributable to the period following the Closing (subject to Section 4.2.4) and (ii) the security deposits, under space leases and the Approved New Lease(s), if any, as shown on the list attached hereto as Schedule 1.1.2(b), to the extent that Section.1.1.2(c)(i) and (ii) are applicable to such leases (collectively, the "**Leasehold Property**"). "**Leases**" refers collectively to the space leases and the Approved New Leases;

EXECUTION COPY

   **1.1.3**  **Real Property**.  All rights, privileges and easements appurtenant to Seller's interest in the Land and the Improvements, if any, including, without limitation, Seller's interest in any licenses, covenants, rights-of-way or easements over any adjoining property and any right, title and interest of Seller in and to adjacent streets, alleys, rights-of-way, bridge structures, subways, air and development rights, all mineral and water rights, any strips or gores within or bounding such Land, and other appurtenances used in connection with the beneficial use and enjoyment of the Land and the Improvements (the Land, the Improvements and all such easements and appurtenances are sometimes collectively referred to herein as the "**Real Property**");

   **1.1.4**  **Personal Property**.  All personal property (including equipment, but excluding any personal computers), if any, owned by Seller and located on the Real Property as of the date hereof, all inventory, if any, owned by Seller and located on the Real Property on the date of Closing, and all fixtures, if any, owned by Seller and located on the Real Property as of the date hereof, including, without limitation, the personal property listed on Schedule 1.1.4 (collectively, the "**Personal Property**"); and

   **1.1.5**  **Intangible Property**.  All (a) non-exclusive logos, trademarks and trade names, if any, used or useful in connection with the Real Property, including without limitation "55 Public Square", and the right to use the Licensed Marks set forth on Schedule 1.1.5(a) (collectively, the "**Trade Names**"), (b) those service, equipment, supply, parking, construction, management, security and maintenance contracts described on Schedule 1.1.5(b) (the "**Contracts**") that Purchaser has designated to be Specified Contracts (defined in Section 9.3), (c) guarantees, licenses, approvals, certificates, permits and warranties relating to the Real Property, Leasehold Property, Personal Property and Specified Contracts, to the extent assignable, including, without limitation, those more particularly described on Schedule 1.1.5(c) attached hereto, and (d) all of Seller's rights and interests in and to any awards of state and federal historic tax credits (collectively, including the Trade Names, Specified Contracts and Beneficial Interests, the "**Intangible Property**").  (The Real Property, the Leasehold Property, the Personal Property and the Intangible Property are sometimes collectively hereinafter referred to as the "**Property**").  It is hereby acknowledged by the parties that Seller shall not convey to Purchaser claims relating to existing insurance claims and any existing claims against previous tenants of the Property, which claims shall be reserved by Seller and which claims are disclosed on Schedules 1.1.5 attached hereto and incorporated herein by this reference.

**ARTICLE II.**
**Purchase Price**

  **2.1**  **Purchase Price**.  The total purchase price for the Property shall be Seventeen Million and 00/100 Dollars ($17,000,000.00), subject to adjustment pursuant to Section 3.2 and Article IV and/or any other provision of this Agreement (the "**Purchase Price**") which will be

2

paid at Closing in immediately available funds by depositing the same with the Escrow Agent (defined in Section 3.1) and distributed thereafter according to the direction given by the Governmental Authority (defined in Article XVIII).

**2.2** **Allocation of Purchase Price**. The Purchase Price is allocated as set forth on the attached Schedule 2.2. If the parties revise or modify Schedule 2.2, the parties shall execute a revised Schedule 2.2 prior to or at Closing, which revised schedule shall be the operative Schedule 2.2 to this Agreement. Each party hereto agrees (i) to complete jointly and to file separately Form 8594 with its federal income tax return consistent with such allocation for the tax year in which the Closing occurs and (ii) no party shall take a position on any income, transfer, gains or other tax return, or before any governmental entity charged with the collection of any such tax (as hereinafter defined) or in any judicial proceeding, that is in any manner inconsistent with the terms of the final allocation of the Purchase Price.

## ARTICLE III.
### Deposit

**3.1** **Deposit.** Within three (3) Business Days after the expiration of the Due Diligence Period (defined in Article IX) provided that Purchaser has not duly terminated this Agreement, Purchaser shall deposit, by wire transfer, an amount equal to Two Hundred Thousand Dollars ($200,000.00) (the "**Deposit**") with NorthStar Title Services located at 1406 West 6th Street, Suite 400, Cleveland, Ohio 44113, phone (216) 623-3655, Attn: Mary Robenalt Porter, email mporter@nstitle.com (the "**Escrow Agent**"), in immediately available federal funds. In the event Purchaser shall fail to tender the Deposit to Escrow Agent within three (3) Business Days following the expiration of the Due Diligence Period, then this Agreement shall be deemed null, void, and of no further force and effect. As of the Effective Date, all of the schedules and exhibits attached to this Agreement have not yet been completed and approved by Purchaser. If such schedules and exhibits are not approved within seven (7) days of the Effective Date, then as its sole remedy Purchaser shall have the right to terminate this Agreement upon written notice to Seller provided however that such failure to deliver the schedules and exhibits shall not be deemed a default by Seller. The proceeds of the Deposit shall be deposited and held by Escrow Agent as a deposit against the Purchase Price in accordance with the terms and provisions of this Agreement, and shall be credited against the Purchase Price if the transaction closes or disbursed as otherwise set forth herein. Except as may otherwise wise be expressly set forth herein, the Deposit shall be immediately non-refundable to Purchaser. By its execution hereof, the Escrow Agent shall confirm and acknowledge receipt of the Deposit.

**3.2** **Application and Distribution of Deposit.** The Deposit shall be applied to the Purchase Price should Closing occur. Should Closing fail to occur or if this Agreement is terminated (except pursuant to Section 3.1), then Seller shall retain the Deposit, subject to and in

accordance with any Governmental Authority that then affects Seller's rights to receive the Deposit.

**3.3    Intentionally deleted.**

**3.4    Escrow Agent**.  Escrow Agent is executing this Agreement to acknowledge Escrow Agent's responsibilities hereunder, which may be modified only by a written amendment signed by all of the parties.  Any amendment to this Agreement that is not signed by Escrow Agent shall be effective as to the parties thereto, but shall not be binding on Escrow Agent.  Escrow Agent shall accept the Deposit with the understanding of the parties that Escrow Agent is not a party to this Agreement except to the extent of its specific responsibilities hereunder, and does not assume or have any liability in connection with the performance or non-performance of Purchaser or Seller hereunder to any of them.  Additional provisions with respect to the Escrow Agent are set forth in Article XVI hereof.

**ARTICLE IV.**
**Closing, Prorations and Closing Costs**

**4.1    Closing**.  Subject to satisfaction or waiver by the applicable party of all closing conditions described in this Agreement, including but not limited to the requirements to Closing described in Article XI, the closing of the purchase and sale of the Property (the "**Closing**") shall occur on or, at Seller and Purchaser's mutual election, before, the date that is thirty (30) Business Days after the Effective Date (the "**Closing Date**"), provided that all requirements to Closing have been satisfied (or waived).  The Closing shall take place through the Escrow Agent, it being understood that neither Seller nor Purchaser nor their respective counsel need be physically present at Closing so long as all documents that are required to be delivered at Closing are fully executed, delivered in escrow to the Escrow Agent and available on the Closing Date, and an authorized signatory of the affected party is available either in person or by telephone, facsimile or email at Closing.

**4.2    Prorations**.  All matters involving proration or adjustments to be made in connection with Closing and not specifically provided for in some other provision of this Agreement shall be adjusted in accordance with this Section 4.2.  Except as otherwise set forth herein, all items to be prorated pursuant to this Section 4.2 shall be prorated as of midnight of the day immediately preceding the Closing Date, with Purchaser to be treated as the owner of the Property, for purposes of proration of income and expenses, on and after the Closing Date.  The provisions of this Section 4.2 shall survive Closing.

**4.2.1    Taxes**.  Real estate and personal property taxes and special assessments, if any, including but not limited to any assessments or charges associated with the Downtown Cleveland Alliance, shall be prorated as of the Closing Date based upon the latest tax duplicate available at the time of Closing. Seller shall pay all real estate and personal property taxes and

4

special assessments attributable to the Property for the time period up to, but not including, the Closing Date, and Purchaser shall pay all real estate and personal property taxes and special assessments attributable to the Property for the time period from the Closing Date and thereafter. If any taxes which have been apportioned shall subsequently be reduced by abatement, the amount of such abatement, less the cost of obtaining the same and after deduction of sums payable to tenants under Leases or expired or terminated Leases, shall be equitably apportioned between the parties hereto. The parties agree that if Fiscal Officer of Cuyahoga County establishes a different value for the Property as a result of this transaction, which may be after Closing, Seller shall not be liable for any increase in value or increase in such taxes. This Section 4.2.1 shall survive Closing notwithstanding anything to the contrary in this Agreement.

      **4.2.2**      **Insurance**.  There shall be no proration of Seller's insurance premiums or assignment of Seller's insurance policies.  Purchaser shall be obligated (at its own election) to obtain any insurance coverage deemed necessary or appropriate by Purchaser.

      **4.2.3**      **Utilities**.  Purchaser and Seller hereby acknowledge and agree that the amounts of all telephone, electric, sewer, water and other utility bills, trash removal bills, janitorial and maintenance service bills and all other operating expenses relating to the Property and allocable to the period prior to the Closing Date shall be determined and paid by Seller before Closing, if possible. If the amounts due under the utility bills cannot be ascertained by Closing, an amount equal to 120% of each of the applicable utility bill will be withheld from the Purchase Price and held in escrow by the Escrow Agent until the final amounts due are determined at which time they will be paid and the balance, if any disbursed to Seller (subject to Governmental Authority for such distribution). Seller shall attempt to have all utility meters read as of the Closing Date.  Purchaser shall cause all utility services to be placed in Purchaser's name as of the Closing Date.  If permitted by the applicable utilities, all utility deposits in Seller's name shall be assigned to Purchaser as of the Closing Date and Seller shall receive a credit therefor at Closing.

      **4.2.4**      **Rents**.  Rents (including, without limitation, estimated pass-through payments, payments for common area maintenance reconciliations and all additional charges, whether payable by tenants to Seller under the Leases including, without limitation, percentage rents to the extent applicable) (collectively, "**Rents**") collected by Seller prior to Closing shall be prorated as of the Closing Date.  During the period after Closing, Purchaser shall deliver to Seller any and all Rents accrued but uncollected by Seller as of the Closing Date to the extent subsequently collected by Purchaser; provided, however, Purchaser shall apply Rents received after Closing first, to the costs of collection incurred with respect to the recovery of any such payments, second, to the most recently accrued obligation or obligations of the tenant, third, to any obligation or obligations attributable to any period occurring after the Closing which are past due on the date of receipt, and then, to any amounts due to the Seller from such tenant (other than "true up" payments received from tenants attributable to a year-end reconciliation of actual and budgeted pass-through payments which shall be allocated between the Seller and Purchaser pro rata in

5

accordance with their respective period of ownership as set forth in <u>Section 4.2.5</u> below). Purchaser agrees that it shall use commercially reasonable efforts after Closing to collect any delinquent Rents which are allocable to the period of Seller's ownership of the Property (provided, however, that Purchaser shall not waive or settle any claim against any tenant for such delinquent Rents without Seller's written consent, and Purchaser shall have no obligation to institute legal proceedings, including an action for unlawful detainer, against a tenant owing such delinquent Rents). The amount of any security deposits under the Leases held by Seller in cash, less any portion of the security deposit applied to cure any tenant's default, at the time of Closing shall be credited against the Purchase Price; accordingly, Seller shall retain the actual cash deposits. If any security deposits are in the form of a letter of credit, Seller, at Purchaser's sole cost and expense shall make commercially reasonable efforts to cause such holder of the letter of credit to assign its interest in each such letter of credit to Purchaser (to the extent assignable) and deliver each such original letter of credit to Purchaser at Closing.

       **4.2.5**      <u>**Calculations**</u>. For purposes of calculating prorations, Purchaser shall be deemed to be in title to the Property, and, therefore entitled to the income therefrom and responsible for the expenses thereof for the entire day upon which the Closing occurs. All such prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the day of the Closing and based upon the actual number of days in the month and a three hundred sixty five (365) day year. The amount of such prorations shall be initially performed at Closing but shall be subject to adjustment in cash after the Closing as and when complete and accurate information becomes available, if such information is not available at the Closing. Seller and Purchaser agree to cooperate and use their best efforts to make such adjustments no later than ninety (90) days after the Closing (or as soon thereafter as may be practicable, with respect to year-end reconciliation of common area maintenance and other additional rent charges (including pass-throughs for real estate and personal property taxes and special assessments) payable by tenants under Leases). Except as set forth in this <u>Section 4.2</u>, all items of income and expense which accrue for the period prior to the Closing will be for the account of Seller and all items of income and expense which accrue for the period on and after the Closing will be for the account of Purchaser.

       Since Seller will not be providing any tenant estoppels or estoppels under any reciprocal easement agreements or any other agreements under which a typical Purchaser would require estoppels, Seller authorizes and instructs the Escrow Agent to withhold One Hundred Thousand Dollars ($100,000) from the Purchase Price and hold such amount in escrow for a period of thirty (30) days after Closing and released to Seller (with the written consent of Purchaser) if all of the following have occurred: (a) the reconciliation of expenses described in this <u>Section 4.2.5</u> have been determined and paid. The Parties hereby agree that no escrow funds shall be released without the written consent of both Seller and Purchaser not to be unreasonably withheld or delayed.

EXECUTION COPY

      **4.2.6**    **Prepaid Items**.  Any prepaid items, including, without limitation, fees for licenses which are transferred to the Purchaser at the Closing and annual permit and inspection fees shall be apportioned between the Seller and the Purchaser at the Closing.

      **4.3**    **Closing and other Costs**.  Seller shall pay (a) 50% of the initial cost of title search and exam, (b) any transfer taxes/ conveyance fees, (c) fees for recording any releases for all liens encumbering the Property as of the Closing Date, that Seller has agreed to clear in writing, (d) one-half (1/2) of all fees and costs of Escrow Agent, (e) Seller's share of prorations, and (f) Leasing Costs (defined in Section 7.1.16) attributable to Seller; (g) 50% of the  premium for a standard ALTA owner's title insurance policy (the "**Title Policy**") to be obtained by Purchaser for the fee interest being acquired by Purchaser or its nominee pursuant to the terms of this Agreement, insuring such interests to be good and marketable, excluding costs related to extended coverage or endorsements.

      Purchaser shall pay (i) 50% of the initial cost of title search and exam and the cost of any new or updated ALTA survey; (ii) any document recording charges (other than those described in clause (c) immediately above); (iii) one-half (1/2) of all escrow fees and costs; (iv) Purchaser's share of prorations; (v) Leasing Costs attributable to Purchaser; (vi) the recording cost for the deed and any recordable financing documents; and (vii) 50% of the  premium for the Title Policy and the premium for any lender requested searches and any endorsements to the Title Policy.  Purchaser and Seller shall each pay their own respective legal and professional fees.  Purchaser shall pay one hundred percent (100%) of all costs of Purchaser's due diligence, including fees due its consultants and all costs and expenses of any new or updated Phase I or other environmental studies which Purchaser desires to obtain with respect to the Property, and all lenders' fees related to any financing to be obtained by Purchaser.  All other costs and expenses shall be allocated between Purchaser and Seller in accordance with the customary practice of Cuyahoga County, Ohio.

**ARTICLE V.**
**Reserved**

**ARTICLE VI.**
**Title and Survey Matters**

      **6.1**    **Title and Survey**.  Purchaser acknowledges that Seller shall cause North Star Title Agency LLC (the "**Title Company**") to issue a title commitment (the "**Title Commitment**"), including legible copies (to the extent available) of title exception documents, to Purchaser. Purchaser, at its sole cost and expense, may order an ALTA survey of the Property (the "**Survey**") within five (5) days after receipt of the Title Commitment.  Purchaser shall have until five (5) Business Days after delivery of both the Title Commitment and the Survey (the "**Title Objection Period**") to give Seller written notice (the "**Title Objection Notice**") as to what exceptions to title, if any, Purchaser has ("**Title Objections**").  Seller shall have five (5) Business Days after receipt

EXECUTION COPY

of Purchaser's Title Objections to give Purchaser written notice ("**Seller's Cure Notice**"): (i) that Seller will  take such actions as may be reasonably necessary to remove, cure, commit to cure or, subject to Purchaser's approval, obtain affirmative title insurance through all or any of the  Title Objections prior to or by Closing ("**Seller's Cure Period**"), or (ii) that Seller elects not to remove, cure, commit to cure by Closing or obtain affirmative title insurance through all or any of the  Title Objections (each a "**Title Defect**"). Seller shall not be required to bring any action or proceedings or otherwise incur any expense to render title to the premises marketable or insurable.   If Seller's Cure Notice is under clause (ii) above, then Purchaser shall have five (5) Business Days after receipt of Seller's Cure Notice to give Seller written notice that Purchaser will either proceed with the purchase of the Property subject to such Title Defect without any reduction or abatement to the Purchase Price or terminate this  Agreement in which case the Deposit will be refunded to Purchaser. Those items or matters revealed by the Title Commitment and/or Survey which are not timely objected to or which are timely objected and thus be deemed waived  by Purchaser are referred to individually herein as a "**Permitted Exception**" and collectively as the "**Permitted Exceptions**."   Notwithstanding any other provision of this Agreement or any objection by Purchaser, the Permitted Exceptions shall include (a) all real property taxes and assessments that are a lien but are not yet due and payable, (b) the rights of tenants on the Property t as of Closing, and (c) all matters created by or on behalf of Purchaser, including, without limitation, any documents or instruments to be recorded as part of any financing for the acquisition of the Property by Purchaser; (d) Any state of facts an accurate survey may show; (e) Any and all covenants, restrictions and easements of record, if any, provided same do not prohibit the maintenance of the structure or structures now on the premises, and same are not now violated; (f) Rights, if any, relating to the construction and maintenance in connection with any public utility of wires, poles, conduits and appurtenances thereto, on, under or across the premises; (g) consents in writing prior to the date hereof, by the Seller or any former owner of the premises, for the erection of any structure or structures on, under or above any street or streets on which said premises may abut; (h) Possible lack of right by any utility company to maintain vaults, coal hole covers, coal chutes and other installations, if any, beyond the building lines; vaults and vault tax, if any; (i) Any and all violations with any City, State or Federal agency; (j) Standard and usual title company exceptions; (k) The Permitted Exceptions on the attached Exhibit B (existing Owner's Policy).

     **6.2**    . Notwithstanding the foregoing, any new title exception received by Seller or Purchaser after the expiration of the Title Objection Period or Seller's Cure Period, as applicable, from a supplemental title report or other source which is not the result of the acts or omissions of Purchaser or its agents, contractors or invitees (each a "**New Title Matter**") shall be subject to the same procedure provided in this <u>Section 6.1</u> (and the Closing Date shall be extended commensurately if the Closing would have occurred but for those procedures being implemented for a New Title Matter), except that the Title Objection Period and Seller's Cure Period for any New Title Matters shall be five (5) Business Days each.  The Closing shall be delayed as needed to accommodate such additional time periods or as otherwise needed for purposes of this <u>Section 6.1</u>.  For purposes of clarification and not for purposes of limitation, should a New Title Matter be

8

discovered and such New Title Matter is a Title Defect and not a Permitted Exception, Purchaser shall have the right to terminate this Agreement and receive a refund of the Deposit.

