UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:20-cv-25313-MGC

UNITED STATES OF AMERICA,

       Plaintiff,

v.

REAL PROPERTY LOCATED AT 55 PUBLIC SQUARE,
CLEVELAND, OHIO, WITH ALL APPURTENANCES,
IMPROVEMENTS, AND ATTACHMENTS THEREON,
AND ANY RIGHT TO COLLECT AND RECEIVE ANY
PROFIT, RENT, INCOME, AND PROCEEDS
THEREFROM,

       Defendant,

_____/

## CLAIMANTS OPTIMA VENTURES, LLC AND OPTIMA 55 PUBLIC SQUARE, LLC'S MOTION TO COMPEL ARBITRATION

Claimants Optima Ventures, LLC ("Optima Ventures") and Optima 55 Public Square, LLC's ("Optima 55 Public Square") (collectively "Claimants") move pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, (the "New York Convention"),[1] incorporated into Chapter 2 of the FAA, 9 U.S.C. §§ 201-208, to compel arbitration, pursuant to the Treaty Between the United States of America and Ukraine Concerning the Encouragement and Reciprocal Protection of Investment (the "U.S.-Ukraine BIT" or the "Treaty"), of all claims in this civil forfeiture matter.

_____

[1] Both the United States and Ukraine are parties to the New York Convention.
*See* https://uncitral.un.org/en/texts/arbitration/conventions/foreign_arbitral_awards/status2

The grounds for this motion are that: (1) the strong federal policy favoring arbitration under the New York Convention applies to the U.S.-Ukraine BIT; (2) as the Supreme Court recognized in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019) and *BG Group PLC v. Republic of Argentina*, 572 U.S. 25, 40-41 (2014), for the BIT Treaty there, the arbitration clause of the U.S.-Ukraine BIT, the International Centre for Settlement of Investment Disputes Convention (the "ICSID Convention"),[2] and the ICSID Arbitration Rules delegate to the arbitrator all questions of arbitrability, so the arbitrator, rather than the Court, must decide whether this case is arbitrable; (3) pursuant to Article 26 of the ICSID Convention, "consent of the parties to arbitration under th[e] Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy"; and (4) even if this Court were to assess arbitrability instead of the arbitrator, all of the claims must be arbitrated because the United States indisputably entered into a valid international agreement mandating arbitration of any and all of the claims covered by the arbitration agreement. Accordingly, the Court should, in its discretion, dismiss the case, or, in the alternative, stay the case pending arbitration.

## PRELIMINARY STATEMENT

In a case of egregious overreach, the United States is inexplicably attempting to step into the shoes of Ukraine, a sovereign state, in order to assert claims alleging conduct committed in Ukraine, by wealthy and powerful Ukrainian nationals, that purportedly harmed a Ukrainian bank, violates specific provisions of Ukrainian criminal law. Notwithstanding that no Ukrainian prosecutor or government entity has even alleged that the Ukrainian conduct described in the Verified Complaint violates Ukrainian criminal law, the United States now seeks, in federal court

---

[2] Both the United States and Ukraine are parties to the ICSID Convention. *See* https://icsid.worldbank.org/sites/default/files/ICSID-3.pdf.

in Florida, the forfeiture of property located in Ohio, purportedly on the ground that the property was acquired with funds unlawfully obtained in Ukraine, under Ukrainian law.  Even if the United States had the authority to allege and prosecute violations of Ukrainian criminal law (it does not), this action – between the United States and property owned indirectly by Ukrainian nationals – is subject to arbitration under the bilateral investment treaty between the United States and Ukraine.

In 1996, the United States of America and Ukraine entered into the U.S.-Ukraine BIT that sought to enhance foreign investment in the two countries by providing their citizens with certain rights in the event that a foreign investment dispute arose.[3] One of those rights, applicable to United States citizens investing in Ukraine as well as to Ukranian citizens investing in the United States, is the obligation to afford investments "fair and equitable" treatment, which sets out a minimum standard of treatment based on customary international law. Claimants allege that the United States' initation of this civil forfeiture proceeding, and its conduct in this case, violates international law by exceeding the reasonable bounds of prescriptive jurisdiction and intruding into the competing rights of Ukraine. *See* Restatement (Fourth) of Foreign Relations Law § 407 (2018). The treaty also provides protection from an "expropriation" or "nationalization" of a party's investment, either directly or indirectly through measures tantamount to expropriation or nationalization, and thus applies to so-called "creeping expropriations" that result in a substantial deprivation of the benefit of an investment without taking of the title to the investment.