## ARTICLE VII.
## Representations and Warranties of the Seller

7.1     **Seller Representations**.  Seller represents and warrants that the following matters are true and correct as of the Effective Date with respect to itself or its interest to the Property:

7.1.1     **Authority**.  Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware.  This Agreement has been duly authorized, executed and delivered by Seller, is the legal, valid and binding obligation of Seller, and, does not violate any provision of any agreement or judicial order to which Seller is a party or to which Seller is subject, except that Seller's authority to enter into this transaction may be subject to approval by any governmental authority.  All documents to be executed by Seller which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by Seller, (ii) be legal, valid and binding obligations of each Seller, and (iii) not violate any provision of any agreement or judicial order to which Seller is a party or to which Seller is subject, but in all cases subject to approval and direction of any governmental Authority.

7.1.2     **Bankruptcy or Debt of a Seller**.  Seller has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy, admitted in writing its inability to pay its debts as they come due or made an offer of settlement, extension or composition to its creditors generally.  Seller has not received written notice of (a) the filing of an involuntary petition by Seller's creditors, (b) the appointment of a receiver to take possession of all, or substantially all, of Seller's assets, or (c) the attachment or other judicial seizure of all, or substantially all, of Seller's assets.

7.1.3     **Foreign Person**.  Seller is not a foreign person within the meaning of Section 1445(f) of the Internal Revenue Code, and Seller agrees to execute any and all documents necessary or required by the Internal Revenue Service or Purchaser in connection with such declaration(s).

7.1.4     **No Other Agreements**.  Seller has not entered into nor, to Seller's knowledge, are there any other outstanding written agreements, options, rights of first refusal, rights of first offer, conditional sales agreements or other agreements or arrangements regarding the purchase and sale of any portion of the Property.

7.1.5     **Leases**.  Seller has provided to Purchaser a true, correct and complete copy of each of the Leases and all amendments and modifications thereto to which Seller is a party, whether as lessor or lessee. Further, to Seller's knowledge, and except as may be disclosed by Seller to Purchaser in writing or in the due diligence materials: (a) Seller has not given, made or

9

received any notice of default or any claim which remains uncured or unsatisfied, with respect to any Lease, (b) no leasing, brokerage or like commissions, fees or payments are due from Seller or may become due in respect of any of the improvements or Leases, or of any other matter or thing relating to the Property  or any portion thereof.

       7.1.6    **Contracts**.  All Contracts are listed on Schedule 1.1.5(b) attached hereto and such list of Contracts is true, correct and complete in all material respects and Seller has provided copies of such Contracts and all amendments and modifications thereto to Purchaser.

       7.1.7    **Litigation**.  Except as shown on Schedule 7.1.7 (the "**Disclosed Litigation**"), Seller, to Seller's knowledge, has not received written notice of any lawsuits, pending or threatened, as of the Effective Date, against or relating to such Seller's interest in the Property other than actions, if any, taken by such Seller in connection with such Seller's enforcement of Lease obligations relating to tenant defaults.

       7.1.8    **Violations**.  Except as set forth on Schedule 7.1.8 attached hereto or on the Title Commitment to be delivered to Purchaser, Seller, to Seller's knowledge, has not received written notice of any violations issued by a governmental authority having jurisdiction over the Property which violation has not been corrected in respect to the ownership, use, maintenance, condition and operation of the Property, except as delivered or made available to Purchaser. Notwithstanding the foregoing representation and warranty, the knowledge, if any, of Seller's past or current tenants shall not be imputed to Seller unless Seller shall have actual knowledge thereof.

       7.1.9    **Title Matters**.  Seller has not granted any unrecorded or undisclosed easements, liens, encumbrances, covenants, or restrictions, which will affect Purchaser's title to the Property after Closing other than matters of record and other matters which may be disclosed to Purchaser in writing.

       7.1.10    **Employees**.  The persons identified on Schedule 7.1.10 are employees at the Property.

       7.1.11    **Space Leases**. Within five (5) Business Days of the Effective Date, Seller will deliver the Rent Roll and tenant receivable ledger ("**Tenant Receivable Ledger**") to Purchaser, which Rent Roll and Tenant Receivable Ledger are true, complete and correct in all material respects. Except as set forth in the Tenant Receivable Ledger or the Leases, no tenant has paid more than one (1) month's rent in advance.  No tenant has any right, option or election under any space lease to renew or extend the term of a space lease or acquire additional space, nor has any tenant vacated or abandoned all or any portion of the space demised under its space lease (except in each case as may be set forth in the Leases).

EXECUTION COPY

   **7.1.12** **Eminent Domain/Contemplated Proceedings**. To Seller's knowledge, there is no existing, proposed or contemplated eminent domain or similar proceeding which would affect the Property.

   **7.1.13** **Intentionally deleted.**

  **7.2** **Seller's Knowledge**. For purposes of this Agreement and any document delivered at Closing, whenever the phrases "to Seller's knowledge" or words of similar import are used, they shall be deemed to refer the actual or constructive knowledge, after due inquiry (and not any implied, imputed or constructive knowledge) of Mr. Chaim Schochet (the "**Asset Manager**"). Seller hereby represents and warrants that the Asset Manager is primarily responsible for the day-to-day asset management of the Property and have the appropriate knowledge of all of the matters relating to the day-to-day operation of the Property represented and warranted by Seller hereunder.

  **7.3** **Intentionally deleted.**

  **7.4** **Survival**. The express representations and warranties made in this Agreement by Seller shall survive Closing for  six (6) months after Closing and any action, suit or proceeding with respect to the truth, accuracy or completeness of such representations and warranties shall be commenced, if at all, on or before the date which is six (6) months from the Closing Date and, if not commenced on or before such date, thereafter such representations and warranties shall be void and of no force or effect.  Notwithstanding the foregoing to the contrary, the representations and warranties in <u>Section 7.1.1</u> shall survive Closing and/or termination of this Agreement for one (1) year.

**ARTICLE VIII.**
**Representations and Warranties of Purchaser**

  **8.1** Purchaser represents and warrants to Seller that the following matters are true and correct as of the Effective Date.

   **8.1.1** **Authority**.  Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Ohio.  This Agreement has been duly authorized, executed and delivered by Purchaser, is the legal, valid and binding obligation of Purchaser, and does not violate any provision of any agreement or judicial order to which Purchaser is a party or to which Purchaser is subject.  All documents to be executed by Purchaser which are to be delivered at Closing, at the time of Closing will be duly authorized, executed and delivered by Purchaser, at the time of Closing will be legal, valid and binding obligations of Purchaser, and at the time of Closing will not violate any provision of any agreement or judicial order to which Purchaser is a party or to which Purchaser is subject. No consent, license, approval, order, permit or authorization of, or registration, filing or declaration with, any court, administrative agency or commission or other governmental authority is required to be obtained

11

by Purchaser or made in connection with the execution, delivery and performance of this Agreement, the closing documents to which it is a party or any of the transactions required hereby.

        **8.1.2**      **Bankruptcy or Debt of Purchaser**.  Purchaser has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by Purchaser's creditors, suffered the appointment of a receiver to take possession of all, or substantially all, of Purchaser's assets, suffered the attachment or other judicial seizure of all, or substantially all, of Purchaser's assets, admitted in writing its inability to pay its debts as they come due or made an offer of settlement, extension or composition to its creditors generally.

        **8.1.3**      There are no actions, suits, arbitrations, orders, decrees, claims, writs, injunctions, government investigations, proceedings pending or, to Purchaser's knowledge, threatened in writing against Purchaser or affecting Purchaser which, if determined adversely to such entity, would adversely affect the ability of Purchaser to perform its obligations hereunder. Purchaser is not a party to or subject to the provision of any judgment, order, writ, injunction, decree or award of any governmental authority which would adversely affect the ability of Purchaser to perform its obligations hereunder.

        **8.1.4**      **ERISA Compliance**. Purchaser has informed Seller and Purchaser hereby represents and warrants to Seller that Purchaser is not a "plan" nor a plan "fiduciary" nor an entity holding "plan assets" (as those terms are defined under the Employee Retirement Income Security Act of 1974, as amended, and its applicable regulations as issued by the Department of Labor and the Internal Revenue Service, "**ERISA**") nor an entity whose assets are deemed to be plan assets under ERISA and that Purchaser is acquiring the Property for Purchaser's own personal account and that the Property shall not constitute plan assets subject to ERISA upon conveyance of the Property by Seller and the closing of this Agreement between Purchaser and Seller.  Seller shall not have any obligation to close the transaction contemplated by this Agreement if the transaction for any reason constitutes a prohibited transaction under ERISA or if Purchaser's representation is found to be false or misleading in any respect.  The foregoing representation and warranty shall survive the Closing.

        **8.1.5**      **Terrorist Organization Lists**.  Purchaser is not acting, directly or indirectly, for or on behalf of any person named by the United States Treasury Department as a Specifically Designated National and Blocked Person, or for or on behalf of any Person designated in Executive Order 13224 as a Person who commits, threatens to commit, or supports terrorism. Purchaser is not engaged in the transaction contemplated by this Agreement directly or indirectly on behalf of, or facilitating such transaction directly or indirectly on behalf of, any such person.

EXECUTION COPY

**8.1.6**     that neither the Seller nor any representative of the Seller has made any representation or promise upon which the Purchaser has relied covering the conditions of any property covered by this sale except as herein expressly set forth;

**8.1.7**     that it has not been induced to execute this Agreement by any representations, promises or statements of the Seller, other than by representations, promises or statements contained herein;

**8.1.8**     that it has examined the premises and  subject to Purchasers right to terminate during the Due Diligence period accepts the premises in "as is" condition.

**8.1.9**     that it has sufficient liquid and readily available funds to close cash above the first mortgage being assumed including any customary adjustments to such items as tax escrows, capital reserves, real estate tax, water, sewer or other pre-paid utilities or other customary adjustments;

**8.2**     <u>Survival</u>.  The express representations and warranties made in this Agreement by Purchaser shall not merge into any instrument of conveyance delivered at the Closing; provided, however, that any action, suit or proceeding with respect to the truth, accuracy or completeness of all such representations and warranties (except for the representation and warranty set forth in <u>Section 8.1.1</u> and <u>Section 8.1.3</u>) shall be commenced, if at all, on or before the date which is six (6) months after the Closing Date and, if not commenced on or before such date, thereafter shall be void and of no force or effect.  The representation and warranties set forth in <u>Section 8.1.1</u> and <u>Section 8.1.3</u> hereof shall survive Closing and/or termination of this Agreement.

## ARTICLE IX.
## DUE DILIGENCE

**9.1**     <u>Due Diligence Period</u>.

**9.1.1**     Purchaser and its authorized agents and representatives shall have the right to enter upon the Property  at all reasonable times during normal business hours to inspect and conduct any and all inspections, studies or tests on Property which Purchaser may desire, at its sole cost and expense, including, without limitation, physical, mechanical, engineering and hazardous material inspections, and an inspection of all books and records and financial information pertaining to the Property; provided, however, any intrusive or invasive physical testing will be conducted by Purchaser only after obtaining Seller's prior written consent, not to be unreasonably withheld, conditioned or delayed.  During such inspection period, Seller shall cooperate with Purchaser in its inspection of Seller's Property, including, but not limited to,

13

furnishing, to the extent such information is in Seller's possession or under Seller's reasonable control, to Purchaser such information, materials and documents as Purchaser may reasonably request.  The right set forth in this Section 9.1.1 may be exercised during the period commencing on the Effective Date and ending at 5:00 p.m. Eastern time thirty (30) days thereafter (the "**Due Diligence Period**"), provided however that if such right is not timely exercised, it shall be deemed irrevocably waived by Purchaser.

      **9.1.2**      Purchaser shall bear the cost of all inspections and tests, and Purchaser shall give reasonable notice to the respective Seller of any inspection or test to be conducted on the Seller's Property.  Purchaser shall also restore the Seller's Property to substantially the same physical condition in which the same were found before any such entry upon Seller's Property and inspection or examination was undertaken.  Such agreement to repair and restore shall expressly survive Closing or any termination of the Agreement.  Purchaser agrees that all information disclosed to Purchaser pursuant to this Section 9.1 is confidential and Purchaser shall not disclose any such information to any other party, other than as required by applicable laws, rules or regulations or by court order, and other than to Purchaser's affiliates, employees, lenders, investors, legal counsel and financial advisors, representatives and agents.  Purchaser shall advise such other parties of the confidentiality provisions of this Section 9.1.  Except with respect to obtaining financing from a government agency and  applying for state historic tax credits, Purchaser shall not, without Seller's prior written consent, which consent may be withheld in Seller's sole and absolute discretion, make application to any governmental authority for any permit, approval, license or other entitlement for the Property or the use and development thereof.  Purchaser's right of inspection pursuant to this Section 9.1 shall be subject to the rights of tenants under the Leases and other occupants and users of the Property.

      **9.1.3**      In the event Purchaser or Purchaser's employees, agents or contractors enter Seller's Property prior to the Closing for any reason, Purchaser shall be responsible to such Seller (or to any third party) for any damage or loss caused as a result of same and Purchaser shall indemnify and hold Seller harmless from any and all such claims, damages, and losses, which obligations shall survive Closing or the termination of this Agreement.  Any entry onto the Seller's Property shall be subject to the rights of tenants and done with commercially reasonable efforts to avoid interference with tenants and shall be subject to the rights of such tenants and occupants.

      **9.2**      **Document Review**.  Within five (5) days after the Effective Date, Seller shall deliver to Purchaser copies of the following items pertaining to the Seller's Property (unless otherwise expressly noted elsewhere in this Agreement), if in Seller's possession: (a) employment contracts, (b) consulting agreements, (c) management agreements, (d) plans and specifications, (e) insurance policies and loss runs, (f) last five (5) years of operating statements, (g) inspection reports for the last three (3) years, (h) governmental notices within the last two (2) years, (i) schedule of all current on-going litigation or FBI investigation, (j) property tax bills for the last three (3) years, (k) schedule of utility assessments, (l) schedule of tenant delinquencies, (m)

EXECUTION COPY

schedule of all tangible personal property, and (n) schedule of all intangible personal property (collectively, "**Documents**").

9.3    **Assignment or Cancellation of Contracts**.  Prior to the expiration of the Due Diligence Period, Purchaser shall advise Seller in writing of any Contracts which it elects to have cancelled upon Closing as to Seller's Property and which contracts it wishes to assume, provided such contracts can be cancelled without fee, cost, or penalty (provided however that if Seller has not sent such notices of termination prior to the Closing Date, then Purchaser can terminate this Agreement and get back its Deposit),   and Seller agrees to give appropriate notices of termination of the contracts which Purchaser timely notifies Seller it wants cancelled, provided, however, that if the notice required to terminate such Contracts will not have run prior to Closing, Seller shall assign and Purchaser shall assume any remaining rights and obligations under such Contracts.  All existing agreements for management of the Seller's Property shall be terminated at Closing.  All contracts which Seller is not obligated to terminate pursuant to this Agreement shall be assigned by Seller and assumed by Purchaser at Closing (the "**Specified Contracts**").

9.4    **Right of Termination During Due Diligence Period**.  Purchaser may elect, for any reason or no reason, in Purchaser's sole and absolute discretion, to terminate this Agreement by written notice to Seller on or before 5:00 pm (Eastern) on the last day of the Due Diligence Period, in which event this Agreement shall be null and void for all purposes. If Purchaser does not deliver notice of termination of this Agreement prior to the expiration of the Due Diligence Period, Purchaser shall be deemed to have waived any and all of its rights to terminate the Agreement under this Section 9.4.


**ARTICLE X.**
**Seller Interim Operating Covenants Prior to Closing**

10.1    **Operations**.  Seller shall, in accordance with its existing business practices, manage, maintain and operate the Property.  Seller shall not make any material change in its normal and customary billing practices and shall not knowingly take any action that is likely to materially and adversely impact the existing zoning approvals for the Property, without the prior written consent of Purchaser, which consent may be withheld in Purchaser's reasonable discretion.

10.2    **Maintain Insurance**.  Seller shall not make any material changes, until the Closing Date, to its existing insurance coverages affecting the Property as of the Effective Date as summarized on Schedule 10.2.

10.3    **Personal Property**.  Seller agrees not to transfer or remove any Personal Property from the Improvements after the Effective Date except for repair or replacement thereof.  Any

15

EXECUTION COPY

items of Personal Property replaced after the Effective Date shall be promptly installed prior to Closing and shall be of substantially similar quality to the item of Personal Property being replaced.

**10.4**     **No Sales/No Grants**.  Except for the execution of Approved New Leases  pursuant to <u>Section 10.5</u>, or as may otherwise be approved in writing by Purchaser (which approval shall not be unreasonably withheld, conditioned or delayed), Seller agrees that they shall not sell, dispose of, or convey any interest in the Property to any third party, including, but not limited to, the grant of any easement, right-of-way, encumbrance, restriction, or covenant affecting the Property or any part thereof unless required by law.

**10.5**     **Tenant Leases**.  Seller shall not, from and after the Effective Date  until the Closing or earlier termination of this Agreement, (i) grant any consent or waive any material rights under the Leases, (ii) terminate any Lease, or (iii) enter into a new lease or a modification of an existing lease, in each case without the prior written approval of Purchaser (an "**Approved New Lease**"), which in each case shall not be unreasonably withheld, conditioned or delayed, and which shall be deemed granted if Purchaser fails to respond to a written request for approval within ten (10) Business Days after receipt of the request therefor together with a summary of lease terms and credit information of the proposed tenant; provided, however, to the extent any new lease or modification of an existing lease requires the payment of Leasing Costs, Purchaser shall have the right to approve such new lease or modification of an existing lease (including the Leasing Costs associated therewith) in its sole and absolute discretion to the extent Seller is requiring Purchaser to pay such Leasing Costs, and any failure by Purchaser to respond to a request for such approval within five (5) Business Days shall be deemed an approval by Purchaser of such new lease or modification of an existing lease. Purchaser hereby acknowledges and agrees that Seller may apply any security deposits toward any delinquent rental payments or any other amounts due under any Leases pursuant to the terms of such Leases, but Seller shall give Purchaser written notice of the application of any such security deposits and Seller shall seek, but not as a condition to Closing, the replenishment of such security deposits from the applicable tenant prior to Closing.

### ARTICLE XI.
### Closing Requirements.

**11.1**     **Requirements of Seller**.  The obligations of Seller under this Agreement to sell the Property and consummate the other transactions contemplated hereby shall be subject to the satisfaction of the following requirements on or before the Closing Date except to the extent that any of such requirements may be waived by Seller in writing at prior to or Closing.