In the event that treatment of an investment does not adhere to the required fair and equitable standards, or that an expropriation occurs by either the United States or Ukraine, the

---

[3] The U.S-Ukraine BIT is attached hereto as Exhibit 1, and can be found at: https://2009-2017.state.gov/e/eb/ifd/43366.htm

3

citizen of the aggrieved country may, under the terms of the Treaty, "choose to consent in writing to the submission of the dispute for settlement by binding arbitration." The reason why binding arbitration provisions are put into bilateral investment treaties such as the U.S.-Ukraine BIT is obvious: it would make little sense for a party aggrieved by a state-sponsored mistreatment of an investment to have, as its sole remedy, the filing of a lawsuit in the court system of the *same* nation that mistreated the property. A third-party neutral arbitrator is critical to implementing bilateral investment treaties, including the U.S.-Ukraine BIT.

55 Public Square – a 22-story office building in Cleveland, Ohio – which is the Defendant-*in-rem* in this case – was purchased with funds invested by Ukrainian nationals Ihor Kolomoisky and Gennadiy Boholiubov through Optima Ventures and Optima 55 Public Square, of which Kolomoisky and Boholiubov are 66.67% beneficial owners, thereby triggering the terms and conditions of the U.S.-Ukraine BIT.[4] Those terms and conditions, as noted, provide the Claimants

---

[4] *See* U.S.-Ukraine BIT, Art. VI(8) ("For purposes of [an] arbitration . . . , any company legally constituted under the applicable laws and regulations of a Party or a political subdivision thereof but that, immediately before the occurrence of the event or events giving rise to the dispute, was an investment of nationals or companies of the other Party, shall be treated as a national or company of such other Party in accordance with Article 25(2)(b) of the ICSID Convention."). The Letter of Submittal addressed to President Clinton by Secretary of State Christopher recognizes that:

> The Treaty's definition of investment is broad, recognizing that investment can take a wide variety of forms. It covers investments that are owned or controlled by nationals or companies of one of the Treaty partners in the territory of the other. Investments can be made either directly or indirectly through one or more subsidiaries, including those of third countries. Control is not specifically defined in the Treaty. Ownership of over 50 percent of the voting stock of a company would normally convey control, but in many cases the requirement could be satisfied by less than that proportion.

https://2009-2017.state.gov/e/eb/ifd/43366.htm. *See Vacuum Salt v. Ghana*, ICSID Case No. ARB/92/1, Award, 16 February 1994, at ¶ 43 ("'The concept of 'control' is broad and flexible . . .

with an ability to submit this investment dispute "for settlement by binding arbitration." Optima Ventures and Optima 55 Public Square are exercising their right to binding arbitration and invoke the protections of the Treaty binding on Ukranian and American authorities.[5]

Article 41 of the ICSID Convention delegates questions of the arbitrability of the dispute to the arbitrators by providing that:

(1) The Tribunal shall be the judge of its own competence; [and]

(2) Any objection by a party to the dispute that the dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

The Notice of Arbitration to be filed with ICSID asserts that the United States is, through this forfeiture action, improperly attempting to regulate conduct that occurred in the territory of Ukraine, and thereby forfeit Ukrainian investors' property. In doing so, the United States has exceeded the reasonable limits of prescriptive jurisdiction, violated the requirement of fair and equitable treatment, and unlawfully caused harm to Ukrainian investments.

Further, because the U.S.-Ukraine BIT satisfies the prerequisites of the New York convention – meaning (1) the agreement is in writing; (2) the agreement provides for arbitration in the territory of a signatory; (3) the agreement arises out of a commercial legal relationship; and, (4) a party to the agreement is not an American citizen or the commercial relationship has some reasonable relation with one or more foreign states – a motion to compel arbitration pursuant to

---

The question is . . . whether the nationality chosen represents an exercise of a reasonable amount of control to warrant its choice on the basis of a reasonable criterion.").

[5] Optima Ventures and Optima 55 Public Square's Notice of Arbitration is attached hereto as Exhibit 2. Claimants will be filing the Notice of Arbitration on Monday, February 22, 2021, with the International Centre for Settlement of Investment Disputes (ICSID) pursuant to Article VI of the U.S.-Ukraine BIT.

Title 9, United States Code, Section 206 is appropriate. *See Suazo v. NCL (Bahamas), Ltd.*, 822 F.3d 543, 546 (11th Cir. 2016).

In sum, the Court should grant the motion to compel arbitration and direct the United States and Claimants to pursue arbitration pursuant to the U.S.-Ukraine BIT. In addition, the Court should dismiss the civil asset forfeiture case, or, in the alternative, stay the case pending the outcome of that arbitration.

## FACTS

### 1. The United States Seeks To Forfeit 55 Public Square

On December 30, 2020, the United States filed a verified complaint for forfeiture *in rem* seeking to forfeit a the 22-story office building known as 55 Public Square, which is located in Cleveland, Ohio (the "Verified Complaint"). *See* ECF#1. at ¶¶ 1-3, 9.