**11.1.1**     **Representations, Warranties and Covenants of Purchaser**. All representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing Date, with the same force and effect as if such representations and warranties were made anew as of the Closing Date. Any changes to such representations

16

disclosed by Purchaser pursuant to Article XI must be approved in writing by Seller , and Purchaser shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by Purchaser prior to the Closing Date.

      **11.1.2**    **No Orders**.  Except for the Disclosed Litigation, no order, writ, injunction or decree shall have been entered and be in effect by any court of competent jurisdiction or any governmental authority, and no statute, rule, regulation or other requirement shall have been promulgated or enacted and be in effect, that restrains, enjoins or invalidates the transactions contemplated hereby.

      **11.1.3**    **No Suits**.  Except for the Disclosed Litigation, no other suit or other proceeding shall be pending or threatened by any third party before any court or governmental authority seeking to restrain or prohibit or declare illegal, or seeking substantial damages against Seller or any of its affiliates in a manner that would affect Purchaser or the Property in connection with the transactions contemplated by this Agreement.

    **11.2**    **Requirements of Purchaser**. Subject to the satisfaction or waiver of the matters described in Article V, the obligations of Purchaser under this Agreement to purchase the Property and consummate the other transactions contemplated hereby shall be subject to the satisfaction of the following requirements on or before the Closing Date, except to the extent that any of such requirements may be waived by Purchaser in writing prior to or at Closing.

      **11.2.1**    **Representations, Warranties and Covenants of Seller**.  All representations and warranties of Seller in this Agreement shall be true and correct in all material respects as of the Closing Date, with the same force and effect as if such representations and warranties were made anew as of the Closing Date.  Any changes to such representations disclosed by Seller pursuant to Section 11.2.6 shall be acceptable to Purchaser, and Seller shall have performed and complied in all material respects with all covenants and agreement required by this Agreement to be performed or complied with by Seller prior to the Closing Date.

      **11.2.2**    **No Orders**.  Except for the Disclosed Litigation, no order, writ, injunction or decree shall have been entered and be in effect by any court of competent jurisdiction or any governmental authority, and no statute, rule, regulation or other requirement shall have been promulgated or enacted and be in effect, that restrains, enjoins or invalidates the transactions contemplated hereby.

      **11.2.3**    **No Suits**.  Except for the Disclosed Litigation, no suit or other proceeding shall be pending or threatened by any third party not affiliated with or acting at the request of Purchaser before any court or governmental authority seeking to restrain or prohibit or declare illegal, or seeking substantial damages against Purchaser or the Property in connection with the transactions contemplated by this Agreement.

EXECUTION COPY

**11.2.4** **Title Policy**.  Upon recordation of the Deed and payment of the title insurance premiums, the Title Company shall be irrevocably committed to issue to Purchaser a Title Policy, together with all approved endorsements, insuring, as applicable, Purchaser as the fee owner of the Property and insuring Purchaser's or its nominee's interest, subject only to the Permitted Exceptions. Notwithstanding the foregoing, in the event the Title Company shall refuse to insure this transaction, Seller shall have the right to replace the Title Company with a national underwriter from any of Stewart, Old Republic, Chicago, or First American, upon which substitution Purchaser shall be obligated to close.

**11.2.5** **Possession of the Property**.  Delivery by Seller of possession of the Property, subject to the Permitted Exceptions and the rights of tenants under the Leases and Approved New Leases.

**11.2.6** **Rights of First Refusal and Options to Purchase**. Seller represents that it has not granted rights of first refusal or purchase options to purchase the Property or any portion thereof**.**

## ARTICLE XII.
### Closing

**12.1** **Purchaser's Closing Obligations**.  Purchaser, at its sole cost and expense, shall deliver or cause to be delivered to Seller at Closing, the following:

**12.1.1** The Purchase Price, after all adjustments are made at the Closing as herein provided, by wire transfer or other immediately available federal funds, which amount shall be received in escrow by the Title Company at or before 12:00 noon Eastern Time on the day of the Closing.

**12.1.2** Two (2) counterparts each of (i) a blanket assignment and bill of sale, substantially in the form attached hereto as Exhibit C (the "**General Assignment**"), duly executed by Purchaser, conveying and assigning to Purchaser, as successor owner or successor landlord, as the case may be, the Personal Property, the Leases, the Property records and plans, and the Intangible Property.

**12.1.3** Evidence reasonably satisfactory to Seller and the Title Company that the person executing the Closing documents on behalf of Purchaser has full right, power and authority to do so

**12.1.4** Written notice executed by Purchaser and addressed to the tenants, (i) acknowledging the sale of the Property to Purchaser, (ii) acknowledging that Purchaser has received and is responsible for any security deposits less any portion of the security deposit applied

18

to cure a tenant's default prior to Closing and (iii) indicating that rent should thereafter be paid to Purchaser and giving instructions therefor.

> 12.1.5    A certificate indicating that the Purchaser's representations and warranties set forth in Article VIII are true and correct on the Closing Date, or, if there have been changes, describing such changes.

> 12.1.6    A settlement statement, signed by Purchaser.

> 12.1.7    Such other documents as may be reasonably necessary or appropriate to effect the consummation of the transactions which are the subject of this Agreement.

> 12.1.8    Counterparts of any of the documents described in <u>Section 11.2</u>, as applicable.

> 12.1.9    A proforma of the Title Policy.

**12.2**    <u>**Seller's Closing Obligations**</u>.  Seller, at its sole cost and expense, shall deliver or cause to be delivered to Purchaser at or prior to the Closing the following:

> 12.2.1    Limited Warranty Deed (collectively, the "**Deed**") in recordable form properly executed by Seller conveying to Purchaser the Land and Improvements described on <u>Exhibit A</u> in fee simple, subject only to the Permitted Exceptions, substantially in the form attached hereto as <u>Exhibit D</u>.

> 12.2.2    an Assignment and Assumption of Lease(s) in recordable form properly executed by Seller conveying Seller's interest in the Leases set forth on <u>Schedules 1.1.2</u> and <u>7.1.15.</u>

> 12.2.3    Two (2) counterparts each of the General Assignment, duly executed by Seller.

> 12.2.4     Written notice, substantially in the form attached hereto as <u>Exhibit E</u>, executed by Seller's property manager and addressed to the tenants.

> 12.2.1    Evidence reasonably satisfactory to the Title Company that  the person executing the Closing documents on behalf of Seller has full right, power and authority to do so. A certificate indicating that the Seller's representations and warranties set forth in <u>Article VII</u> are true and correct on the Closing Date, or, if there have been changes, describing such changes.

> 12.2.2    A certificate ("**Non-foreign Entity Certification**") certifying that Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended in a form reasonably acceptable to the Escrow Agent.

19

**12.2.3**      A settlement statement, signed by Seller.

**12.2.4**      An Owner's Affidavit in a form reasonably required by the Title Company, signed by Seller sufficient for the Title Company to delete the standard exceptions from the Title Policy to be issued to Purchaser at Closing

**12.2.5**      The following items, to the extent in Seller's possession or control and not deemed Seller's work product:  (i) all keys for all entrance door and spaces which may be locked (whether occupied or not) in the Improvements; (ii) all original books, records, tenant files, operating reports, plans and specifications, warranties, and other materials reasonably necessary to the continuity of operation of the Property; (iii) the originals (or certified copies where originals are not available) of the Leases, the Contracts which are not terminated as of the Closing Date pursuant to Section 9.6 hereof and the licenses and permits; (iv) an updated rent roll and accounts receivable ledger, updating the rent roll and accounts receivable ledger delivered within three (3) Business Days prior to Closing certified by each applicable Seller as true and correct; and (v) certificates of insurance from the tenants.

**12.2.6**      Releases and/or terminations for the items Seller has agreed to clear pursuant to Seller's Title Response (other than Permitted Exceptions) in forms required by the Title Company or the substitute title company to delete, omit, or otherwise insure over such items as exceptions to the Title Policy and in recordable form.

**12.2.7**      Such other documents as may be reasonably necessary or appropriate to effect the consummation of the transactions which are the subject to this Agreement.

## ARTICLE XIII.
### Risk of Loss.

**13.1**    **Condemnation and Casualty**.  If, prior to the Closing Date, all or any portion of the Property is taken by condemnation or eminent domain, or is the subject of a pending taking which has not been consummated, or is destroyed or damaged by fire or other casualty, Seller shall notify Purchaser of such fact promptly after Seller obtains knowledge thereof.  If such condemnation, eminent domain or casualty is "**Material**" (as hereinafter defined), Purchaser shall have the option to terminate this Agreement upon notice to Seller given not later than fifteen (15) days after receipt of each such Seller's notice, or the Closing Date, whichever is earlier.  If this Agreement is terminated, the Deposit shall be returned to Purchaser and thereafter neither Seller nor Purchaser shall have any further rights or obligations to the other hereunder except with respect to the Surviving Obligations.  If this Agreement is not terminated, Seller shall not be obligated to repair any damage or destruction but (x) the Seller shall assign, without recourse, and turn over to Purchaser all of the insurance proceeds or condemnation proceeds, as applicable, net of any costs of repairs and net of reasonable collection costs (or, if such have not been awarded, all of its right, title and interest therein) payable with respect to such fire or other casualty or condemnation

20

EXECUTION COPY

including any rent abatement insurance for such casualty or condemnation and (y) the parties shall proceed to Closing pursuant to the terms hereof without abatement of the Purchase Price except for a credit in the amount of the applicable insurance deductible.

**13.2** **Condemnation Not Material**. If the condemnation or eminent domain is not Material, then the Closing shall occur without abatement of the Purchase Price and, after deducting the Seller's reasonable costs and expenses incurred in collecting any award, the Seller shall assign, without recourse, all remaining awards or any rights to collect awards to Purchaser on the Closing Date.

**13.3** **Casualty Not Material**. If the casualty is not Material, then the Closing shall occur without abatement of the Purchase Price except for a credit in the amount of the applicable deductible and the Seller shall not be obligated to repair such damage or destruction and the Seller shall assign, without recourse, and turn over to Purchaser all of the insurance proceeds net of any costs of repairs and net of reasonable collection costs (or, if such have not been awarded, all of its right, title and interest therein) payable with respect to such fire or such casualty including any rent abatement insurance for such casualty, less any expenses incurred by Seller in repairing/restoring the Property.

**13.4** **Materiality**. For purposes of this Article XII, (i) with respect to a taking by eminent domain, the term "**Material**" shall mean any taking whatsoever, regardless of the amount of the award or the amount of the Property taken, excluding, however, any taking solely of (x) subsurface rights or takings for utility easements or right of way easements, if the surface of the Property, after such taking, may be used in substantially the same manner as though such rights had not been taken, or (y) a lease of less than 10% of the rentable square feet for a term of less than five years, and (ii) with respect to a casualty, the term "**Material**" shall mean any casualty such that the cost of repair, as reasonably estimated by the applicable Seller's engineer, is in excess of Five Hundred Thousand Dollars ($500,000.00) and (iii) with respect to a condemnation, the term "**Material**" shall mean any condemnation of the office building portion of the Property only and for purposes of clarification, any condemnation affecting the parking facilities portion of the Property (regardless of materiality) is not subject to this Article XII.

## ARTICLE XIV.
## Default

**14.1** **Default by Seller**. If Seller defaults under any term or condition of this Agreement, Purchaser shall provide Seller with written notice of such default and Seller shall have a period of fourteen (14) days from receipt of Purchaser's notice to cure such default or if the nature of the default is such that it cannot reasonably be cured within such 14-day period, then Seller shall have until Closing to cure such default provided that Seller affirmatively commits to undertaking such cure and completing it before Closing. If Seller fails to cure (or commit to cure) as described in

this <u>Section 13.1</u> then Purchaser's sole remedy shall be to terminate this Agreement, receive a return of the Deposit or attempt to enforce specific performance of this Agreement, which suit must commenced within 60 days of Seller' default.

      **14.2**    **Default by Purchaser**.  If Purchaser defaults under any term or condition of this Agreement, Seller shall provide Purchaser with written notice and a fourteen (14) day cure period. If Purchaser fails to cure the default within said fourteen (14) day cure period, Seller may, as its sole rights and remedies elect one of the following: (i) terminate this Agreement and retain, as liquidated damages, the Deposit; or (ii) specifically enforce the terms and conditions of this Agreement.

**ARTICLE XV.**
**Brokers**

      Purchaser and Seller each represent and warrant to the other that it has not dealt with any person or entity entitled to a brokerage commission, finder's fee or other compensation with respect to the transaction contemplated hereby other than Rico Pietro of Cushman and Wakefield (the "**Broker**") whose 2% commission will be shared equally between Seller and Purchaser and will be paid by each party pursuant to a separate agreement by and between each party and Broker, which commission(s) will be paid at Closing should Closing occur.  Purchaser hereby agrees to indemnify, defend, and hold Seller harmless from and against any losses, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and costs) incurred by Seller by reason of any breach or inaccuracy of the Purchaser's (or its nominee's) representations and warranties contained in this <u>Article XV</u>.  Seller hereby agree to indemnify, defend, and hold Purchaser harmless from and against any losses, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and costs) incurred by Purchaser by reason of any breach or inaccuracy of Seller's representations and warranties contained in this <u>Article XIV</u>.  Seller and Purchaser agree that it is their specific intent that no broker shall be a party to or a third party beneficiary of this Agreement or the Deposit, that no broker shall have any rights or cause of action hereunder, and further that the consent of a broker shall not be necessary to any agreement, amendment, or document with respect to the transaction contemplated by this Agreement.  The provisions of this <u>Article XV</u> shall survive the Closing or earlier termination of this Agreement.

22

## ARTICLE XVI.
### Confidentiality

**16.1** <u>**Confidentiality**</u>.

      **16.1.1** <u>**Mutual Obligations**</u>.  Seller and Purchaser expressly acknowledge and agree that the transactions contemplated by this Agreement and the terms, conditions and negotiations concerning the same shall be held in the strictest confidence by each of them  and shall not be disclosed by either of them, except to its legal counsel, surveyor, lenders, property consultants and inspectors, environmental consultants, Title Company, broker, accountants, consultants, officers, partners, directors, managers, members and shareholders (the "**Authorized Representatives**"), and except and only to the extent that such disclosure may be necessary or appropriate for its performance hereunder (including, without limitation, any interviews with tenants, occupants or other third parties or other regulatory approvals that may be pursued by Purchaser pursuant to the terms of this Agreement).  Seller and Purchaser agree that each of them shall instruct each of their respective Authorized Representatives to maintain the confidentiality of such information.  Purchaser further acknowledges and agrees that, unless and until the Closing occurs, all information and materials obtained by Purchaser in connection with the Property that are not otherwise known by or readily available to the public will not be disclosed by Purchaser to any third persons (other than to its Authorized Representatives) without the prior written consent of Seller.  Nothing contained in this <u>Section 16.1</u> or in <u>Section 16.2</u> shall preclude or limit either party from disclosing or accessing any information otherwise deemed confidential under this <u>Section 16.1</u> or <u>Section 16.2</u> in connection with the party's enforcement of its rights following a disagreement hereunder or in response to lawful process or subpoena or other valid or enforceable order of a court of competent jurisdiction or any filings with governmental authorities required by reason of the transactions provided for herein.  The provisions of this <u>Section 16.1.1</u> shall survive any termination of this Agreement for a period of six (6) months.

      **16.1.2** <u>**Seller Obligations**</u>.  Seller hereby acknowledges and agrees that after Closing all information and materials obtained by Seller from Purchaser in connection with the Property that are not otherwise known by or readily available to the public will not be disclosed by Seller to any third persons (other than to its Authorized Representatives and in no event shall Seller be liable in the event of an unintentional breach under this <u>Section 16.1.2</u>) without the prior written consent of Purchaser.  The provisions of this <u>Section 16.1.2</u> shall survive Closing for a period of six (6) months following Closing.

    **16.2** <u>**Post-Closing Publication**</u>.  Notwithstanding the foregoing, following Closing, neither party shall have the right to announce or publish any news regarding the purchase and sale

23

of the Property without the written consent of the other party. The provisions of this <u>Section 16.2</u> shall survive Closing.

## ARTICLE XVII.
### Miscellaneous

**17.1**   **<u>Notices</u>**.   Any and all notices, requests, demands or other communications hereunder shall be deemed to have been duly given if in writing and if transmitted by hand delivery with receipt therefor, by facsimile or electronic e-mail delivery (with confirmation by hard copy), by overnight courier, or by registered or certified mail, return receipt requested, first class postage prepaid addressed as follows (or to such new address as the addressee of such a communication may have notified the sender thereof) (the date of such notice shall be the date of actual delivery to the recipient thereof):

| | |
|---|---|
| To Purchaser: | KD 55 PUBLIC SQUARE LLC<br>4420 Sherwin Road<br>Willoughby, Ohio 44094<br>Attn: Douglas E. Price III<br>Phone No:   440-946-3600<br>Fax No.: 440-946-8715<br>Email:  mstempihar@KandD.com |
| With a copy to: | Ulmer & Berne LLP<br>West 2nd Street, Suite 1100<br>Cleveland, Ohio 44113<br>Attn: Mary Forbes Lovett, Esq.<br>Phone No: 216-583-7074<br>Fax No:  216-583-7075<br>Email:  mlovett@ulmer.com |
| To Seller: | Optima 55 Public Square LLC<br>1375 E 9th St #2250<br>Cleveland, OH 44114<br>Attn:  Chaim Schochet<br>Phone No.: 216-781-8980<br>Email: chaim@optimamng.com |

24

To Escrow Agent:        NorthStar Title Services
1406 West 6th Street, Suite 400
Cleveland, OH  44113
Attn: Mary Robenalt Porter, Esq.
Phone: (216) 623-3655
Email: mporter@nstitle.com

**17.2**    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the internal, substantive laws of the State of Ohio, without regard to the conflict of laws principles thereof.

**17.3**    **Headings**.  The captions and headings herein are for convenience and reference only and in no way define or limit the scope or content of this Agreement or in any way affect its provisions.

**17.4**    **Effective Date**.  This Agreement shall be effective upon the Effective Date when fully executed by the Seller and Purchaser.

**17.5**    **Business Days**.  If any date herein set forth for the performance of any obligations of Seller or Purchaser or for the delivery of any instrument or notice as herein provided should be on a Saturday, Sunday or legal holiday, the compliance with such obligations or delivery shall be deemed acceptable on the next Business Day following such Saturday, Sunday or legal holiday. As used herein, the term "legal holiday" means any state or Federal holiday for which financial institutions or post offices are generally closed in the state where the Property is located.

**17.6**    **Counterpart Copies**.  This Agreement may be executed in two or more counterpart copies, all of which counterparts shall have the same force and effect as if all parties hereto had executed a single copy of this Agreement. Signatures transmitted via facsimile or PDF shall be deemed to be original signatures.