The Verified Complaint alleges that Ihor Kolomoisky is "a billionaire Ukrainian oligarch" who "controls businesses in many sectors of the Ukrainian economy, including metals, energy, and media" and was the co-owner of PrivatBank, "one of the largest banks in Ukraine." *Id.* at ¶¶ 10-11. The Verified Complaint describes Gennadiy Boholiubov as a "Ukrainian oligarch" who was "the second major shareholder of PrivatBank along with Kolomoisky" and the owner of "40% of PrivatBank" prior to its nationalization by the Ukrainian government in the year 2016. *Id.* at ¶¶ 12.  According to the Verified Complaint, Kolomoisky and Boholiubov used "their control of PrivatBank to steal billions of dollars of the bank's funds," which the two men then invested in real estate in the United States. *Id.* at ¶ 16. The Verified Complaint also identifies Mordechai Korf, also known as "Motti," as "a Miami-based business associate of Kolomoisky and Boholiubov" who, along with his longtime friend Uriel Laber, another "Miami-based business associate of Kolomoisky and Boholiubov," helped manage Kolomoisky and Boholiubov's investments in the

United States "under the 'Optima' umbrella of companies." *Id.* at ¶¶ 13-14, 19-20. **The United States does not assert any allegations of criminal charges brought by Ukraine against Kolomoisky, Boholiubov, Korf, or Laber arising from the purported misconduct concerning PrivatBank described in the Verified Complaint**.

According to the allegations in the Verified Complaint, one such investment occurred "[i]n 2008, [when Korf, Laber, Kolomoisky and Boholiubov] purchased 55 Public Square in Cleveland, Ohio " and supposedly "[t]he money used to purchase 55 Public Square in Cleveland, Ohio . . . was directly traceable to a loan obtained from PrivatBank by Kolomoisky and Boholiubov," which was "the proceeds of embezzlement, misappropriation, and fraud" in violation of "numerous provisions of the Ukrainian Criminal Code." *Id.* at ¶¶ 21, 63. The Verified Complaint alleges that Kolomoisky, Boholiubov, Korf, and Laber acquired the property through a Delaware limited liability company, Optima Ventures LLC, which "was the primary vehicle used to acquire property in the United States with misappropriated funds from PrivatBank." *Id.* at ¶ 82(c). The Verified Complaint further alleges that "Korf and Laber established many entities under Optima Ventures, with which they acquired property using funds misappropriated from PrivatBank, including . . . [Claimant] Optima 55 Public Square, LLC, used . . . to acquire the building at 55 Public Square in Cleveland, Ohio." *Id.* at ¶ 86(c)(vii).

On December 22, 2020, Claimants notified the United States that a contract to sell the 55 Public Square property had been executed. One week later, on December 30, 2020, the United States filed a complaint for civil forfeiture against 55 Public Square, which asserts that the United States may forfeit all of Claimants' interests in 55 Public Square. The United States thereafter inserted itself into the sale and conditioned the sale of the property upon the deposit of the net sale proceeds into the account of the United States Marshals Service. 55 Public Square eventually sold

on February 12, 2021. The United States has prohibited the use of funds derived from 55 Public Square's sale to pay building employees and legal counsel. The funds derived from the sale are currently on deposit with the United States Marshals Service.

On January 19, 2021, multiple verified claims for 55 Public Square were filed in the instant action. *See* ECF#4-7. Claimant Optima Ventures stated that it held a 100% ownership interest in Optima 55 Public Square; Claimant Optima 55 Public Square, in turn, averred that it held a 100% ownership stake in 55 Public Square.

## 2. **Claimants File a Notice of Arbitration**

Claimants will be filing a Notice of Arbitration on Monday, February 22, 2021, with the International Centre for Settlement of Investment Disputes (ICSID) pursuant to Article VI of the U.S.-Ukraine BIT. *See* Ex. 2. The Notice of Arbitration provides that the Ukrainian Prosecutor's Office has not charged Kolomoisky or Boholiubov with any crimes in Ukraine, let alone the "embezzlement, misappropriation, and fraud" constituting "violat[ions] [of] numerous provisions of the Ukrainian Criminal Code" and causing Ukraine "$5.5 billion" in losses and a potential "economic crisis for the whole country," as described by the United States in the Verified Complaint.