**17.7**    **Binding Effect**.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns.

**17.8**    **Assignment**.  Purchaser shall not have the right to assign the Agreement without Seller's prior written consent, which consent may be given or withheld in Seller's sole and absolute discretion; and Purchaser shall in no event be released from any of its obligations or liabilities hereunder as a result of any such approved assignment. Notwithstanding the foregoing to the contrary, Purchaser intends to form a special purpose entity to acquire and take title at Closing to the Property (the "**Purchaser's Designee**").  Purchaser represents and warrant that Purchaser's

25

EXECUTION COPY

Designee entity will be an Affiliate (as defined below) of Purchaser. Accordingly, and notwithstanding anything to the contrary stated above, Purchaser is permitted to assign this Agreement, in whole or in part, without Seller's consent to the aforementioned Affiliate of Purchaser, provided that, (i) assignee assumes Purchaser's obligations under this Agreement pursuant to a written agreement in form and substance reasonably acceptable to Seller; (ii) Seller receives a copy of such assignment and assumption agreement on or before three (3) Business Days prior to Closing and reaffirms all of the representations and warranties of Purchaser herein and (iii) Purchaser shall remain liable for, and shall not be released from the performance of, Purchaser's obligations under this Agreement after such assignment. Whenever reference is made in this Agreement to Seller or Purchaser, such reference shall include the successors and assigns of such party under this Agreement.  For purposes of this <u>Section 17.8</u>, "**Affiliate**" shall mean an entity that directly or indirectly through one or more intermediaries' controls, or is controlled by, or is under the common control with, the Purchaser. Should Purchaser desire to assign this Agreement, in whole or in part, to a third party or parties other than to the special purpose entity created to take title to the Property, then the terms of this <u>Section 17.8</u> shall apply to any such assignment.

      **17.9**    <u>**Interpretation**</u>.  This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared by counsel for one of the parties, it being recognized that both Seller and Purchaser have contributed substantially and materially to the preparation of this Agreement.

      **17.10**

      <u>**Entire Agreement**</u>.  This Agreement and the Exhibits attached hereto contain the final and entire agreement between the parties hereto with respect to the sale and purchase of the Property and are intended to be an integration of all prior negotiations and understandings.  Purchaser, Seller and their agents shall not be bound by any terms, conditions, statements, warranties or representations, oral or written, not contained herein.   No change or modifications to this Agreement shall be valid unless the same is in writing and signed by the parties hereto.  Each party reserves the right to waive any of the terms or conditions of this Agreement which are for their respective benefit and to consummate the transaction contemplated by this Agreement in accordance with the terms and conditions of this Agreement which have not been so waived.  Any such waiver must be in writing signed by the party for whose benefit the provision is being waived.

      **17.11**   Joint and Several Liability. In the event there are multiple assignees of Purchaser who take title to the Property, the liability of such assignees with respect to the obligations of Purchaser under this Agreement shall be joint and severable.

      **17.12**   Limited Liability.   The obligations of Seller, its agents, representatives or employees arising by virtue of this Agreement shall be limited to the interest of Seller in the

EXECUTION COPY

Property and no recourse shall be had to any other assets of Seller, its agents, representatives or employees.

**17.13**   Confidentiality.  Purchaser shall make no public announcement or disclosure of any information related to this Agreement to outside brokers or third parties without the prior written consent of Seller; provided, however, that Purchaser may, subject to the provisions of Section 5(e) hereof, make disclosure of this Agreement to its employees, mortgage brokers, and lenders as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Purchaser.

**17.14**  LIS PENDENS OTHER THAN IN CONNECTION WITH THE EXERCISE OF PURCHASER'S RIGHT TO COMPEL SPECIFIC PERFORMANCE, PURCHASER EXPRESSLY WAIVES ANY RIGHT TO RECORD OR FILE THIS AGREEMENT OR ANY NOTICE OF IT, OR ANY LIS PENDENS OR NOTICE OF PENDENCY OF ACTION OR SIMILAR NOTICE AGAINST ALL OR ANY PORTION OF THE PROPERTY IN CONNECTION WITH ANY ALLEGED DEFAULT BY SELLER HEREUNDER. PURCHASER AND SELLER HEREBY EVIDENCE THEIR SPECIFIC AGREEMENT TO THE TERMS OF THIS WAIVER BY PLACING THEIR INITIALS IN THE PLACE PROVIDED HEREINAFTER.  IN THE EVENT OF SUCH RECORDING, THIS AGREEMENT SHALL BE NULL AND VOID AND THE TITLE COMPANY SHALL PAY THE EARNEST MONEY TO SELLER.  PURCHASER AND SELLER HEREBY EVIDENCE THEIR SPECIFIC AGREEMENT TO THE TERMS OF THIS WAIVER BY PLACING THEIR INITIALS IN THE PLACE PROVIDED HEREINAFTER.  THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE CLOSING OR ANY TERMINATION OF THIS AGREEMENT.

**17.15**  No Liability of Related Parties.  No Related Entity, nor any person who holds a direct or indirect ownership interest in Seller or any Related Entity, nor any of the respective officers, directors, trustees, agents and employees of any such person shall have any liability, directly or indirectly, under or in connection with this Agreement, any document or certificate executed in connection with this Agreement (including the documents executed at Closing) or any amendment of any of the foregoing made at any time, whether prior to, contemporaneous with or after this Agreement.  Purchaser and its successors and assigns, as well as all other persons, may look solely to Seller's assets for the payment of any claim or any performance, and Purchaser, on behalf of itself and its successors and assigns, hereby waives any and all other claims, demands, causes of action and liability. "Related Entities" or a "Related Entity" means all direct and indirect affiliates and subsidiaries of Seller, all entities related thereto and all partners, shareholders, members, directors, officers, trustees, managers, authorized agents and employees thereof.

EXECUTION COPY

**17.16**    Waiver of Jury Trial. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR RELATED HERETO, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.   THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS TRANSACTION. The provisions of this Subsection U shall survive the Closing and any termination of this Agreement.

**17.17**    Disclaimers.

(a)    Purchaser expressly acknowledges that, except as expressly provided in this Agreement, the Property is being sold and accepted AS IS, WHERE-IS, WITH ALL FAULTS. SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY PURCHASER) WITH RESPECT TO THE PROPERTY OR ITS CONDITION OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS OR RESULTS OF OPERATIONS OF THE PROPERTY AND PURCHASER ACCEPTS SUCH DISCLAIMERS.   THE DISCLAIMERS IN THIS SECTION 17.17 SPECIFICALLY EXTEND TO (1) MATTERS RELATING TO HAZARDOUS MATERIALS AND COMPLIANCE WITH ENVIRONMENTAL LAWS, (2) GEOLOGICAL CONDITIONS, INCLUDING SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND STREAMS AND RESERVOIRS AND OTHER UNDERGROUND WATER CONDITIONS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER, EARTHQUAKE FAULTS, AND MATTERS RELATING TO FLOOD PRONE AREAS, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARDS, (3) STORMWATER DETENTION, RETENTION, DISCHARGE OR DRAINAGE, (4) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF UNSTABLE SOILS, CONDITIONS OF SOIL FILL, SUSCEPTIBILITY TO LANDSLIDES, AND THE SUFFICIENCY OF ANY UNDERSHORING, (5) ZONING AND SUBDIVISION AND COMPLIANCE WITH ZONING AND SUBDIVISION LAWS, (6) THE VALUE AND PROFIT POTENTIAL OF THE PROPERTY, (7) DESIGN, CONSTRUCTION, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY AND PHYSICAL CONDITION OF THE PROPERTY AND (8) COMPLIANCE OF THE PROPERTY WITH ANY LAWS (INCLUDING BUILDING CODES AND SIMILAR LAWS, THE AMERICANS WITH DISABILITIES ACT OF 1990 AND THE FAIR HOUSING

28

AMENDMENTS ACT OF 1988). PURCHASER REPRESENTS AND WARRANTS TO SELLER AND ITS RELATED ENTITIES THAT PURCHASER IS A KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED PURCHASER OF REAL ESTATE. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY STATEMENT OF SELLER OR ANY OF ITS RELATED ENTITIES OR ANY OFFICER, DIRECTOR, TRUSTEE, AGENT, EMPLOYEE OR OTHER PERSON ACTING OR PURPORTING TO ACT ON BEHALF OF SELLER OR ANY OF ITS RELATED ENTITIES. PURCHASER ACKNOWLEDGES THAT IT HAS CONDUCTED OR WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS AS TO THE CONDITION OF THE PROPERTY AND ALL MAILERS BEARING UPON THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY TO PROTECT ITS INTERESTS AND DETERMINE THE SUITABILITY OF THE PROPERTY FOR PURCHASER'S INTENDED USE. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN SECTION 15U HEREOF, PURCHASER IS ACQUIRING THE PROPERTY "AS IS" AND "WHERE IS" AND SUBJECT TO ALL FAULTS, DEFECTS OR OTHER ADVERSE MATTERS, WHETHER PATENT OR LATENT. UPON CLOSING, PURCHASER WILL ACCEPT THE PROPERTY SUBJECT TO BOTH PATENT AND LATENT ADVERSE STRUCTURAL, PHYSICAL, ECONOMIC OR ENVIRONMENTAL CONDITIONS OR DEFECTS THAT MAY THEN EXIST, WHETHER OR NOT REVEALED BY THE INSPECTIONS AND INVESTIGATIONS CONDUCTED BY PURCHASER. PURCHASER SPECIFICALLY WAIVES AND RELEASES (1) ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY SELLER BUT EXCLUDING THE REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN) WITH RESPECT TO THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AND (2) EXCEPT FOR ANY BREACH BY SELLER UNDER THIS AGREEMENT, ALL RIGHTS, REMEDIES, RECOURSE OR OTHER BASIS FOR RECOVERY (INCLUDING ANY RIGHTS, REMEDIES, RECOURSE OR BASIS FOR RECOVERY BASED ON NEGLIGENCE OR STRICT LIABILITY) THAT PURCHASER WOULD OTHERWISE HAVE AGAINST SELLER OR ANY OF ITS RELATED ENTITIES, ANY PERSON WHO HOLDS A DIRECT OR INDIRECT OWNERSHIP INTEREST IN SELLER OR ANY RELATED ENTITY AND THE RESPECTIVE

EXECUTION COPY

MEMBERS, PARTNERS, OFFICERS, DIRECTORS, TRUSTEES, AGENTS AND EMPLOYEES OF EACH SUCH PERSON IN RESPECT OF THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY TO PROTECT ITS INTERESTS.  PURCHASER ACKNOWLEDGES AND AGREES THAT: (i) THE DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 17.17 ARE AN INTEGRAL PART OF THIS AGREEMENT, (ii) SELLER WAS MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT AND SELL THE PROPERTY TO PURCHASER IN MATERIAL RELIANCE UPON SUCH DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 17.17, (iii) SELLER WOULD NOT HAVE AGREED TO COMPLETE THE SALE ON THE TERMS PROVIDED IN THIS AGREEMENT, WITHOUT THE DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 17.17.  THE PROVISIONS OF THIS SECTION 17.17 AND THE DISCLAIMERS, WAIVERS AND RELEASES SET FORTH HEREIN SHALL EXPRESSLY INCLUDE AND BE FOR THE BENEFIT OF ALL RELATED ENTITIES AND ALL RELATED ENTITIES ARE EXPRESSLY THIRD-PARTY BENEFICIARIES OF THIS SECTION 17.17.

EXCEPT WITH RESPECT TO A SELLER DEFAULT UNDER THIS AGREEMENT WITH RESPECT TO WHICH PURCHASER HAS CERTAIN REMEDIES AS MAY BE EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER HEREBY AGREES THAT SELLER, AND EACH OF SELLER'S PARTNERS, MEMBERS, TRUSTEES, DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, PROPERTY MANAGERS, ASSET MANAGERS, AGENTS, ATTORNEYS, AFFILIATES AND RELATED ENTITIES, HEIRS, SUCCESSORS, AND ASSIGNS (COLLECTIVELY, THE "RELEASEES") SHALL BE, AND ARE HEREBY, FULLY AND FOREVER RELEASED AND DISCHARGED FROM ANY AND ALL LIABILITIES, LOSSES, CLAIMS (INCLUDING THIRD PARTY CLAIMS), DEMANDS, DAMAGES (OF ANY NATURE WHATSOEVER), CAUSES OF ACTION, COSTS, PENALTIES, FINES, JUDGMENTS, REASONABLE ATTORNEYS' FEES, CONSULTANTS' FEES AND COSTS AND EXPERTS' FEES (COLLECTIVELY, THE "CLAIMS") WITH RESPECT TO ANY AND ALL CLAIMS, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THAT MAY ARISE ON ACCOUNT OF OR IN ANY WAY BE CONNECTED WITH THE ASSETS OR THE PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, THE PHYSICAL, ENVIRONMENTAL AND STRUCTURAL CONDITION OF THE ASSETS OR THE PROPERTY OR ANY LAW OR REGULATION APPLICABLE THERETO, INCLUDING, WITHOUT LIMITATION, ANY CLAIM OR MATTER (REGARDLESS OF WHEN IT FIRST APPEARED) RELATING TO OR ARISING FROM (A) THE PRESENCE OF ANY ENVIRONMENTAL PROBLEMS, OR THE

EXECUTION COPY

USE, PRESENCE, STORAGE, RELEASE, DISCHARGE, OR MIGRATION OF HAZARDOUS MATERIALS ON, IN, UNDER OR AROUND THE PROPERTY REGARDLESS OF WHEN SUCH HAZARDOUS MATERIALS WERE FIRST INTRODUCED IN, ON OR ABOUT THE PROPERTY, (ii) ANY PATENT OR LATENT DEFECTS OR DEFICIENCIES WITH RESPECT TO THE ASSETS , (iii) ANY AND ALL MATTERS RELATED TO THE ASSETS OR ANY PORTION THEREOF, INCLUDING WITHOUT LIMITATION, THE CONDITION AND/OR OPERATION OF THE ASSETS AND EACH PART THEREOF, (iv) ANY AND ALL MATTERS RELATED TO THE CURRENT OR FUTURE ZONING OR USE OF THE PROPERTY, AND (E) THE PRESENCE, RELEASE AND/OR REMEDIATION OF ASBESTOS AND ASBESTOS CONTAINING MATERIALS IN, ON OR ABOUT THE PROPERTY REGARDLESS OF WHEN SUCH ASBESTOS AND ASBESTOS CONTAINING MATERIALS WERE FIRST INTRODUCED IN, ON OR ABOUT THE PROPERTY; PROVIDED, HOWEVER, THAT IN NO EVENT SHALL RELEASEES BE RELEASED FROM ANY CLAIMS ARISING PURSUANT TO THE PROVISIONS OF THIS AGREEMENT OR SELLER'S OBLIGATIONS, IF ANY, UNDER THE CLOSING DOCUMENTS. PURCHASER HEREBY WAIVES AND AGREES NOT TO COMMENCE ANY ACTION, LEGAL PROCEEDING, CAUSE OF ACTION OR SUITS IN LAW OR EQUITY, OF WHATEVER KIND OR NATURE, INCLUDING, BUT NOT LIMITED TO, A PRIVATE RIGHT OF ACTION UNDER THE FEDERAL SUPERFUND LAWS, 42 U.S.C. SECTIONS 9601 ET SEQ. AND SIMILAR STATE ENVIRONMENTAL LAWS (AS SUCH LAWS AND STATUTES MAY BE AMENDED, SUPPLEMENTED OR REPLACED FROM TIME TO TIME), DIRECTLY OR INDIRECTLY, AGAINST THE RELEASEES OR THEIR AGENTS IN CONNECTION WITH CLAIMS DESCRIBED ABOVE.IN THIS CONNECTION AND TO THE GREATEST EXTENT PERMITTED BY LAW, PURCHASER HEREBY AGREES THAT PURCHASER REALIZES AND ACKNOWLEDGES THAT FACTUAL MATTERS NOW KNOWN TO IT MAY HAVE GIVEN OR MAY HEREAFTER GIVE RISE TO CAUSES OF ACTION, CLAIMS, DEMANDS, DEBTS, CONTROVERSIES, DAMAGE, COSTS, LOSSES AND EXPENSES WHICH ARE PRESENTLY UNKNOWN, UNANTICIPATED AND UNSUSPECTED, AND PURCHASER FURTHER AGREES THAT THE WAIVERS AND RELEASES HEREIN HAVE BEEN NEGOTIATED AND AGREED UPON IN LIGHT OF THAT REALIZATION AND THAT PURCHASER NEVERTHELESS HEREBY INTENDS TO RELEASE, DISCHARGE AND ACQUIT SELLER FROM ANY SUCH UNKNOWN CLAIMS, DEBTS, AND CONTROVERSIES WHICH MIGHT IN ANY WAY BE INCLUDED AS A MATERIAL PORTION OF THE CONSIDERATION GIVEN TO SELLER BY PURCHASER IN EXCHANGE FOR SELLER'S PERFORMANCE HEREUNDER.

(b)     SELLER HAS GIVEN PURCHASER MATERIAL CONCESSIONS REGARDING THIS TRANSACTION IN EXCHANGE FOR PURCHASER AGREEING TO THE PROVISIONS OF THIS SECTION 17.17.  THE PROVISIONS OF THIS SECTION 17.17 SHALL SURVIVE THE CLOSING AND SHALL NOT BE DEEMED MERGED INTO ANY INSTRUMENT OR CONVEYANCE DELIVERED AT THE CLOSING.

EXECUTION COPY

The matters described in this Section 17.17 shall survive Closing and are expressly excluded from any Seller's indemnity set forth herein.

**17.18**   **Severability**.  If any one or more of the provisions hereof shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**17.19**   -**Survival**.  Except as otherwise expressly provided for herein (collectively, the "**Surviving Obligations**") the provisions of this Agreement and the representations and warranties herein shall not survive after the conveyance of title and payment of the Purchase Price but be merged therein.

**17.20**   **Exhibits and Schedules**.  Exhibits and Schedules attached hereto are incorporated herein by reference

**17.21**   **Time**.  Time is of the essence in the performance of each of the parties' respective obligations contained herein.

**17.22**   -**Prevailing Party**.  Should either party employ an attorney to enforce any of the provisions hereof, (whether before or after Closing, and including any claims or actions involving amounts held in escrow), the non-prevailing party in any final judgment agrees to pay the other party's reasonable expenses, including reasonable attorneys' fees and expenses in or out of litigation and, if in litigation, trial, appellate, bankruptcy or other proceedings, expended or incurred in connection therewith, as determined by a court of competent jurisdiction.  The provisions of this Section 16.15 shall survive Closing or any earlier termination of this Agreement.

**17.23**   **Escrow Agreement**.

**17.23.1**   **Instructions**.  Purchaser and Seller each shall promptly deposit a copy of this Agreement executed by such party (or either of them shall deposit a copy executed by both Purchaser and Seller) with Escrow Agent, and, upon receipt of the Deposit from Purchaser, Escrow Agent shall immediately execute this Agreement where provided below.  This Agreement, together with such further instructions, if any, as the parties shall provide to Escrow Agent by written agreement, shall constitute the escrow instructions.  If any requirements relating to the duties or obligations of Escrow Agent hereunder are not acceptable to Escrow Agent, or if Escrow Agent requires additional instructions, the parties hereto agree to make such deletions, substitutions and additions hereto as counsel for Purchaser and Seller shall mutually approve, which additional instructions shall not substantially alter the terms of this Agreement unless otherwise expressly agreed to by Seller and Purchaser.