As set forth in the Notice of Arbitration, Article 62 of the Ukrainian Constitution provides that "a person shall be deemed innocent of committing a crime and shall not be subjected to a criminal punishment unless his/her guilt has been proven through a legal procedure and established by a court verdict of guilty." The Ukrainian Constitution further provides that the Ukrainian Prosecutor's Office is exclusively empowered to initiate criminal charges.  Ukrainian civil and commercial courts therefore uniformly have held that – in the absence of criminal charges filed by the Ukrainian Prosecutor's Office and a finding of violations of the Criminal Code of Ukraine by

a Ukrainian criminal court – they lack authority to conclude or find that conduct violates the Criminal Code of Ukraine.

Recently, certain of the Ukrainian borrowers accused by the United States of committing Ukrainian crimes – in Ukraine, against a Ukrainian bank – have initiated litigations in Ukraine against PrivatBank seeking judgments that, contrary to PrivatBank's allegations in its various litigations (and the United States' allegations here), the purportedly fraudulent loans were in fact entirely legitimate and consistent with Ukrainian law. Those cases are proceeding through the Ukrainian judicial system, and Ukrainian courts are now issuing decisions directly refuting PrivatBank's allegations – allegations that the United States has parroted in the Complaint.

As a specific example, the United States alleges that application for Loan Number 4N09129D falsely "stated that the loan would be repaid via funds earned through ferroalloy production; instead, it was repaid with funds from two other loans." The United States claims that such alleged misrepresentations "constituted a fraud by and on PrivatBank." However, in a decision issued by the Economic Court of Kyiv on January 22, 2021, the Ukrainian court found that the "the loan repayment and payment of all interest, fees, and other payments, which were set forth in the Loan Agreement No. 4N09129D . . . were made at the expense of funds received by [NZF] from its business activities, at the expense of the Guarantor and not at the expense of other loan funds, which were received by [NZF] under other loan agreements." Decision, *Joint Stock Co. Nikopol Ferroalloy Plant v. Joint Stock Co. Comm. Bank PrivatBank*, No. 910/14224/20 (Kyiv Econ. Ct. Jan. 22, 2021) at 25). This finding by a Ukrainian court concerning issues of Ukrainian law directly contradicts the United States' allegation that Loan No. 4N09129D was a "fraud," and that the proceeds from that loan "constituted embezzlement and conversion." Another decision issued by the same Ukrainian court on the same day determined that a number of other loans the

9

Complaint identifies as examples of allegedly fraudulent loans were in fact properly performed, including Loan Nos. 4N10122D, 4N10221D, 4N10224D, 4N10220D, and 4N10263D. (Decision, *Joint Stock Co. Nikopol Ferroalloy Plant v. Joint Stock Co. Comm. Bank PrivatBank*, No. 910/13313/20 (Kyiv Econ. Ct. Jan. 22, 2021), at 5-6).

The Notice of Arbitration asserts that the United States is improperly attempting to regulate conduct that occurred in the territory of Ukraine. In doing so, the United States has exceeded the reasonable limits of prescriptive jurisdiction, violated the requirement of fair and equitable treatment, and unlawfully expropriated Ukrainian investments. Claimants are seeking full reparations for the United States' breaches of the U.S.-Ukraine BIT and estimated damages in excess of USD $23.25 million for the expropriation of 55 Public Square, which amount includes the net proceeds of the sale of 55 Public Square.

## ARGUMENT

1. **The Provisions of the U.S.-Ukraine BIT Allow for Binding Arbitration in the Event that There Is an Investment Dispute Governed by the Terms of the Treaty.**

Article VI of the U.S.-Ukraine BIT provides remedies in the event that there is a "dispute between a Party and a national or company of the other Party arising out of or relating to . . . (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment," which would include the expropriation of assets or the failure to provide for fair and equitable treatment. According to the Treaty, the "national or company concerned may choose to submit the dispute for resolution" to the "courts or administrative tribunals of the Party that is a Party to a dispute" or in "accordance with any applicable, previously agreed dispute settlement procedures." If the "national or company concerned has <u>not</u> submitted the dispute for resolution" as described above, and "six months have elapsed from the date on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for

settlement by binding arbitration." And, once the "national or company concerned has so consented, either Party to the dispute may initiate arbitration." The Treaty is clear that this right to arbitration applies not only to nationals (or companies) of the other Party (in this case Ukraine), but also, as described in Article VI(8) "any company legally constituted under the applicable laws and regulations of a Party or a political subdivision thereof," in this case the United States, as long as "**immediately before the occurrence of the event or events giving rise to the dispute, was an investment of nationals or companies of the other Party . . . ."**[6] In short, the protections of the Treaty are available not only to Ukraine nationals and companies, but also to United States companies (such as LLCs) through which Ukrainian investment flowed.

### A. The New York Convention, As Incorporated into United States Law under Title 8, United States Code, Sections 201-208, Mandates the Granting of This Motion to Compel Arbitration.