EXECUTION COPY

**17.23.2** **Real Estate Reporting Person**.  Escrow Agent is hereby designated the "real estate reporting person" for purposes of Section 6045 of Title 26 of the United States Code and Treasury Regulation 1.6045-4 and any instructions or settlement statement prepared by Escrow Agent shall so provide.  Upon the consummation of the transaction contemplated by this Agreement, Escrow Agent shall file Form 1099 information return and send the statement to Seller as required under the aforementioned statute and regulation.  Seller and Purchaser shall promptly furnish their federal tax identification numbers to Escrow Agent and shall otherwise reasonably cooperate with Escrow Agent in connection with Escrow Agent's duties as real estate reporting person.

**17.23.3** **Liability of Escrow Agent**.  The parties acknowledge that the Escrow Agent shall be conclusively entitled to rely, except as hereinafter set forth, upon a certificate from Purchaser or Seller as to how the Deposit (which, for purposes of this Section shall be deemed to also include any other escrowed funds held by the Escrow Agent pursuant to this Agreement) should be disbursed. Any notice sent by Seller or Purchaser (the "**Notifying Party**") to the Escrow Agent shall be sent simultaneously to the other noticed parties pursuant to Section 16.1 herein (the "**Notice Parties**").  If the Notice Parties do not object to the Notifying Party's notice to the Escrow Agent within ten (10) days after the Notice Parties' receipt of the Notifying Party's certificate to the Escrow Agent, the Escrow Agent shall be able to rely on the same.  If the Notice Parties send, within such ten (10) days, written notice to the Escrow Agent disputing the Notifying Party's certificate, a dispute shall exist and the Escrow Agent shall hold the Deposit as hereinafter provided.  The parties hereto hereby acknowledge that Escrow Agent shall have no liability to any party on account of Escrow Agent's failure to disburse the Deposit if a dispute shall have arisen with respect to the propriety of such disbursement and, in the event of any dispute as to who is entitled to receive the Deposit, disburse them in accordance with the final order of a court of competent jurisdiction, or to deposit or interplead such funds into a court of competent jurisdiction pending a final decision of such controversy. The parties hereto further agree that Escrow Agent shall not be liable for failure of any depository and shall not be otherwise liable except in the event of Escrow Agent's gross negligence or willful misconduct.  The Escrow Agent shall be reimbursed on an equal basis by Purchaser and Seller for any reasonable expenses incurred by the Escrow Agent arising from a dispute with respect to the Deposit.  The obligations of Seller and/or Purchaser with respect to the Escrow Agent are intended to be binding only on Seller and each such Seller's assets and/or Purchaser and Purchaser's assets and shall not be personally binding upon, nor shall any resort be had to, the private properties of any of the partners, officers, members, directors, shareholders or beneficiaries of Seller or Purchaser, or of any of each Seller's or Purchaser's employees or agents.

**17.24**  -**No Recording**.  Neither this Agreement nor any memorandum or short form hereof shall be recorded or filed in any public land or other public records of any jurisdiction by either party and any attempt to do so may be treated by the other party as a breach of this Agreement.

33

**17.25  <u>Waiver of Trial by Jury</u>**.  The respective parties hereto shall and hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Agreement, or for the enforcement of any remedy under any statute, emergency or otherwise.

## ARTICLE XVIII.

## INTENTIONALLY OMITTED

## ARTICLE XIX.

### Tax Credit Application

Seller, as owner of the Property, will reasonably cooperate with Purchaser, at no cost or liability to Seller, in Purchaser's application for an award of historic tax credits from the State of Ohio (the "**SHTC Award**"), including but not limited to signing the application (as fee simple owner of the Property), and providing all reasonable information in its possession that may be reasonably required of the applicant and the Property. Purchaser will prepare and arrange for the filing of the application for the SHTC Award which Purchaser intends to do by its due date, March 30, 2021. The matters set forth in this Article XIX shall not be a condition to Closing.

[Signature pages follow.]

EXECUTION COPY

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**SELLER:**

**OPTIMA 55 PUBLIC SQUARE LLC,**
a Delaware limited liability company

By:_____
    Mordechai Y. Korf, Manager

Tax I.D. No. _____

[Seller's Signature Page]

PURCHASER:

**KD 55 PUBLIC SQUARE LLC**
an Ohio limited liability company

By: _____

Douglas E. Price III, Manager

Tax I.D. No._____

[Purchaser's Signature Page]

The Escrow Agent hereby executes this Agreement for the sole purpose of acknowledging receipt of the Initial Deposit and its responsibilities hereunder and to evidence its consent to serve as Escrow Agent in accordance with the terms of this Agreement.

ESCROW AGENT:

NorthStar Title Services

By:_____
Name:_____
Title:_____
Date:_____, 2020

[Escrow Agent's Signature Page]

EXHIBIT A
Legal Description

PARCEL NO. 1

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA AND STATE OF OHIO AND KNOWN AS BEING SUBLOT NOS. 19, 20 AND 21, PART OF SUBLOT NOS. 18 AND 22, PART OF ALLEYS NOS. 1 AND 2 (NOW VACATED) ALL IN SIMON PERKINS SUBDIVISION OF PART OF ORIGINAL TWO ACRE LOT NOS. 55, 56 AND 57, AS SHOWN BY THE RECORDED PLAT IN VOLUME F OF DEEDS, PAGES 264 AND 265 OF CUYAHOGA COUNTY RECORDS, PART OF BROOME COURT N.W. (NOW VACATED), AND PART OF ORIGINAL TWO ACRE LOT NOS. 58 AND 59, AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTERLINE OF ST. CLAIR AVENUE N.W., 99 FEET WIDE, AT ITS INTERSECTION WITH THE CENTERLINE OF WEST 3RD STREET, FORMERLY SENECA STREET, 99 FEET WIDE, AND FROM WHICH POINT AN IRON MONUMENT FOUND IN THE CENTERLINE OF WEST 3RD STREET BEARS SOUTH 34 DEG. 03' 42" EAST, 0.10 FEET; THENCE NORTH 55 DEG. 56' 37" EAST ALONG THE CENTERLINE OF ST. CLAIR AVENUE, 132.92 FEET TO A NAIL SET AT ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF SAID ORIGINAL LOT NO. 57; THENCE SOUTH 34 DEG. 03' 33" EAST ALONG THE NORTHEASTERLY LINE OF SAID ORIGINAL LOT NO. 57, 49.50 FEET TO A DRILL HOLE SET AT ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF ST. CLAIR AVENUE, AND THE PRINCIPAL PLACE OF BEGINNING OF THE PARCEL HEREIN DESCRIBED; THENCE NORTH 55 DEG. 56' 37" EAST ALONG THE SOUTHEASTERLY LINE OF ST. CLAIR AVENUE, 66.59 FEET TO A DRILL HOLE SET AT ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF PARCEL OF LAND CONVEYED TO FIRST UNION REAL ESTATE EQUITY AND MORTGAGE INVESTMENTS BY DEED RECORDED IN VOLUME 98-01915, PAGE 30; THENCE SOUTH 34 DEG. 03' 23" EAST ALONG THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO FIRST UNION REAL ESTATE EQUITY AND MORTGAGE

INVESTMENTS, 173.74 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF SAID LAND SO CONVEYED; THENCE NORTH 55 DEG. 53' 12" EAST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO FIRST UNION REAL ESTATE EQUITY AND MORTGAGE INVESTMENTS, BEING ALSO THE CENTERLINE OF VACATED BROOME COURT N.W., FORMERLY 16.5 FEET WIDE, 142.80 FEET TO A NAIL SET AT ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF A PARCEL OF LAND ACQUIRED BY THE CITY OF CLEVELAND BY MEANS OF SAID VACATION OF BROOME COURT N.W.; THENCE SOUTH 34 DEG. 06' 48" EAST ALONG THE SOUTHWESTERLY LINE OF SAID LAND ACQUIRED BY THE CITY OF CLEVELAND, 8.25 FEET TO A NAIL SET AT ITS INTERSECTION WITH THE NORTHWESTERLY LINE OF A PARCEL OF LAND CONVEYED TO THE CITY OF CLEVELAND FOR THE WIDENING OF WEST 2ND PLACE BY DEED RECORDED IN VOLUME 9085, PAGE 430 OF CUYAHOGA COUNTY RECORDS; THENCE SOUTH 55 DEG. 53' 12" WEST ALONG THE NORTHWESTERLY LINE OF SAID LAND CONVEYED TO THE CITY OF CLEVELAND, 6 FEET TO A NAIL SET AT ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF SAID LAND SO CONVEYED; THENCE SOUTH 34 DEG. 03' 04" EAST ALONG THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO THE CITY OF CLEVELAND, 153.89 FEET TO ITS INTERSECTION WITH THE NORTHWESTERLY LINE OF FRANKFORT AVENUE N.W., 45 FEET WIDE, FROM WHICH POINT A NAIL SET BEARS NORTH 55 DEG. 55' 06" EAST, 6.00 FEET; THENCE SOUTH 55 DEG. 55' 06" WEST ALONG THE NORTHWESTERLY LINE OF FRANKFORT AVENUE N.W., 286.76 FEET TO A DRILL HOLE SET AT ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF WEST 3RD STREET; THENCE NORTH 34 DEG. 03' 42" WEST ALONG THE NORTHEASTERLY LINE OF WEST 3RD STREET, 253.05 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF A PARCEL OF LAND CONVEYED TO PRIME PROPERTIES LIMITED PARTNERSHIP BY DEED RECORDED IN VOLUME 91-4116, PAGE 33 OF CUYAHOGA COUNTY RECORDS, AND FROM WHICH POINT A DRILL HOLE SET BEARS SOUTH 55 DEG. 54' 58" WEST 1 FOOT; THENCE NORTH 55 DEG. 54' 58" EAST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO PRIME PROPERTIES LIMITED PARTNERSHIP, BEING ALSO THE SOUTHEASTERLY LINE OF SUBLOT NO. 17 IN SAID SIMON PERKINS SUBDIVISION AND ITS NORTHEASTERLY PROLONGATION, 83.41 FEET TO A DRILL HOLE SET AT ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF SAID LAND SO CONVEYED; THENCE NORTH 34 DEG. 03' 33" WEST ALONG THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO PRIME PROPERTIES LIMITED PARTNERSHIP, BEING ALSO THE NORTHEASTERLY LINE OF SAID ORIGINAL LOT NO. 57, 82.78 FEET TO THE PRINCIPAL PLACE OF BEGINNING, AND CONTAINING 65,688 SQUARE FEET OR 1.5080 ACRES OF LAND.

PARCEL NO. 2

A NON-EXCLUSIVE EASEMENT APPURTENANT TO PARCEL NO. 1 FOR THE PURPOSE OF KEEPING AND MAINTAINING SNOW MELTING COILS, PIPES, TUBING OR LIKE EQUIPMENT AT THE LOCATION SPECIFIED IN VOLUME 9085, PAGE 430 OF CUYAHOGA COUNTY RECORDS OVER THE FOLLOWING DESCRIBED PREMISES:

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA AND STATE OF OHIO AND KNOWN AS BEING PART OF ORIGINAL TWO ACRE LOT NO. 59, AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHWESTERLY LINE OF FRANKFORT AVENUE, N.W., 45 FEET WIDE, AT ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF A PARCEL OF LAND CONVEYED TO THE CITY OF CLEVELAND BY DEED RECORDED IN VOLUME 6488, PAGE 224 OF CUYAHOGA COUNTY RECORDS; THENCE SOUTH 55 DEG. 55' 06" WEST ALONG THE NORTHWESTERLY LINE OF FRANKFORT AVENUE, 6 FEET TO ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF A PARCEL OF LAND CONVEYED TO ROBERT F. BLACK, ET AL, TRUSTEES OF FIRST UNION REALTY, BY DEED RECORDED IN VOLUME 10664, PAGE 461 OF CUYAHOGA COUNTY RECORDS; THENCE NORTH 34 DEG. 03' 04" WEST ALONG THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO ROBERT F. BLACK, ET AL, 153.89 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF BROOME COURT N.W., 16.5 FEET WIDE, NOW VACATED; THENCE NORTH 55 DEG. 55' 12" EAST ALONG THE SOUTHEASTERLY LINE OF BROOME COURT, NOW VACATED, 6 FEET TO ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO THE CITY OF CLEVELAND; THENCE SOUTH 34 DEG. 03' 04" EAST ALONG THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO THE CITY OF CLEVELAND, 153.90 FEET TO THE PLACE OF BEGINNING.

PARCEL NO. 3

TOGETHER WITH THE RIGHTS IN AND TO THE PEDESTRIAN BRIDGE EASEMENT, THE UTILITY EASEMENT AND THE CITY DELIVERY EASEMENT SET FORTH IN THE RECIPROCAL EASEMENT AGREEMENT BY AND BETWEEN 55 PUBLIC LLC AND THE CITY OF CLEVELAND, OHIO, DATED AUGUST 28, 2003 AND RECORDED AS CUYAHOGA COUNTY RECORDER'S DOCUMENT NO. 200308290199 AND DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

PEDESTRIAN BRIDGE EASEMENT AREA:

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA, AND STATE OF OHIO, AND KNOWN AS BEING PART OF ORIGINAL TWO ACRE LOT 58 AND PART OF BROOME COURT N.W. (NOW VACATED), AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF A PARCEL OF LAND CONVEYED TO CEI VENTURE LLC BY DEED RECORDED AS A.F.N. 200102220641 OF CUYAHOGA COUNTY RECORDS;

THENCE NORTH 55 DEGREES 53 MINUTES 12 SECONDS EAST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 49.20 FEET TO ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF AN OVERHEAD PEDESTRIAN BRIDGE, AND THE PRINCIPAL PLACE OF BEGINNING OF THE EASEMENT HEREIN DESCRIBED;

THENCE NORTH 34 DEGREES 03 MINUTES 23 SECONDS WEST ALONG THE SOUTHWESTERLY LINE OF SAID OVERHEAD BRIDGE, 6.03 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY FACE OF AN EXISTING BUILDING;

THENCE NORTH 55 DEGREES 53 MINUTES 12 SECONDS EAST ALONG THE SOUTHEASTERLY FACE OF SAID EXISTING BUILDING, 8.30 FEET TO ITS INTERSECTION WITH THE NORTHEASTERLY FACE OF SAID OVERHEAD BRIDGE;

THENCE SOUTH 34 DEGREES 03 MINUTES 23 SECONDS EAST ALONG THE NORTHEASTERLY FACE OF SAID OVERHEAD BRIDGE, 6.03 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC;

THENCE SOUTH 55 DEGREES 53 MINUTES 12 SECONDS WEST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 8.30 FEET TO THE PRINCIPAL PLACE OF BEGINNING.

UTILITY EASEMENT AREA:

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA, AND STATE OF OHIO, AND KNOWN AS BEING PART OF ORIGINAL TWO ACRE LOT 59 AND PART OF BROOME COURT N.W. (NOW VACATED), AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST EASTERLY CORNER OF A PARCEL OF LAND CONVEYED TO CEI VENTURE LLC BY DEED RECORDED AS A.F.N. 200102220641 OF CUYAHOGA COUNTY RECORDS;

THENCE SOUTH 55 DEGREES 53 MINUTES 12 SECONDS WEST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 26.48 FEET TO A POINT;

THENCE NORTH 34 DEGREES 03 MINUTES 04 SECONDS WEST, 2.43 FEET TO A POINT IN THE NORTHWESTERLY EDGE OF AN EXISTING ASPHALT ALLEY TURNOUT;

THENCE NORTHEASTERLY ALONG THE CURVED NORTHWESTERLY EDGE OF SAID EXISTING TURNOUT, BEING THE ARC OF A CURVE DEFLECTING TO THE LEFT, 9.91 FEET TO A POINT, SAID ARC HAVING A RADIUS OF 16.73 FEET, A CENTRAL ANGLE OF 33 DEGREES 56 MINUTES 28 SECONDS, AND A CHORD WHICH BEARS NORTH 38 DEGREES 07 MINUTES 57 SECONDS EAST, 9.76 FEET;

THENCE NORTH 16 DEGREES 08 MINUTES 38 SECONDS EAST ALONG THE WESTERLY EDGE OF SAID EXISTING TURNOUT, 15.25 FEET TO A POINT;

THENCE NORTH 1 DEGREE 33 MINUTES 19 SECONDS WEST ALONG THE WESTERLY EDGE OF SAID EXISTING TURNOUT, 10.18 FEET TO ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC;

THENCE SOUTH 34 DEGREES 03 MINUTES 04 SECONDS EAST ALONG THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 23.74 FEET TO THE PLACE OF BEGINNING.

CITY DELIVERY COURT EASEMENT AREA:

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA, AND STATE OF OHIO, AND KNOWN AS BEING PART OF ORIGINAL TWO ACRE LOTS 58 AND 59 AND PART OF BROOME COURT N.W. (NOW VACATED), AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF A PARCEL OF LAND CONVEYED TO CEI VENTURE LLC BY DEED RECORDED AS A.F.N. 200102220641 OF CUYAHOGA COUNTY RECORDS;

THENCE NORTH 34 DEGREES 03 MINUTES 23 SECONDS WEST ALONG THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 6.03 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF AN EXISTING BUILDING;

THENCE NORTH 55 DEGREES 53 MINUTES 12 SECONDS EAST ALONG THE SOUTHEASTERLY LINE OF SAID EXISTING BUILDING, 58.13 FEET TO A POINT;

THENCE EASTERLY ALONG THE CURVED NORTHERLY LINE OF AN EXISTING ALLEY, BEING THE ARC OF A CURVE DEFLECTING TO THE LEFT, 5.65 FEET TO A POINT, SAID ARC HAVING A RADIUS OF 3.60 FEET, A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS, AND A CHORD WHICH BEARS SOUTH 79 DEGREES 06 MINUTES 48 SECONDS EAST, 5.09 FEET;

THENCE NORTH 55 DEGREES 53 MINUTES 12 SECONDS EAST ALONG THE NORTHWESTERLY LINE OF SAID EXISTING ALLEY, 59.59 FEET TO A POINT;

THENCE NORTHEASTERLY ALONG THE CURVED NORTHWESTERLY LINE OF SAID EXISTING ALLEY, BEING THE ARC OF A CURVE DEFLECTING TO THE LEFT, 9.91 FEET TO A POINT, SAID ARC HAVING A RADIUS OF 16.73 FEET, A CENTRAL ANGLE OF 33 DEGREES 56 MINUTES 28 SECONDS, AND A CHORD WHICH BEARS NORTH 38 DEGREES 07 MINUTES 57 SECONDS EAST, 9.76 FEET;

THENCE NORTH 16 DEGREES 08 MINUTES 38 SECONDS EAST ALONG THE WESTERLY LINE OF SAID EXISTING ALLEY AMOUNT, 15.25 FEET TO A POINT;

THENCE NORTH 1 DEGREE 33 MINUTES 19 SECONDS WEST ALONG THE WESTERLY LINE OF SAID EXISTING ALLEY TURNOUT, 10.18 FEET TO ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC;

THENCE SOUTH 34 DEGREES 03 MINUTES 04 SECONDS EAST ALONG THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 23.74 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF SAID LAND SO CONVEYED;

THENCE SOUTH 55 DEGREES 53 MINUTES 12 SECONDS WEST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 147.80 FEET TO THE PLACE OF BEGINNING.