The New York Convention is an international treaty incorporated into Chapter 2 of the Federal Arbitration Act ("FAA"). The FAA requires courts of contracting states to give effect to agreements to arbitrate and to recognize and enforce arbitration awards made in other contracting

---

[6]     The Letter of Submittal addressed to President Clinton by Secretary of State Christopher recognizes that:

> The Treaty's definition of investment is broad, recognizing that investment can take a wide variety of forms. It covers investments that are owned or controlled by nationals or companies of one of the Treaty partners in the territory of the other. Investments can be made either directly or indirectly through one or more subsidiaries, including those of third countries. Control is not specifically defined in the Treaty. Ownership of over 50 percent of the voting stock of a company would normally convey control, but in many cases the requirement could be satisfied by less than that proportion.

https://2009-2017.state.gov/e/eb/ifd/43366.htm. *See Vacuum Salt v. Ghana*, ICSID Case No. ARB/92/1, Award, 16 February 1994, at ¶ 43 ("The concept of 'control' is broad and flexible . . . . The question is . . . whether the nationality chosen represents an exercise of a reasonable amount of control to warrant its choice on the basis of a reasonable criterion.").

states.[7] *See* 9 U.S.C. §§ 201-208. The Supreme Court and the Eleventh Circuit both have recognized "the reciprocal nature of the [New York] Convention and the need for uniformity in the enforcement of arbitration agreements." *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1285 (11th Cir. 2011). The "principal purpose" of the adoption of the New York Convention "was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts. . . ." *Suazo v. NCL (Bahamas), Ltd.*, 822 F.3d 543, 545 (11th Cir. 2016) (*quoting Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974)). "A court having jurisdiction under [the New York Convention] may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206. In short, the FAA creates "two causes of action in federal court for a party seeking to enforce an arbitration agreement that falls under the New York Convention: a motion to *compel* arbitration "in accordance with the agreement," 9 U.S.C. § 206; and a motion to "*confirm*" an arbitral award, *id.* at § 207." *See Suazo*, 822 F.3d 545-56; *see also Lindo*, 652 F.3d 1285 (recognizing "the reciprocal nature of the [FAA] Convention and the need for uniformity in the enforcement of arbitration agreements").

---

[7]  In determining whether to compel arbitration, courts must apply the standards set forth in the FAA. Generally, the FAA evidences a strong federal policy favoring arbitration. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001) ("[T]he FAA compels judicial enforcement of a wide range of written arbitration agreements."). *See also Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A.*, 69 F. Supp. 2d 1341, 1345-48 (M.D. Fla. 2001) (noting the strong federal policy to liberally apply arbitration agreements). In interpreting the FAA, the Supreme Court has repeatedly held that arbitration agreements should be enforced liberally. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). *See also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.").

An arbitration agreement, such as the one contained in the U.S.-Ukraine BIT, falls within the jurisdiction of the New York Convention if: "(1) the agreement is 'in writing within the meaning of the [New York] Convention'; (2) 'the agreement provides for arbitration in the territory of a signatory of the [New York] Convention'; (3) 'the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial'; and (4) a party to the agreement is not an American citizen or the commercial relationship has some reasonable relation with one or more foreign states." *Suazo*, 822 F.3d at 546 (quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 n.7) (bracketed text in original). "If these prerequisites are met, then the court should compel arbitration pursuant to the agreement unless the agreement is 'null and void, inoperative or incapable of being performed,' pursuant to Article II of the Convention." *Clair v. NCL (Bahamas), Ltd.*, 2013 WL 12128723, at *1 (S.D. Fla. June 5, 2013) (citing Convention, art. II (3)); *see Bautista*, 396 F.3d at 1294 ("In deciding whether "to compel arbitration under the Convention Act, a court conducts 'a very limited inquiry.'"); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1287 (11th Cir. 2015) (the only affirmative defense to arbitration at the initial arbitration-enforcement stage is that the contract is null and void) (citing New York Convention, Art. II(3)).

### B. *First* - The Agreement to Arbitrate Pursuant to the U.S.-Ukraine BIT Is in Writing Within the Meaning of the New York Convention

The U.S.-Ukraine BIT constitutes an "agreement in writing" within the meaning of the New York Convention, and therefore satisfies the first prerequisite for compelling arbitration. *See Suazo*, 822 F.3d at 546. The U.S.-Ukraine BIT was signed by the United States on March 4, 1994, entered into force on November 16, 1996 and remains in force today. *See* U.S.-Ukraine BIT; Senate Executive Report 104-13. By its own terms, it is an "agreement in writing" under the New York Convention. *See* U.S.-Ukraine BIT, Art VI(4)(b) (stating that the U.S.-Ukraine BIT is "an

13

'agreement in writing,' for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958 ('New York Convention').")*; see also Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 66 (D.D.C.), *judgment entered*, 987 F. Supp. 2d 82 (D.D.C. 2013) (for purposes of the New York Convention, an "agreement in writing is created a foreign company gives notice in writing to a BIT signatory and submits an investment dispute between the parties to binding arbitration"), *and aff'd sub nom. Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015); *accord Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 392-93 (2d Cir. 2011).  Accordingly, this prerequisite for implementation of the FAA is satisfied.