EXHIBIT B

N/A

EXHIBIT C

Form of General Assignment

**GENERAL ASSIGNMENT AND BILL OF SALE**

THIS GENERAL ASSIGNMENT AND BILL OF SALE (the "**Assignment**") is made as of the \_\_\_\_\_ day of [_____, 2020] by OPTIMA 55 PUBLIC SQUARE LLC, a Delaware limited liability company ("**Seller**"), and KD 55 PUBLIC SQUARE LLC, an Ohio limited liability company ("**Purchaser**").

KNOW ALL BY THESE PRESENTS:

Concurrently with the execution and delivery hereof, pursuant to a certain Agreement of Purchase and Sale dated as of January \_\_, 2020 (the "**Agreement**") between Seller and Purchaser, Seller is conveying to Purchaser all of Seller's right, title and interest in and to the Assigned Property (as hereinafter defined).

It is the desire of Seller to hereby sell, assign, transfer, convey, set-over and deliver to Purchaser all of Seller's right, title and interest in and to the Assigned Property.

1.    <u>Bill of Sale and Assignment</u>.  Seller does hereby sell, assign, transfer, set-over and deliver unto Purchaser, its successors and assigns, with special warranty of title and subject to the limitations contained in Section [\_\_\_\_\_] of the Agreement, all right, title and interest of Seller in and to:

a.    All personal property (including equipment, but excluding any personal computers), if any, owned by Seller and located on the Property on the date hereof, all inventory, if any, owned by Seller and located on the Property on the date hereof, and all fixtures, if any, owned by Seller and located on the Property on the date hereof, including, without limitation, the personal property listed on <u>Exhibit A</u> attached hereto (the "**Personal Property**");

b.    All non-exclusive logos, trademarks and trade names, if any, used in connection with the Property, but only to the extent that the same are not trademarks or trade names of Seller or any of Seller's affiliated companies (collectively, the "**Trade Names**");

c.      All guarantees, licenses, approvals, certificates, permits and warranties relating to the Property, to the extent assignable, including those more particularly described on Exhibit B attached hereto (the "**Intangible Property**"); and

d.      All (i) leases, subleases, licenses and other occupancy agreements, together with any and all amendments, modifications or supplements thereto described on Exhibit C attached to this Assignment (collectively, the "**Leases**") demising space in or otherwise similarly affecting or relating to the Property, (ii) all prepaid rent attributable to the period after the date hereof, (iii) unapplied security deposits thereunder, and (iv) all guaranties of Leases described on Exhibit C-1 attached hereto (together with the Leases, collectively, the "**Leasehold Property**"), which Leasehold Property excludes leases of record which will be conveyed by separate assignment; subject, however, to the rights of Seller set forth in the Agreement to rents under the Leases assigned hereby attributable to the period prior to the date hereof.

TO HAVE AND TO HOLD the Personal Property, the Trade Names, the Intangible Property and the Leasehold Property (collectively, the "**Assigned Property**") unto Purchaser, its successors and assigns, forever.

2.      Assumption.  Purchaser accepts the foregoing assignment and assumes and agrees to be bound by and to perform and observe all of the obligations, covenants, terms and conditions to be performed or observed under the Assigned Property arising on or after the date hereof.  Purchaser further agrees to indemnify Seller and hold Seller harmless from and against any and all claims, liens, damages, demands, causes of action, liabilities, lawsuits, judgments, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, the "**Losses**") asserted against or incurred by Seller, or any one of them, by reason of or arising out of any failure by Purchaser to perform or observe the obligations, covenants, terms and conditions assumed by Purchaser hereunder in connection with the Assigned Property related to the period on or after the date hereof.  Seller hereby agrees to indemnify Purchaser and hold Purchaser harmless from and against any and all Losses asserted against or incurred by Purchaser by reason of or arising out of any failure by Seller to perform or observe the obligations, covenants, terms and conditions assigned by Seller hereunder arising in connection with the Assigned Property related to the period prior to the date hereof.

3.      Limitation of Liability.  The obligations of Seller hereunder are intended to be binding only on Seller and Seller's assets and shall not be personally binding upon, nor shall any resort be had to, the private properties of any of the partners, officers, directors, shareholders or beneficiaries of Seller, or of any partners, officers, directors, shareholders or beneficiaries of any partners of Seller, or of any of such Seller's employees or agents and any liability of Seller hereunder shall be expressly limited as set forth in Sections 7.3, 8.2, 8.3 and 13.1 (or as elsewhere

expressly provided for in the Agreement) of the Agreement. The obligations of Purchaser are intended to be binding only on Purchaser and Purchaser's assets and shall not be personally binding upon, nor shall any resort be had to, the private properties of any of the partners, officers, directors, shareholders or beneficiaries of Purchaser, or of any partners, officers, directors, shareholders or beneficiaries of any partners of Purchaser, or of any of Purchaser's employees or agents.

       4.    <u>Exclusions from Assigned Property</u>. It is hereby acknowledged by the parties that the Assigned Property shall not include claims relating to any real property tax refunds or rebates accruing for periods prior to the date hereof, existing insurance claims and any existing claims against previous tenants of the Property, which claims are hereby reserved by Seller.

       5.    <u>Counterpart Copies</u>. This Assignment may be executed in two or more counterpart copies, all of which counterparts shall have the same force and effect as if all parties hereto had executed a single copy of this Assignment. Signatures transmitted via facsimile or PDF shall be deemed to be original signatures.

[Signature Page follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**SELLER:**

**OPTIMA 55 PUBLIC SQUARE LLC,**
a Delaware limited liability company

By:_____
    Mordechai Y. Korf, Manager

Tax I.D. No. _____

[Signature page of Seller to General Assignment and Bill of Sale

]

PURCHASER:

KD 55 PUBLIC SQUARE LLC
an Ohio limited liability company

By: _____
        Douglas E. Price III
Its:    Manager

[Signature page of Purchaser to General Assignment and Bill of Sale

]

**Exhibit A**
**to General Assignment**

**List of Personal Property**

Attached

**Exhibit B**
**to General Assignment**

**List of Permits and Warranties**

Attached

**Exhibit C**
**to General Assignment**

**List of Leases**

Attached

**Exhibit C-1**
**to General Assignment**

**List of Lease Guaranties**


Attached

EXHIBIT D
Form of Limited Warranty Deed

## <u>LIMITED WARRANTY DEED</u>
*Ohio Statutory Form (Ohio Revised Code Section 5302.07)*

KNOW ALL MEN BY THESE PRESENTS, that OPTIMA 55 PUBLIC SQUARE LLC, a Delaware limited liability company (the "**Grantor**"), for the consideration of Ten and No/100ths Dollars ($10.00) received to Grantor's full satisfaction from KD 55 PUBLIC SQUARE LLC, an Ohio limited liability company (the "**Grantee**"), whose tax mailing address is 4420 Sherwin Road, Willoughby, Ohio 44094, does hereby give, grant, bargain, sell and convey with Limited Warranty Covenants unto the said Grantee, its successors and assigns, the property situated in the City of Cleveland, County of Cuyahoga, and State of Ohio and more fully described on <u>Exhibit A</u> attached hereto and incorporated herein by reference (the "**Property**").

PPNs: 101-07-004, 101-07-006 and 101-07-007
Prior Instrument Reference:  200807290225
Address: 55 Public Square, Cleveland, Ohio 44113

TO HAVE AND TO HOLD the above granted and bargained Property, with the appurtenances thereunto belonging, unto the said Grantee, its successors and assigns, forever.  And the said Grantor does for itself and its successors and assigns covenant with said Grantee, its successors and assigns that the above granted and bargained Property are free and clear from all encumbrances made by said Grantor, except: (a) real estate taxes and assessments which are a lien against the Property, but are not yet due and payable; (b) easements, reservations and restrictions of record, (c) zoning ordinances, if any, and (d) those items which would be shown by an accurate survey of the Property.

And that, except as aforesaid, it will warrant and defend said Property, with the appurtenances thereunto belonging, to the said Grantee, its successors and assigns, forever, against all lawful claims and demands of all persons claiming by, through or under said Grantor, but against none other.

IN WITNESS WHEREOF, Grantor has hereunto executed this Limited Warranty Deed this _____ day of [_____, 2020].

OPTIMA 55 PUBLIC SQUARE LLC
a Delaware limited liability company

By: _____
      Mordechai Y. Korf, Manager

STATE OF _____          )
                          ) SS:
COUNTY OF _____      )


        The foregoing instrument was acknowledged before me this ____ day of _____, 20___ by _____, the _____ of _____, a _____, on behalf of the _____. This is an acknowledgment clause.  No oath or affirmation was administered to the signer.


                          _____
                          Notary Public
                          My Commission Expires

This Instrument Prepared By:

_____
_____
_____
_____
_____

EXHIBIT A

PARCEL NO. 1

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA AND STATE OF OHIO AND KNOWN AS BEING SUBLOT NOS. 19, 20 AND 21, PART OF SUBLOT NOS. 18 AND 22, PART OF ALLEYS NOS. 1 AND 2 (NOW VACATED) ALL IN SIMON PERKINS SUBDIVISION OF PART OF ORIGINAL TWO ACRE LOT NOS. 55, 56 AND 57, AS SHOWN BY THE RECORDED PLAT IN VOLUME F OF DEEDS, PAGES 264 AND 265 OF CUYAHOGA COUNTY RECORDS, PART OF BROOME COURT N.W. (NOW VACATED), AND PART OF ORIGINAL TWO ACRE LOT NOS. 58 AND 59, AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTERLINE OF ST. CLAIR AVENUE N.W., 99 FEET WIDE, AT ITS INTERSECTION WITH THE CENTERLINE OF WEST 3RD STREET, FORMERLY SENECA STREET, 99 FEET WIDE, AND FROM WHICH POINT AN IRON MONUMENT FOUND IN THE CENTERLINE OF WEST 3RD STREET BEARS SOUTH 34 DEG. 03' 42" EAST, 0.10 FEET; THENCE NORTH 55 DEG. 56' 37" EAST ALONG THE CENTERLINE OF ST. CLAIR AVENUE, 132.92 FEET TO A NAIL SET AT ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF SAID ORIGINAL LOT NO. 57; THENCE SOUTH 34 DEG. 03' 33" EAST ALONG THE NORTHEASTERLY LINE OF SAID ORIGINAL LOT NO. 57, 49.50 FEET TO A DRILL HOLE SET AT ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF ST. CLAIR AVENUE, AND THE PRINCIPAL PLACE OF BEGINNING OF THE PARCEL HEREIN DESCRIBED; THENCE NORTH 55 DEG. 56' 37" EAST ALONG THE SOUTHEASTERLY LINE OF ST. CLAIR AVENUE, 66.59 FEET TO A DRILL HOLE SET AT ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF PARCEL OF LAND CONVEYED TO FIRST UNION REAL ESTATE EQUITY AND MORTGAGE INVESTMENTS BY DEED RECORDED IN VOLUME 98-01915, PAGE 30; THENCE SOUTH 34 DEG. 03' 23" EAST ALONG THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO FIRST UNION REAL ESTATE EQUITY AND MORTGAGE

INVESTMENTS, 173.74 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF SAID LAND SO CONVEYED; THENCE NORTH 55 DEG. 53' 12" EAST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO FIRST UNION REAL ESTATE EQUITY AND MORTGAGE INVESTMENTS, BEING ALSO THE CENTERLINE OF VACATED BROOME COURT N.W., FORMERLY 16.5 FEET WIDE, 142.80 FEET TO A NAIL SET AT ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF A PARCEL OF LAND ACQUIRED BY THE CITY OF CLEVELAND BY MEANS OF SAID VACATION OF BROOME COURT N.W.; THENCE SOUTH 34 DEG. 06' 48" EAST ALONG THE SOUTHWESTERLY LINE OF SAID LAND ACQUIRED BY THE CITY OF CLEVELAND, 8.25 FEET TO A NAIL SET AT ITS INTERSECTION WITH THE NORTHWESTERLY LINE OF A PARCEL OF LAND CONVEYED TO THE CITY OF CLEVELAND FOR THE WIDENING OF WEST 2ND PLACE BY DEED RECORDED IN VOLUME 9085, PAGE 430 OF CUYAHOGA COUNTY RECORDS; THENCE SOUTH 55 DEG. 53' 12" WEST ALONG THE NORTHWESTERLY LINE OF SAID LAND CONVEYED TO THE CITY OF CLEVELAND, 6 FEET TO A NAIL SET AT ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF SAID LAND SO CONVEYED; THENCE SOUTH 34 DEG. 03' 04" EAST ALONG THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO THE CITY OF CLEVELAND, 153.89 FEET TO ITS INTERSECTION WITH THE NORTHWESTERLY LINE OF FRANKFORT AVENUE N.W., 45 FEET WIDE, FROM WHICH POINT A NAIL SET BEARS NORTH 55 DEG. 55' 06" EAST, 6.00 FEET; THENCE SOUTH 55 DEG. 55' 06" WEST ALONG THE NORTHWESTERLY LINE OF FRANKFORT AVENUE N.W., 286.76 FEET TO A DRILL HOLE SET AT ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF WEST 3RD STREET; THENCE NORTH 34 DEG. 03' 42" WEST ALONG THE NORTHEASTERLY LINE OF WEST 3RD STREET, 253.05 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF A PARCEL OF LAND CONVEYED TO PRIME PROPERTIES LIMITED PARTNERSHIP BY DEED RECORDED IN VOLUME 91-4116, PAGE 33 OF CUYAHOGA COUNTY RECORDS, AND FROM WHICH POINT A DRILL HOLE SET BEARS SOUTH 55 DEG. 54' 58" WEST 1 FOOT; THENCE NORTH 55 DEG. 54' 58" EAST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO PRIME PROPERTIES LIMITED PARTNERSHIP, BEING ALSO THE SOUTHEASTERLY LINE OF SUBLOT NO. 17 IN SAID SIMON PERKINS SUBDIVISION AND ITS NORTHEASTERLY PROLONGATION, 83.41 FEET TO A DRILL HOLE SET AT ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF SAID LAND SO CONVEYED; THENCE NORTH 34 DEG. 03' 33" WEST ALONG THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO PRIME PROPERTIES LIMITED PARTNERSHIP, BEING ALSO THE NORTHEASTERLY LINE OF SAID ORIGINAL LOT NO. 57, 82.78 FEET TO THE PRINCIPAL PLACE OF BEGINNING, AND CONTAINING 65,688 SQUARE FEET OR 1.5080 ACRES OF LAND.

PARCEL NO. 2

A NON-EXCLUSIVE EASEMENT APPURTENANT TO PARCEL NO. 1 FOR THE PURPOSE OF KEEPING AND MAINTAINING SNOW MELTING COILS, PIPES, TUBING OR LIKE EQUIPMENT AT THE LOCATION SPECIFIED IN VOLUME 9085, PAGE 430 OF CUYAHOGA COUNTY RECORDS OVER THE FOLLOWING DESCRIBED PREMISES:

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA AND STATE OF OHIO AND KNOWN AS BEING PART OF ORIGINAL TWO ACRE LOT NO. 59, AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHWESTERLY LINE OF FRANKFORT AVENUE, N.W., 45 FEET WIDE, AT ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF A PARCEL OF LAND CONVEYED TO THE CITY OF CLEVELAND BY DEED RECORDED IN VOLUME 6488, PAGE 224 OF CUYAHOGA COUNTY RECORDS; THENCE SOUTH 55 DEG. 55' 06" WEST ALONG THE NORTHWESTERLY LINE OF FRANKFORT AVENUE, 6 FEET TO ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF A PARCEL OF LAND CONVEYED TO ROBERT F. BLACK, ET AL, TRUSTEES OF FIRST UNION REALTY, BY DEED RECORDED IN VOLUME 10664, PAGE 461 OF CUYAHOGA COUNTY RECORDS; THENCE NORTH 34 DEG. 03' 04" WEST ALONG THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO ROBERT F. BLACK, ET AL, 153.89 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF BROOME COURT N.W., 16.5 FEET WIDE, NOW VACATED; THENCE NORTH 55 DEG. 55' 12" EAST ALONG THE SOUTHEASTERLY LINE OF BROOME COURT, NOW VACATED, 6 FEET TO ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO THE CITY OF CLEVELAND; THENCE SOUTH 34 DEG. 03' 04" EAST ALONG THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO THE CITY OF CLEVELAND, 153.90 FEET TO THE PLACE OF BEGINNING.

PARCEL NO. 3

TOGETHER WITH THE RIGHTS IN AND TO THE PEDESTRIAN BRIDGE EASEMENT, THE UTILITY EASEMENT AND THE CITY DELIVERY EASEMENT SET FORTH IN THE RECIPROCAL EASEMENT AGREEMENT BY AND BETWEEN 55 PUBLIC LLC AND THE CITY OF CLEVELAND, OHIO, DATED AUGUST 28, 2003 AND RECORDED AS CUYAHOGA COUNTY RECORDER'S DOCUMENT NO. 200308290199 AND DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

PEDESTRIAN BRIDGE EASEMENT AREA:

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA, AND STATE OF OHIO, AND KNOWN AS BEING PART OF ORIGINAL TWO ACRE LOT 58 AND PART OF BROOME COURT N.W. (NOW VACATED), AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF A PARCEL OF LAND CONVEYED TO CEI VENTURE LLC BY DEED RECORDED AS A.F.N. 200102220641 OF CUYAHOGA COUNTY RECORDS;

THENCE NORTH 55 DEGREES 53 MINUTES 12 SECONDS EAST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 49.20 FEET TO ITS INTERSECTION WITH THE SOUTHWESTERLY LINE OF AN OVERHEAD PEDESTRIAN BRIDGE, AND THE PRINCIPAL PLACE OF BEGINNING OF THE EASEMENT HEREIN DESCRIBED;

THENCE NORTH 34 DEGREES 03 MINUTES 23 SECONDS WEST ALONG THE SOUTHWESTERLY LINE OF SAID OVERHEAD BRIDGE, 6.03 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY FACE OF AN EXISTING BUILDING;

THENCE NORTH 55 DEGREES 53 MINUTES 12 SECONDS EAST ALONG THE SOUTHEASTERLY FACE OF SAID EXISTING BUILDING, 8.30 FEET TO ITS INTERSECTION WITH THE NORTHEASTERLY FACE OF SAID OVERHEAD BRIDGE;

THENCE SOUTH 34 DEGREES 03 MINUTES 23 SECONDS EAST ALONG THE NORTHEASTERLY FACE OF SAID OVERHEAD BRIDGE, 6.03 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC;

THENCE SOUTH 55 DEGREES 53 MINUTES 12 SECONDS WEST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 8.30 FEET TO THE PRINCIPAL PLACE OF BEGINNING.