## C.    *Second* - The U.S.-Ukraine BIT Provides for Arbitration in the Territory of a Signatory of the New York Convention

The second prerequisite for compelling arbitration under the New York Convention requires that the agreement provide for arbitration in the territory of a signatory of the New York Convention.  *See Suazo*, 822 F.3d at 546.  The U.S.-Ukraine BIT plainly satisfies the requirement, expressly providing that "any arbitration under [the U.S-Ukraine BIT] shall be held in a state that is a party to the New York Convention." U.S.-Ukraine BIT, Art. VI(5).  Thus, there can therefore be no dispute that the second prerequisite for compelling arbitration under the New York Convention is satisfied.

## D.    *Third* - The U.S.-Ukraine BIT Arises Out of a Commercial Legal Relationship

The third prerequisite for compelling arbitration under the New York Convention requires that the agreement to arbitrate at issue arise out of a commercial legal relationship.  *See Suazo*, 822 F.3d at 546.  Here, the entire premise of the U.S.-Ukraine BIT is to promote commercial ties between the United States and Ukraine.  As the U.S.-Ukraine BIT itself states, it "concern[s] the encouragement and reciprocal protection of investment," and its purpose is to "to promote greater

14

economic cooperation between [the United States and Ukraine], with respect to investment by nationals and companies of one Party in the territory of the other Party." *See* U.S.-Ukraine BIT, Preamble.

The U.S.-Ukraine BIT "[r]ecogniz[es] that agreement upon the treatment to be accorded such investment will stimulate the flow of private capital and the economic development of the Parties." *Id.* To that end, the U.S.-Ukraine BIT provides substantive protections for investments by nationals and companies of one party in the territory of the other party, including requiring the fair and equitable treatment of the investments and the requirement to provide prompt, adequate and effective compensation for any expropriation of the respective investments. *See* U.S. Ukraine-BIT, Arts. II-III.  Thus, the U.S.-Ukraine BIT plainly arises out of a commercial legal relationship between the United States and Ukraine, as well as commercial legal relationships between the United States and Ukraine and investors who make investments from one of those countries into the territory of the other.  *See generally BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 32 (2014) (recognizing that a bilateral investment treaty regulates international commerce).

E.     *Fourth* - **Ukraine Is a Party to the U.S.-Ukraine BIT and the Commercial Relationship Has Some Reasonable Relation with One or More Foreign States**

The fourth prerequisite for compelling arbitration under the New York Convention requires that a party to the agreement is not an American citizen or that the commercial relationship has some reasonable relation with one or more foreign states.  *See Suazo*, 822 F.3d at 546.  Here, the U.S.-Ukraine BIT – a bilateral investment treaty – plainly satisfies the requirement.  Ukraine is a party to the U.S.-Ukraine BIT.  The entire purpose of the U.S.-Ukraine BIT is to facilitate relations between two foreign states, *i.e.*, Ukraine and the United States, by protecting the investments of one another's citizens in the other's country.  Therefore, the fourth prerequisite for compelling

15

arbitration under the New York Convention is met, and this Court should order that this matter be referred for binding arbitration.

**2.**   **The Arbitrator – Rather Than the Court – Must Decide Whether This Case Is Arbitrable Because the Agreement Delegates that Process to the Arbitrator**

It is true that courts can refuse to compel arbitration if the arbitration agreement is "null and void, inoperative or incapable of being performed, pursuant to Article II of the Convention," but that is a defense that has been interpreted narrowly "as encompassing only those standard breach-of-contract defenses, namely fraud, mistake, duress, and waiver." *Clair*, 2013 WL 12128723, at *2 (citations and quotations omitted). It is axiomatic that the United States government was not defrauded into entering into an international treaty, and there is no good faith basis to allege that the agreement to arbitrate pursuant to Article VI of the U.S.-Ukraine BIT is somehow "null and void, inoperative or incapable of being performed." But even if such an argument could be made (and it cannot), those threshold questions, *i.e.*, the validity of standard breach-of-contract defenses, namely fraud, mistake, duress, and waiver, are delegated to the arbitrator. The Court must enforce that delegation and allow the arbitrator to decide threshold questions of arbitrability, *i.e.*, whether this dispute is capable of submission to arbitration and whether the arbitrator has jurisdiction.