UTILITY EASEMENT AREA:

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA, AND STATE OF OHIO, AND KNOWN AS BEING PART OF ORIGINAL TWO ACRE LOT 59 AND PART OF BROOME COURT N.W. (NOW VACATED), AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST EASTERLY CORNER OF A PARCEL OF LAND CONVEYED TO CEI VENTURE LLC BY DEED RECORDED AS A.F.N. 200102220641 OF CUYAHOGA COUNTY RECORDS;

THENCE SOUTH 55 DEGREES 53 MINUTES 12 SECONDS WEST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 26.48 FEET TO A POINT;

THENCE NORTH 34 DEGREES 03 MINUTES 04 SECONDS WEST, 2.43 FEET TO A POINT IN THE NORTHWESTERLY EDGE OF AN EXISTING ASPHALT ALLEY TURNOUT;

THENCE NORTHEASTERLY ALONG THE CURVED NORTHWESTERLY EDGE OF SAID EXISTING TURNOUT, BEING THE ARC OF A CURVE DEFLECTING TO THE LEFT, 9.91 FEET TO A POINT, SAID ARC HAVING A RADIUS OF 16.73 FEET, A CENTRAL ANGLE OF 33 DEGREES 56 MINUTES 28 SECONDS, AND A CHORD WHICH BEARS NORTH 38 DEGREES 07 MINUTES 57 SECONDS EAST, 9.76 FEET;

THENCE NORTH 16 DEGREES 08 MINUTES 38 SECONDS EAST ALONG THE WESTERLY EDGE OF SAID EXISTING TURNOUT, 15.25 FEET TO A POINT;

THENCE NORTH 1 DEGREE 33 MINUTES 19 SECONDS WEST ALONG THE WESTERLY EDGE OF SAID EXISTING TURNOUT, 10.18 FEET TO ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC;

THENCE SOUTH 34 DEGREES 03 MINUTES 04 SECONDS EAST ALONG THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 23.74 FEET TO THE PLACE OF BEGINNING.

CITY DELIVERY COURT EASEMENT AREA:

SITUATED IN THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA, AND STATE OF OHIO, AND KNOWN AS BEING PART OF ORIGINAL TWO ACRE LOTS 58 AND 59 AND PART OF BROOME COURT N.W. (NOW VACATED), AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF A PARCEL OF LAND CONVEYED TO CEI VENTURE LLC BY DEED RECORDED AS A.F.N. 200102220641 OF CUYAHOGA COUNTY RECORDS;

THENCE NORTH 34 DEGREES 03 MINUTES 23 SECONDS WEST ALONG THE SOUTHWESTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 6.03 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF AN EXISTING BUILDING;

THENCE NORTH 55 DEGREES 53 MINUTES 12 SECONDS EAST ALONG THE SOUTHEASTERLY LINE OF SAID EXISTING BUILDING, 58.13 FEET TO A POINT;

THENCE EASTERLY ALONG THE CURVED NORTHERLY LINE OF AN EXISTING ALLEY, BEING THE ARC OF A CURVE DEFLECTING TO THE LEFT, 5.65 FEET TO A POINT, SAID ARC HAVING A RADIUS OF 3.60 FEET, A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00 SECONDS, AND A CHORD WHICH BEARS SOUTH 79 DEGREES 06 MINUTES 48 SECONDS EAST, 5.09 FEET;

THENCE NORTH 55 DEGREES 53 MINUTES 12 SECONDS EAST ALONG THE NORTHWESTERLY LINE OF SAID EXISTING ALLEY, 59.59 FEET TO A POINT;

THENCE NORTHEASTERLY ALONG THE CURVED NORTHWESTERLY LINE OF SAID EXISTING ALLEY, BEING THE ARC OF A CURVE DEFLECTING TO THE LEFT, 9.91 FEET TO A POINT, SAID ARC HAVING A RADIUS OF 16.73 FEET, A CENTRAL ANGLE OF 33 DEGREES 56 MINUTES 28 SECONDS, AND A CHORD WHICH BEARS NORTH 38 DEGREES 07 MINUTES 57 SECONDS EAST, 9.76 FEET;

THENCE NORTH 16 DEGREES 08 MINUTES 38 SECONDS EAST ALONG THE WESTERLY LINE OF SAID EXISTING ALLEY AMOUNT, 15.25 FEET TO A POINT;

THENCE NORTH 1 DEGREE 33 MINUTES 19 SECONDS WEST ALONG THE WESTERLY LINE OF SAID EXISTING ALLEY TURNOUT, 10.18 FEET TO ITS INTERSECTION WITH THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC;

THENCE SOUTH 34 DEGREES 03 MINUTES 04 SECONDS EAST ALONG THE NORTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 23.74 FEET TO ITS INTERSECTION WITH THE SOUTHEASTERLY LINE OF SAID LAND SO CONVEYED;

THENCE SOUTH 55 DEGREES 53 MINUTES 12 SECONDS WEST ALONG THE SOUTHEASTERLY LINE OF SAID LAND CONVEYED TO CEI VENTURE LLC, 147.80 FEET TO THE PLACE OF BEGINNING.

EXHIBIT E
Form of notice letter to tenants


[_____, 2020]


_____
_____
_____

Dear _____:

Please accept this letter as formal notice that 55 Public Square has been sold and Optima 55 Public Square LLC will no longer be the owner of the property effective [_____, 2020] (the "Effective Date").  The new owner will be KD 55 PUBLIC SQUARE LLC.

Please know that as of the Effective Date the leases (including yours) have been assigned to and accepted by the new owner and the new owner has agreed to assume all responsibility for security deposits currently held under the leases.

All future correspondence relating to your tenancy, notices and rent payments should be mailed to:

        KD 55 PUBLIC SQUARE LLC
        c/o K&D Management LLC
        4420 Sherwin Road
        Willoughby, OH  44094

As of the Effective Date, please have all rents, inclusive of any arrears, paid directly to **K&D Management LLC**. If you desire to pay your rent by wire transfer rather than by check, K&D Management's wire instructions are:

We are confident K&D Management will be good stewards of 55 Public Square and KD 55 PUBLIC SQUARE LLC looks forward to working with you in the operation of this building.


        Very truly yours,


        _____,
        _____

Schedule 1.1.2(a) – Rent Roll (Leases)

Schedule 1.1.2(b) - Security Deposits

Schedule 1.1.4 – List of Personal Property

Schedule 1.1.5 – List of Pending Insurance Claims and Tenant Claims

Schedule 1.1.5(a) – Trade Names

Schedule 1.1.5(b) – List of Service Contracts

Schedule 1.1.5(c) – List of Licenses and Permits

Schedule 2.2 - Allocation of Purchase Price
[OPEN]

| | |
|---|---|
| Office building and parking facilities: | $ 14,000,000 |
| Personal property: | $      500,000 |
| Intangible property: | $   2,500,000 |
| Total: | $  17,000,000 |

Schedule 7.1.6 – Defaults

Schedule 7.1.7
Disclosed Litigation

_Joint Stock Company Commercial Bank Privatbank v. Igor Valeryevich Kolomoisky, et al_, Court of Chancery of the State of Delaware, case number 2019-0377 in which Optima 55 Public Square LLC, Mordechai Korf, Chaim Schochet, and others who may have an interest in Optima 55 Public Square LLC may have an interest are named defendants.

Schedule 7.1.8 – Violations

[SELLER NEEDS TO UPDATE THIS]

Notice of Violation of Building and Housing Code Ordinances – Violation #V13012072  - dated April 9, 2013 relative to inspection conducted on April 3, 2013, including list of violations dated May 9, 2013.

Request for extension for violation notice #V13012072

Hearing notice – docket #A-133-13, hearing date August 14, 2013.

Action taken by Board of Building Standards and Building Appeals dated September 11, 2013 relative to Docket #A-133-13 including cover letter form City of Cleveland dated September 25, 2013.

Letter from Optima Management dated November 11, 2013 regarding a submittal of maintenance and inspection provided to the City of Cleveland [Note: For purposes of this Schedule 7.1.8, the underlying documents described in the cover letter were not provided]

Notice of Violation of Building and Housing Code Ordinances – Violation #V16020249 - dated June 10, 2016 relative to inspection conducted on June 9, 2016, including list of violations dated July 10, 2016.

Notice of Violation of Building and Housing Code Ordinances – Violation #V16032368 - dated September 23, 2016 relative to inspection conducted on September 22, 2016, including list of violations dated October 23, 2016.

City of Cleveland, Division of Fire, Abatement Order dated June 30, 2017.

Schedule 7.1.10 – Employees

Schedule 9.2 - Summary of Insurance

## **FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE**

THIS FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "Amendment") is made and entered into as of the _____ day of January, 2021 by and among OPTIMA 55 PUBLIC SQUARE LLC, a Delaware limited liability company (hereinafter referred to as "Seller") and KD 55 PUBLIC SQUARE LLC, an Ohio limited liability company, and its permitted assigns (hereinafter referred to as "Purchaser").

A.     On December 24, 2020, Seller and Purchaser entered into that certain Agreement of Purchase and Sale (the "Purchase Agreement"), under which  Seller agreed to sell to Purchaser, and Purchaser agreed to purchase from Seller, the property commonly known as the 55 Public Square, all as more particularly described in the Purchase Agreement (the "Property"); and

B.     As part of its due diligence, Purchaser has discovered a pending lawsuit in the U.S. District Court, Northern District of Ohio (Cleveland) being <u>Spencer Neal v. 229 St. Clair Parking LLC and Optima 55 Public Square LLC</u>, civil case #1:20-cv-00088-SO (the "Neal Case") in which plaintiff, Spencer Neal ("Plaintiff") has alleged certain Americans with Disabilities Act ("ADA") violations pertaining to the parking garage for the 55 Public Square property.

C.     Defendant's local counsel, Deborah Michaelson of the law firm of Buckley King, expressed to Purchaser's counsel that, in her opinion, the case can be settled with the payment of Plaintiff's legal fees and costs and a commitment from the property owner that the ADA violations in the parking garage will be remedied.

D.     Should closing occur, Purchaser is willing to assume the obligation for curing the ADA violations in the parking garage but is not willing to assume Plaintiff's legal fees and costs as part of the settlement of the Neal Case.

E.     If the Neal Case is not settled (or an agreement in principle to settle the Neal Case is not agreed to), Purchaser is unwilling to close on the acquisition of the property because Purchaser, as successor owner, will likely be added as a necessary party.

F.     Section 4.2.5 of the Purchase Agreement currently provides for One Hundred Thousand Dollars ($100,000) from the purchase price to be held in escrow pending the post-closing true up of operating expenses.

G.     Subject to the terms and conditions set forth herein, the parties have agreed that a portion of the One Hundred Thousand Dollars ($100,000) escrow can be applied toward settlement of the Neal Case so that Purchaser will agree to move forward with the acquisition of the Property.

H.     The parties recognize and agree that the Property is currently subject to a forfeiture action filed by the United States of America styled <u>United States of America v Real Property Located at 55 Public Square, Cleveland, Ohio, with all Appurtenances, Improvements, and Attachments Thereon, and any Right to Collect and Receive Any</u>

1

<u>Profit, Rent, Income and Proceeds Therefrom, U.S. District Court</u>, Southern District of Florida, Case No. 1:20-cv-25313 (the "Forfeiture Case") and, as such, this Amendment is subject to the consent and approval of the Department of Justice.

I.     The parties hereto also desire to amend the Purchase Agreement to provide for a new Escrow Agent and to provide for other matters, including but not limited to those matters resulting from delays in the parties' ability to close the transaction.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller and Purchaser hereby agree as follows:

1.     Except as otherwise defined in this Amendment, all terms used in this Amendment with initial capital letters shall have the meaning ascribed to them in the Purchase Agreement.

2.     Section 3.1 of the Purchase Agreement is hereby amended by deleting the reference to the current Escrow Agent, "Northstar Title Services located at 1406 West 6th Street, Suite 400, Cleveland, Ohio 44113, phone (216) 623-3655, Attn: Mary Robenalt Porter, email mporter@nstitle.com", and substituting the following in lieu thereof such that the same shall be deemed the "Escrow Agent":

"Chicago Title Insurance Company located at 1111 Superior Avenue, Suite 600, Cleveland, Ohio 44114, Attn: Samantha S. Joseph, Esq., phone (216) 696-4027, email Samantha.Joseph@ctt.com"

3.     Section 4.2.5 of the Purchase Agreement is hereby amended by adding the following at the end of the paragraph:

In addition, the parties agree that a portion of the foregoing escrow can be applied to the settlement of the case of <u>Spencer Neal v. 229 St. Clair Parking LLC and Optima 55 Public Square LLC</u>, U.S. District Court, Northern District of Ohio (Cleveland), civil case #1:20-cv-00088-SO, which settlement terms will provide (i) that Purchaser will commit to cure the Americans with Disabilities Act violations cited in the <u>Neal</u> case if Purchaser acquires the Property and (ii) for the payment of plaintiff's legal fees and costs which amount Seller authorizes to be deducted from the escrowed funds ($100,000). Notwithstanding the foregoing, Purchaser shall not settle any such matters or use/deploy any of the aforementioned escrow funds without the prior written consent of Seller.

=

4.     The following schedules are attached hereto and made a part hereof and the parties have agreed to the matters shown therein: Schedule 1.1.5(b) (Service Contracts), Schedule 2.2 (Allocation of Purchase Price) and Schedule 7.1.7 (Disclosed Litigation).  Pursuant to Section 3.1 (as amended herein), Seller must provide Schedules 1.1.2(a) (Rent Roll), 1.1.2(b) (Security Deposits), 1.1.4 (Personal Property), 1.1.5 (Pending Claims), 1.1.5(a) (Trade Names), 1.1.5(c) (Licenses and Permits), 7.1.6 (Defaults), 7.1.10 (Employees) and 9.2 (Summary of Insurance) for Purchaser's review and approval. Schedule 7.1.8 is hereby deleted.

5.     Except as expressly amended in this Amendment, all other terms and conditions of the Purchase Agreement shall remain in full force and effect and are hereby ratified and confirmed

by Seller and Purchaser.  In the event of any conflict between the terms of this Amendment and the terms of the Purchase Agreement, the terms of this Amendment shall control.

6.       This Amendment may be executed in counterparts, each of which shall constitute an original although not fully executed, but all of which when taken together, shall constitute but one agreement.  Delivery by facsimile or electronic mail of this Amendment or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof.

7.       This Amendment shall be binding upon the parties hereto and their respective successors and permitted assigns.

[the rest of this page intentionally left blank; signatures on next page]

The parties to this Amendment to Purchase Agreement have executed it on the day and year first above written.

**SELLER:**

**OPTIMA 55 PUBLIC SQUARE LLC,**
a Delaware limited liability company

By: _____
      Mordechai Y. Korf, Manager

**PURCHASER:**

**KD 55 PUBLIC SQUARE LLC**
an Ohio limited liability company

By: _____
      Douglas E. Price III, Manager

200060357v3
32204-0154

Schedule 1.1.5(b) – List of Service Contracts

| |
|---|
| ABM Parking |
| |
| Gem Energy |
| |
| ABM Services - Janitorial Service |
| |
| Fire Alarm Services - Johnson Controls |
| |
| Constellation<br>CEI 08011154661180001292 |
| |
| Cleveland Thermal Steam |
| |
| ChemTreat<br>Water Treatment |
| |
| Elevator - Schindler |
| |
| Trash- Rumpke |
| |
| Pest- APEX Control |
| |
| Allied- Security |
| |
| Cintas Uniform |
| |
| Plant Masters |
| |
| Sodexo Roth - EMS Monitoring |
| |
| Clearview Cleaning- Window |

Schedule 2.2 - Allocation of Purchase Price

| | |
|---|---|
| Office building and parking facilities: | $ 14,000,000 |
| Personal property: | $      500,000 |
| Intangible property: | $    2,500,000 |
| Total: | $   17,000,000 |

Schedule 7.1.7
Disclosed Litigation

1. *Joint Stock Company Commercial Bank Privatbank v. Igor Valeryevich Kolomoisky, et al*, Court of Chancery of the State of Delaware, case number 2019-0377 in which Optima 55 Public Square LLC, Mordechai Korf, Chaim Schochet, and others who may have an interest in Optima 55 Public Square LLC may have an interest are named defendants (the "Delaware Case").

2. *Spencer Neal v. 229 St. Clair Parking LLC and Optima 55 Public Square LLC*, civil case #1:20-cv-00088-SO filed in the U.S. District Court, Northern District of Ohio (Cleveland).

3. *United States of America v Real Property Located at 55 Public Square, Cleveland, Ohio, with all Appurtenances, Improvements, and Attachments Thereon, and any Right to Collect and Receive Any Profit, Rent, Income and Proceeds Therefrom, U.S. District Court,* Southern District of Florida, Case No. 1:20-cv-25313.

4. *55 Bridge Lending, LLC v Optima 55 Public Square  LLC*, et al, civil case #CV-20-941352, Cuyahoga County Common Pleas Court.

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:20-cv-25313 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| REAL PROPERTY AT 55 PUBLIC SQUARE, | ) | |
| CLEVELAND, OHIO, WITH ALL | ) | **DECLARATION OF** |
| APPURTENANCES, IMPROVEMENTS, | ) | **DOUGLAS E. PRICE, III** |
| AND ATTACHMENTS THEREON, | ) | |
| AND ANY RIGHT, RENT, INCOME, | ) | |
| AND PROCEEDS THEREFROM | ) | |

1.      I, Douglas E. Price, III, am of legal age and have no legal disability.  I make this Declaration based on my personal knowledge.

2.      I am an equal owner, along with Karen Paganini, of K&D Management, LLC ("K&D").  I am also the Manager of K&D.

3.      K&D manages 40 properties throughout Northeast Ohio.  These properties are each owned by a single purpose entity ("SPE").  Each SPE is controlled directly or indirectly by K&D jointly.  The SPE's that are owned indirectly are owned through an affiliated entity that is in turn owned 50/50 by K&D.

4.      I am a member of KD 55 Public Square LLC, and I am the Manager of KD 55 Public Square LLC.

5.      On December 24, 2020, KD 55 Public Square LLC signed a purchase agreement with Optima to purchase 55 Public Square. This purchase agreement is attached as Exhibit 1. KD 55 Public Square LLC has agreed to purchase 55 Public Square for $17 million dollars.  This purchase price is consistent with the fair market value of the property.  The building and its parking structure will require substantial repairs, the current occupancy rate is low, and the COVID pandemic has caused a

general downturn in the value of commercial real estate in downtown Cleveland.  Accordingly, the fair market value of 55 Public Square is $17 million dollars.

6.     The structure diagram for KD 55 Public Square LLC and the associated Operating Agreement are attached as Exhibits 2 and 3.

7.     Neither K&D nor KD 55 Public Square have any ownership or other affiliation with Optima or any of its owners, members, officers, or employees.

8.     Neither I nor Karen Paganini have any ownership or other affiliation with Optima or any of its owners, members, officials, or employees.

9.     Neither Optima nor any of its owners, members, officials, or employees will have any continued interest or title in 55 Public Square after this property is purchased by KD 55 Public Square LLC.

10.     I, Karen Paganini, K&D, and KD 55 Public Square LLC have no ownership or other affiliation with any of the entities or individuals specifically identified in paragraphs 9 through 15 of the Complaint in the above-captioned matter.

11.     KD 55 Public Square LLC's acquisition of 55 Public Square is an arm's length transaction.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct.