In interpreting a bilateral investment treaty, the Court should treat the treaty "as if it were an ordinary contract between private parties." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 33 (2014). "As a general matter, a treaty is a contract, though between nations." *Id.* at 37. "Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent." *Id.* (citing *Air France v. Saks*, 470 U.S. 392, 399 (1985) (courts must give "the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties"); *Sullivan v. Kidd*, 254 U.S. 433, 439 (1921) ("[T]reaties are to be interpreted upon the principles

which govern the interpretation of contracts in writing between individuals, and are to be executed in the utmost good faith, with a view to making effective the purposes of the high contracting parties"); *Wright v. Henkel*, 190 U.S. 40, 57 (1903) ("Treaties must receive a fair interpretation, according to the intention of the contracting parties").). "When asked to interpret the contracting States to a treaty's intent, the Court should "normally apply the presumptions supplied by American law." *Id.*

The Supreme Court has held that it is appropriate to defer to a treaty's "authorizat[ion] [of] the use of international arbitration associations, the rules of which provide that arbitrators shall have the authority to interpret provisions of this kind [relating to arbitrability]." *Id.* (citing ICSID Convention, Regulations and Rules, Art. 41(1) (2006 ed.) ("Tribunal shall be the judge of its own competence")).

> Under the Federal Arbitration Act, parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract. When a dispute arises, the parties sometimes may disagree not only about the merits of the dispute but also about the threshold arbitrability question – that is, whether their arbitration agreement applies to the particular dispute. Who decides that threshold arbitrability question? Under the Act and this Court's cases, the question of who decides arbitrability is itself a question of contract. The Act allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes.

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). "Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator." *Id.* at 530. "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.*

The Supreme Court has repeatedly held that where an agreement delegates to an arbitrator threshold questions of arbitrability, validity, or existence, such agreements must be enforced and

decided by the arbitrator in the first instance. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010). In fact, where "the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Schein*, 139 S. Ct. at 530. If the arbitration agreement incorporates arbitration rules which delegate to an arbitrator questions of arbitrability, courts must enforce that delegation and allow the arbitrator to decide threshold questions of arbitrability. *See Preston v. Ferrer*, 552 U.S. 346, 361-62 (2008) (where contract incorporated AAA rules, which rules delegated to arbitrator questions of validity, enforceability, and arbitrability, parties were bound by agreement to have arbitrator rather than court decide threshold arbitrability questions).

Here, Article 41 of the ICSID Convention delegates questions of the arbitrability of the dispute to the arbitrators by providing that:

> (1) The Tribunal shall be the judge of its own competence; [and]
>
> (2) Any objection by a party to the dispute that the dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

The parties have agreed that the arbitrator must decide any questions regarding the arbitrability of Claimants' claims relating to the U.S.-Ukraine BIT. Because all of Claimants' (and the United States') claims in this lawsuit are now the subject of arbitration pursuant to Art. VI of the U.S.-Ukraine BIT, all of the claims must be compelled to arbitration pursuant to the U.S.-Ukraine BIT. *See* 9 U.S.C. § 206.

As a matter of law, the delegation clause in the ICSID Convention require this dispute to be referred to arbitration and the case dismissed pending the arbitration. *See* 9 U.S.C. §§ 202, 206.

**3. <u>Pending the Issuance of an Award under the U.S.-Ukraine BIT, the Court Should Dismiss the Verified Complaint, or, in the Alternative, Stay the Proceedings.</u>**

18

In compelling arbitration under the New York Convention pursuant to Title 9, U.S.C., § 206, the Court has the discretion to dismiss the matter. *See Martinez v. Carnival Corp.*, 744 F.3d 1240, 1244 (11th Cir. 2014) (recognizing that, in compelling arbitration, court may dismiss case, noting that "[w]hen the district court compels arbitration . . . it effectively and functionally has issued a decision that 'ends the litigation on the merits'."); *Lindo*, 652 F.3d at 1286 (affirming the district court's order compelling arbitration under the Convention and dismissing the plaintiff's complaint); *Bendlis v. NCL (Bahamas), Ltd.*, 112 F. Supp. 3d 1339, 1348 (S.D. Fla. 2015) (compelling arbitration and dismissing case without prejudice); *Pysarenko v. Carnival Corp.*, 2014 WL 1745048, at *8 (S.D. Fla. Apr. 30, 2014), *aff'd*, 581 F. App'x 844 (11th Cir. 2014) (dismissing case while retaining jurisdiction to enforce arbitration award); *Escobar v. Celebration Cruise Operator, Inc.*, 2014 WL 11380939, at *9 (S.D. Fla. Mar. 26, 2014), *aff'd*, 805 F.3d 1279 (11th Cir. 2015) (compelling arbitration and dismissing case); *Trifonov v. MSC Mediterranean Shipping Co. SA*, 2014 WL 11776940, at *8 (S.D. Fla. Mar. 17, 2014), *aff'd*, 590 F. App'x 842 (11th Cir. 2014) (compelling arbitration and dismissing case without prejudice); *Plugchiev v. Royal Caribbean Cruises, Ltd.*, 2012 WL 12906162, at *2 (S.D. Fla. Sept. 5, 2012) (finding dismissal without prejudice appropriate after compelling arbitration under the Convention); *Hiotakis v. Celebrity Cruises, Inc.*, 2011 WL 2148978, at *9 (S.D. Fla. May 31, 2011) (compelling arbitration under the Convention and granting the defendant's motion to dismiss the plaintiff's complaint); *Tancu v. Celebrity Cruises, Inc.*, 2010 WL 271432, at *2 (S.D. Fla. Jan. 15, 2010) (compelling arbitration under the Convention and dismissing the plaintiff's complaint without prejudice). The Court should dismiss this matter *without prejudice* because the Claimants have already filed a Notice of Arbitration with the ICSID. Thus, the Claimants are not seeking to evade forfeiture