January _19_, 2021

Douglas B. Price, III

2

# Exhibit C

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JOINT STOCK COMPANY COMMERCIAL BANK:      :
PRIVATBANK,      :
     :
     Plaintiff,      :
     :
     v.      : Civil Action
     : No. 2019-0377-JRS
IGOR VALERYEVICH KOLOMOISKY,      :
et al.,      :
     :
     Defendants.      :

- - -

Chancery Court Chambers
417 South State Street
Dover, Delaware
Monday, January 25, 2021
9:15 a.m.

- - -

BEFORE:  HON. JOSEPH R. SLIGHTS III, Vice Chancellor.

- - -

ORAL ARGUMENT ON DEFENDANTS' MOTIONS TO DISMISS FOR
FORUM NON CONVENIENS AND THE BENCH RULING ON
PLAINTIFF'S MOTION FOR ALTERNATIVE METHOD OF SERVICE
AND DEFENDANTS OPTIMA 777, LLC'S AND OPTIMA 55 PUBLIC
SQUARE, LLC'S MOTION TO APPROVE SALE OF DISTRESSED
PROPERTIES HELD VIA ZOOM

------------------------------------------------------------
CHANCERY COURT REPORTERS
Leonard L. Williams Justice Center
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0532

153

1   applies here, and the motion is granted as to both

2   defendants on the same grounds.

3            To be clear, this ruling extends to

4   service of process only.  "[S]ervice of process and

5   personal jurisdiction both must be satisfied before a

6   suit can proceed," and they are "distinct concepts

7   that require separate inquiries."  That's actually a

8   quote from Am.Jur. 2d.

9            These defendants have challenged this

10  Court's exercise of personal jurisdiction over them,

11  and that determination will be made on another day.

12           So with that, my ruling on the motion

13  for alternative service is complete.  I'll ask that

14  within five days the plaintiff submit a summary form

15  of implementing order on notice to these defendants

16  that incorporates the rulings I just made on the

17  record today granting the motion for alternative

18  method of service.

19           Turning, now, to the motion for sale

20  of distressed assets.  Defendants Optima 777, LLC, and

21  Optima 55 Public Square, LLC, whom I'll refer to as

22  "Optima," request an order of this Court authorizing

23  the sale of properties located at 55 Public Square and

24  777 St. Clair Avenue, which I'll refer to as the

154

1    "Westin Cleveland Property," and together "The

2    Properties," both of which are located in Cleveland,

3    Ohio, to bona fide third parties free and clear of

4    PrivatBank's constructive trust claim made in this

5    litigation.  55 Public Square has an outstanding offer

6    of $17 million that is conditioned on the Court

7    granting this motion and entering a conforming order.

8              While there is no evidence the buyer

9    will walk away from the deal at a specific time -- and

10   this is important to my decision here -- both

11   buildings are in foreclosure and will soon be sold at

12   auction in a process Optima fears will result in a

13   substantial discount to the property's fair market

14   value.  To avoid any prejudice to PrivatBank, Optima

15   has agreed to place the properties' net sale proceeds

16   into escrow pending completion of this litigation and

17   to seek court approval prior to any sale of the Westin

18   Cleveland once Optima's brokers find a willing

19   arm's-length buyer.

20             The United States Department of

21   Justice is litigating claims implicating both

22   properties and has already signed off on the sale of

23   55 Public Square, after conducting its own due

24   diligence.  PrivatBank, however, objects to the sale

155

1  on the ground that it has insufficient information to

2  assess its merits and asks for leave to take limited

3  discovery before the Court approves this sale.

4              I'll note here that there is no

5  dispute that I have the authority to grant the motion.

6  The dispute is whether I should grant the motion based

7  on the limited information in the record regarding the

8  real value of the asset.

9              After reading the briefs and hearing

10  oral argument, my first inclination is to simply grant

11  the motion.  It appears that any purported lack of

12  information is due, in large measure, to PrivatBank's

13  own lack of diligence.  It has known about this sale

14  for months but did not bother to reach out to the

15  broker of the deal to ask questions or ask that it be

16  given permission to do so.  It did not approach the

17  Department of Justice to understand its thought

18  process in approving the sale.  It does not appear

19  that it investigated comparables or otherwise

20  attempted any meaningful assessment of the value of

21  the property, and its express discomfort stands in

22  tension with the record containing substantial

23  information regarding the process leading to this

24  proposed transaction and the value of this property,

156

1  including an independent appraisal and multiple

2  affidavits from nonaffiliated Cleveland real estate

3  brokers swearing to the fairness of the price and the

4  process.

5                    To be fair, though, there has not been

6  perfect transparency due to some haranguing between

7  the parties over a confidentiality agreement and some

8  very late substantive information submitted into the

9  record in the reply submission supporting the motion.

10                    At oral argument, PrivatBank

11  stipulated that it needed only two depositions: one of

12  Mr. Mordechai Korf, and the other of Mr. Enrico

13  Pietro, the broker.  I agree that PrivatBank needs no

14  more documents.  The documents that have been provided

15  seem quite detailed.  I also agree that a deposition

16  of Mr. Pietro is appropriate, as he swore in his

17  affidavit that he brokered the 55 Public Square deal

18  and has led the negotiations since discussions began

19  with the putative buyer in early 2018.  But I see no

20  legitimate reason why Mr. Korf should be deposed, in

21  addition to Mr. Pietro, and PrivatBank hasn't really

22  offered any.  So I am denying PrivatBank's request for

23  that deposition.  Mr. Korf smartly turned the process

24  over to a professional, and that's where the relevant

157

1    information lies.

2                 I understand this matter is time

3    sensitive due in part to the default interest rate

4    paid daily by the property owner.  For that reason,

5    the deposition should occur within two weeks of this

6    order, no later than February 9th.  It will last no

7    longer than four hours.  After Mr. Pietro is deposed,

8    PrivatBank will have three days to submit any

9    objections to the sale in a letter limited to 2,000

10   words.  Optima will then have three days to respond to

11   the objections, if any are lodged.  There will be no

12   reply, and I'll render my decision on the objections

13   promptly thereafter.

14                 Now, in recognition of the fact that

15   there is ongoing harm in the sense of accruing

16   interest as a condition to taking the deposition and

17   lodging objections, PrivatBank will post a bond with

18   surety covering the costs that will accrue as a result

19   of the daily default interest until this process is

20   completed.  While it's difficult to know precisely how

21   long all of this will take, I think a fair estimate is

22   30 days.  Because Optima estimated, and PrivatBank

23   does not dispute, that the default interest penalty is

24   approximately $6,500 per day, the bond will be in the

158

1    amount of $195,000, the product of the daily default

2    interest and a 30-day timeline.  If the Court

3    determines that the sales price is not fair, then

4    PrivatBank will get its bond back.  But if the Court

5    determines that the transaction as proposed is the

6    best price that can be obtained therefore, as

7    contemplated by Section 297 of the Delaware General

8    Corporation Law, which appears to be the case from the

9    evidence supplied thus far, then the bond will be

10   forfeited to Optima to cover its losses.

11            As to the Westin Cleveland, I am going

12   to grant Optima's motion and ask that they submit a

13   revised form of order reflecting that any proposed

14   sale must be submitted to the Court for approval

15   before any sale occurs.  That is not in the current

16   form of order that has been supplied.

17            So that concludes my ruling.  I am not

18   looking for reargument at this time, but I am happy to

19   entertain any questions the parties might have for

20   clarification.

21            MR. FREEDMAN:  Your Honor, one quick

22   question on behalf of the Optima defendants.  How long

23   does PrivatBank have to put up the bond or to allow

24   the sale to go through?

CHANCERY COURT REPORTERS

159

1          THE COURT:  Well, certainly in advance

2    of the scheduling of the deposition, which I assume

3    would occur any day now.  But promptly.  If there is

4    going to actually be an exploration of this process

5    through discovery, I think that determination could be

6    made in the next day or two.  And it makes sense at

7    that point.  Once the plaintiff indicates that they

8    intend to pursue this process, at that point the bond

9    should be posted.

10          MR. FREEDMAN:  Thank you, Your Honor.

11          THE COURT:  Any further questions?

12   Mr. Baker?

13          MR. BAKER:  One further question, Your

14   Honor.  In the event we proceed with the deposition

15   and ultimately the Court concludes that $17 million is

16   fair market value and the bond is forfeited, will the

17   proceeds of that bond be subject to the same treatment

18   as the proceeds from a sale, meaning it would go in

19   escrow pending resolution of the Delaware action?

20          THE COURT:  I think that's fair.

21          MR. BAKER:  Thank you, Your Honor.

22          MR. FREEDMAN:  Your Honor, actually, I

23   apologize.  I said that was the last question.  But I

24   recall that there's a little bit of tension in that

160

1   the Department of Justice wants the proceeds placed

2   with the marshals.  Is that an acceptable escrow to

3   the Court?

4               THE COURT:  It is to me.  Escrow is

5   escrow.  So long as the plaintiff will have some

6   access or claim to it, just as it would to any money

7   placed in escrow with an agent approved by the Court.

8   The point here is to have the proceeds preserved so

9   that PrivatBank can make a claim to them in the event

10  it prevails.

11              MR. FREEDMAN:  Your Honor, to follow

12  up on that -- I'm not sure there's an answer to this

13  question, but I know that there are deadlines in the

14  sale that are coming up next week for the deposit of

15  real money from the buyer.  This buyer has walked away

16  multiple times before.  What do we do if the buyer

17  walks again?

18              THE COURT:  First of all, none of that

19  was in the papers.  We looked back very carefully to

20  see if there were any of those exigencies identified,

21  and none were.  So I don't have an answer for you on

22  that.  If that was a legitimate concern, that was

23  certainly something I would have expected to see in

24  the papers.  And we looked specifically for that.

# Exhibit D

### ABRAMS & BAYLISS LLP
20 MONTCHANIN ROAD, SUITE 200
WILMINGTON, DE 19807
MAIN: 302-778-1000
FAX: 302-778-1001

MICHAEL A. BARLOW

DIRECT DIAL NUMBER
302-778-1183
Barlow@AbramsBayliss.com

January 28, 2021

## VIA HAND DELIVERY AND FILE & SERVE*XPRESS*

The Honorable Joseph R. Slights III
Court of Chancery
38 The Green
Dover, Delaware 19901

Re:   *Joint Stock Company Commercial Bank PrivatBank v. Kolomoisky, et al.,*
      C.A. No. 2019-0377-JRS

Dear Vice Chancellor Slights:

We write pursuant to this Court's January 25 ruling regarding Movants' Motion to Approve Sale. Dkt. 181. As stated during argument, PrivatBank's interest throughout this process has been to ensure that any sale is at fair market value.

While PrivatBank continues to strongly believe that the circumstances surrounding the purported marketing and $17 million sale price of 55 Public Square raise serious questions as to fair value, PrivatBank does not intend to proceed with a deposition of Mr. Pietro. Given the information provided for the first time in Movants' Reply (Dkt. 189)—despite PrivatBank's repeated requests since January 2020—it appears Movants have engaged with only one potential buyer (KD 55 Public Square) since early 2018 and no other potential buyers have

{A&B-00715652}

The Honorable Joseph R. Slights III
January 28, 2021
Page 2

been approached.   Accordingly, even if PrivatBank were to establish that $17 million is not fair value, such a showing would not necessarily increase the sale proceeds or avoid a foreclosure auction.

Nevertheless, PrivatBank remains deeply concerned about the transaction for the following reasons:

***First***, there are reasons to question whether 55 Bridge Lending—the lender that initiated the foreclosure—is truly at arm's length with Movants.  According to the U.S. Department of Justice, 55 Bridge Lending was "created by Optima's attorneys."   Ex. C ¶ 123.[1]   The business manager for 55 Bridge Lending has described the foreclosure proceedings as "friendly," Ex. H at 4, and recently produced correspondence suggests that 55 Bridge Lending does not intend to proceed with a foreclosure auction.[2]  Movants' affiliates are known to engage in related-party restructuring schemes.  *See* USDOJ Forfeiture Compl. (attached as

---

[1]   Citations to lettered exhibits are to those attached to PrivatBank's Opposition to Movants' Motion to Approve Sale.  Dkt. 187.

[2]   Ex. J at Ex. H (Sept. 16, 2020 letter from B. Silverman to M. Korf: "Although a Notice of Default has been declared, Lender will consider entering into a Forbearance Agreement that provides that Lender will forbear from filing a foreclosure action if Borrower immediately undertakes a process to sell the property for an amount in excess of the outstanding loan balance (plus accrued interest) ….").

The Honorable Joseph R. Slights III
January 28, 2021
Page 3

Exhibit 1) ¶¶ 135-156 (explaining how "Korf and Laber" "converted their ownership of [the PNC Plaza] into ownership of a note, and then turned it back into ownership of the building" and that the "name games were designed to conceal and disguise the nature, location, source, ownership and control of PNC Plaza and the funds that had been used to purchase, restructure, and run it").

*Second*, negotiation with only one potential buyer, KD 55 Public Square, over a two-plus year period cannot be said to maximize potential interest in the property and is contrary to a reasonable marketing process that would generate interest in the property.  As a result of the decisions Movants have made, it appears that only one potential entity has any interest in the property; therefore, even if PrivatBank established that $17 million is below fair market value, no other potential interested buyer exists because the sale process has been exclusive for more than two years.

*Third*, the timing of the sale—in the midst of the COVID-19 pandemic—is unlikely to maximize sale proceeds.  Indeed, very few commercial buildings have been sold during this period precisely because of the COVID-19 discount.  It is possible that this entire situation and sale at a depressed price might have been

The Honorable Joseph R. Slights III
January 28, 2021
Page 4

avoided had Movants managed the asset properly rather than over-leverage the asset to strip out equity.

**Fourth**, Movants acquired 55 Public Square in 2008 for $34 million using PrivatBank's misappropriated loan proceeds.  SAC (Dkt. 146) ¶ 102; Ex. C ¶ 109. In May 2018, Movants took out an $18.5 million loan using 55 Public Square as collateral.   In connection with the transaction, Mr. Korf executed a personal guaranty, which explicitly recognized that he personally benefited from the financing and that he was personally liable in the event of any default on the loan (regardless of whether the lender first executed on the collateral).   Consistent with Defendants' schemes with respect to other properties, Movants neglected 55 Public Square and defaulted on the loan.  *See* SAC ¶¶ 147 n.35, 189 n.39 (describing how Defendants allowed the Huntington Building and the Motorola Campus to fall into disrepair).   Rather than pay under the guaranty to avoid a below-fair-market-value sale, Movants will now sell 55 Public Square to pay off the loan.   Under this scenario, Movants will get an $18.5 million windfall, avoid liability under the guaranty, and further profit on their illicit schemes.  *See generally* Ex. C ¶¶ 117 (describing refinancing transactions as "essentially recouping and reusing the proceeds of the embezzlement and fraud that had been used to purchase the real

The Honorable Joseph R. Slights III
January 28, 2021
Page 5

estate" and "money laundering transactions"), 118 ("The use of [55 Public Square]
as collateral to secure loans, and the other transfers associated with the loans,
further laundered the misappropriated funds from PrivatBank.").

*    *    *

In short, PrivatBank has serious concerns about the circumstances
surrounding the proposed sale.  The deposition of Mr. Pietro may address some of
PrivatBank's concerns.  But it would not remedy deficiencies in the marketing
process, result in another bidder coming to the table to execute a deal in the near
future, or provide PrivatBank the detailed information needed to confirm that the
sale is legitimate.  PrivatBank understands that the net proceeds of the sale, which
Movants' counsel represented will "generate millions of dollars in net proceeds,"[3]
will be placed in escrow pending resolution of this action.

Accordingly, PrivatBank withdraws its opposition to the proposed sale of 55
Public Square, but fully reserves, and does not waive, all claims and damages
associated with Defendants' misappropriation and use of PrivatBank's loan
proceeds to acquire 55 Public Square.

---

[3] 1/21/2021 Oral Arg. Tr. at 6.

The Honorable Joseph R. Slights III
January 28, 2021
Page 6


  If Your Honor has any questions, counsel is available at the Court's

convenience.

          Respectfully,

          */s/ Michael A. Barlow*

          Michael A. Barlow (#3928)

          Words: 961

cc: Register in Chancery (By File & Serve*Xpress*)
   David J. Margules, Esq. (By File & Serve*Xpress*)
   Raymond J. DiCamillo, Esq. (By File & Serve*Xpress*)
   Albert H. Manwaring, IV, Esq. (via File & Serve*Xpress*)

# Exhibit E

Optima 55 Public Square
Proforma Closing

| Closing Date | | | | | 2/11/2021 | |
|---|---|---|---|---|---|---|
| Sale Price | | | | | | 17,000,000.00 |
| | | | | | | |
| Bridge Loan Payoff | | | | | | |
| | Principal & Interest thru | 2/11/2021 | | | 14,217,625.60 | |
| | Legal Fees thru | 2/11/2021 | | | 85,392.02 | |
| | | | | | 14,303,017.62 | (14,303,017.62) |
| | | | | | | |
| Real Estate Tazes | | | | | | |
| | 2H 2019 RE Tax | | | | 343,219.21 | |
| | 2H 2019 Late Pay Penalty | | | | 34,321.92 | |
| | 2H 2019 Late Pay Interest | | | | 7,550.82 | |
| | Full Year 2020 RE Tax | | | | 729,131.44 | |
| | 2020 DCID Tax-1H | | | | 20,356.62 | |
| | 2020 DCID Tax-2H | | | | 20,356.62 | |
| | 2020 DCID SPA Fee-1H | | | | 203.57 | |
| | 2020 DCID SPA Fee-2H | | | | 203.57 | |
| | Total per County Website | | | | 1,155,343.77 | (1,155,343.77) |
| | | | | | | |
| | 2021 Estimated Taxes | *From* | *To* | *Days* | | |
| | RE Tax | 729,131.44 | 1/1/2021 | 2/10/2021 | 41.00 | 81,902.44 |
| | DCID | 41,120.38 | 1/1/2021 | 2/10/2021 | 41.00 | 4,619.00 |
| | | | | | 86,521.44 | (86,521.44) |
| | | | | | | |
| Tenant Security Deposits | | | | | | (29,120.77) |
| | | | | | | |
| Existing Payables | | | | | | (148,166.23) |
| Expense Prorations | | | | | | (118,298.27) |
| Feb Rent ProRations | | | | | | (56,525.69) |
| Prepaid rents in excess of Feb billings (Allstate, Obral & Grange) | | | | | | (59,391.40) |
| | | | | | | |
| ProRation Escrow deposit per PSA | | | | | | (100,000.00) |
| | | | | | | |
| NGKF Broker Lien | | | | | | (21,718.45) |
| Cushman & Wakefield commission | | | | | | (170,000.00) |
| Owners Policy Premium | | | | | | (22,031.25) |
| Exam / Search Fee | | | | | | (250.00) |
| Exam / Search Fee | | | | | | (75.00) |
| Commitment | | | | | | (50.00) |
| Closing Fee | | | | | | (1,000.00) |
| Conveyance Fee | | | | | | (68,001.50) |
| | | | | | | |
| Net Closing Proceeds | | | | | | 660,488.61 |