proceedings, but are rather seeking to adjudicate the forfeiture proceedings as quickly as possible in the binding arbitration called for under the Treaty.

In the event that the Court determines that dismissal is inappropriate at this stage, the Court should stay the action pending resolution of the arbitration. Section 3 of the FAA provides that when a plaintiff brings a lawsuit "upon any issue referable to arbitration under an agreement in writing for such arbitration," the court "<u>shall</u> on application of one of the parties" stay the action until arbitration is completed in accordance with the terms of the parties' agreement. 9 U.S.C. § 3 (emphasis added); *See, e.g.*, *Alcalde v. Carnival Cruise Lines*, 798 F. Supp. 2d 1314, 1321 (S.D. Fla. 2011) (Court "may properly compel arbitration and stay this case"). Although the Court may properly exercise its discretion to dismiss the case, it <u>must</u> alternatively stay the case pending resolution of the arbitration. The Eleventh Circuit has explained that, "when a dispute is arbitrable, entry of a § 3 stay is mandatory." *Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1238 (11th Cir. 2008) (citation omitted); *see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC, USW Local 200 v. Wise Alloys, LLC*, 807 F.3d 1258, 1268 (11th Cir. 2015) ("[S]ection 3 qualifies the mandatory nature of any stay it authorizes by requiring a party to apply for the stay: 'the court . . . shall on application of one of the parties stay the trial.'" (quoting 9 U.S.C § 3)); *Klay v. All Defendants*, 389 F.3d 1191, 1203-04 (11th Cir. 2004) ("For arbitrable issues, the language of Section 3 indicates that the stay is mandatory.").

Accordingly, even if the Court does not exercise its discretion to dismiss the case pending arbitration pursuant to 9 U.S.C. § 206, it must nevertheless stay the case pending arbitration pursuant to 9 U.S.C § 3.

## <u>CONCLUSION</u>

Based on the foregoing, the Court should, pursuant to the New York Convention, compel arbitration under the U.S.-Ukraine BIT, and dismiss all claims with prejudice, or, alternatively, stay this action.

Dated: February 19, 2021

Respectfully submitted,

Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Blvd., Suite 1300
Miami, FL 33131
Tel: (305) 371-6421
Fax: (305) 371-6322

By:     */s/ Howard M. Srebnick*
Howard M. Srebnick
Florida Bar No. 919063
Robert T. Dunlap
Florida Bar No. 11950
HSrebnick@RoyBlack.com
RDunlap@RoyBlack.com

*Attorneys for Claimants Korf, Optima Ventures and Optima 55 Public Square*

Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
Marc E. Kasowitz
Mark P. Ressler
Ronald R. Rossi
Sarmad M. Khojasteh
Joshua Paul
*Pro Hac Vice Anticipated*
MKasowitz@kasowitz.com
MRessler@kasowitz.com
RRossi@kasowitz.com
SKhojasteh@kasowitz.com
JPaul@kasowitz.com

*Attorneys for Claimants Korf, Laber, Optima*
*Ventures and Optima 55 Public Square*

<u>*/s/ Scott A. Srebnick*</u>
Scott A. Srebnick, P.A.
201 South Biscayne Boulevard
Suite 1210
Miami, FL 33131
Telephone: (305) 285-9019
Facsimile: (305) 377-9937
Scott@srebnicklaw.com

*Attorney for Claimant Laber*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those parties who are not authorized to receive Notices of Filing electronically.

*/s/ Howard M. Srebnick*
Howard M. Srebnick
