# EXHIBIT 1

Click here for the Trade Guide

## Ukraine Bilateral Investment Treaty

Signed March 4, 1994; Entered into Force November 16, 1996

103D CONGRESS 2D Session

SENATE TREATY Doc. 103-37

INVESTMENT TREATY WITH UKRAINE

MESSAGE

FROM

THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

TREATY BETWEEN THE UNITED STATES OF AMERICA AND UKRAINE CONCERNING THE ENCOURAGEMENT AND RECIPROCAL PROTECTION OF INVESTMENT, WITH ANNEX, AND RELATED EXCHANGE OF LETTERS, DONE AT WASHINGTON ON MARCH 4, 1994

September 27, 1994 --Convention was read the first time and, together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

79-118 Washington : 1994

LETTER OF TRANSMITTAL

THE WHITE HOUSE, September 27, 1994.

To the Senate of the United States:

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty Between the United States of America and Ukraine Concerning the Encouragement and Reciprocal Protection of Investment, with Annex and related exchange of letters, done at Washington on March 4, 1994. Also transmitted for the information of the Senate is the report of the Department of State with respect to this Treaty.

This bilateral investment Treaty with Ukraine is the seventh such Treaty between the United States and a newly independent state of the former Soviet Union. This Treaty will protect U.S. investors and assist Ukraine in its efforts to develop its economy by creating conditions more favorable for U.S. private investment and thus strengthening the development of the private sector.

The Treaty is fully consistent with U.S. policy toward international and domestic investment. A specific tenet of U.S. policy, reflected in this Treaty, is that U.S. investment abroad and foreign investment in the United States should receive national treatment. Under this Treaty, the Parties also agree to international law standards for expropriation and compensation for expropriation; free transfer of funds associated with investment; freedom of investments from performance requirements; fair, equitable and most-favored-nation treatment; and the investor or investment's freedom to choose to resolve disputes with the host government through international arbitration.

I recommend that the Senate consider this Treaty as soon as possible, and give its advice and consent to ratification of the Treaty, with Annex, and related exchange of letters at an early date.

WILLIAM J. CLINTON.

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,

Washington, September 7,1994.

The PRESIDENT,

The White House.

THE PRESIDENT: I have the honor to submit to you the Treaty between the United States of America and Ukraine Concerning the Encouragement and Reciprocal Protection of Investment, with a related exchange of letters, signed at Washington on March 4, 1994. I recommend that this Treaty and exchange of letters be transmitted to the Senate for its advice and consent to ratification.

The bilateral investment treaty (BIT) with Ukraine was the seventh such treaty between the United States and a newly independent state of the former Soviet Union. The United States had previously concluded BITs with Russia, Armenia, Belarus Kazakhstan Kyrgyzstan, and Moldova; and has subsequently signed a treaty with Georgia. The Treaty is based on the view that an open investment policy contributes to economic growth. The Treaty will assist Ukraine in its efforts to develop its economy by creating conditions more favorable for U.S. private investment and thus strengthening the development of the private sector. It is U.S. policy, however, to ad-vise potential treaty partners during BIT negotiations that conclusion of a BIT does not necessarily result in immediate increases in private U.S. investment flows.

To date, nineteen BITs are in force for the United States--with Bangladesh, Bulgaria, Cameroon, the Congo, the Czech Republic, Egypt, Grenada, Kazakhstan, Kyrgyzstan, Morocco, Panama, Poland, Romania, Senegal, Slovakia, Sri Lanka, Tunisia, Turkey, and Zaire. In addition to the Treaty with Ukraine, the United States has signed, but not yet brought into force, BITs with Argentina, Armenia, Belarus, the Congo, Ecuador, Estonia, Georgia, Haiti, Jamaica, Moldova, and Russia.

The Office of the United States Trade Representative and the Department of State jointly led this BIT negotiation, with assistance from the Departments of Commerce and Treasury and the Overseas Private Investment Corporation.

THE U.S.-UKRAINE TREATY

The Treaty with Ukraine is based on the 1992 U.S. prototype BIT, and achieves all of the prototype's objectives, which are:

--All forms of U.S. investment in the territory of Ukraine are covered.

--Investments receive the better of national treatment or most-favored-nation (MFN) treatment both on establishment and thereafter, subject to certain specified exceptions.

--performance requirements may not be imposed upon or enforced against investments.

--Expropriation can occur only in accordance with international law standards; that is, for a public purpose; in a nondiscriminatory manner, in accordance with due process of law, and upon payment of prompt, adequate, and effective compensation.

--The unrestricted transfer, in a freely usable currency, of funds related to a covered investment is guaranteed.

--Investment disputes with the host government may be brought by investors, or by their subsidiaries, to binding international arbitration as an alternative to domestic courts.

The U.S.-Ukraine Treaty differs from the prototype in some respects. It eliminates Article VIII of the 1992 prototype text which had excluded from the dispute settlement provisions of the BIT those disputes arising under the export credit, guarantee or insurance programs of the Export-Import Bank of the United States, as well as those arising under any other such official programs pursuant to which the Parties agreed to other means of settling disputes. The Export-Import Bank, the Overseas Private Investment Corporation and other relevant government. agencies indicated prior to this negotiation that they saw no need to maintain such a provision.

The U.S.-Ukraine Treaty also differs from the prototype in that it includes provisions at Article I, paragraph 1 (f) and (g), and Article Il, paragraph 2, which clarify and extend the requirements of the Treaty with respect to state enterprises, and Article II, paragraph 11, which clarifies that investors should receive the better of national or MFN treatment with respect to activities associated with their investment. This new language is discussed in further detail in the article-by-article analysis of the Treaty below.

In addition, a related exchange of letters designates an office within Ukraine to assist U.S. nationals and companies. These elements are further described below.

The following is an article-by-article analysis of the provisions of the Treaty.

Preamble

The Preamble states the goals of the Treaty. The Treaty is premised on the view that an open investment policy leads to economic growth. These goals include economic cooperation, increased flow of capital, a stable framework for investment, development of respect for internationally-recognized worker rights, and maximum efficiency in the use of economic resources. While the Preamble does not impose binding obligations, its statement of goals may serve to assist in the interpretation of the Treaty.

Article I (Definitions)

Article I sets out definitions for terms used throughout the Treaty. As a general matter, they are designed to be broad and inclusive in nature.

Investment

The Treaty's definition of investment is broad, recognizing that investment can take a wide variety of forms. It covers investments that are owned or controlled by nationals or companies of one of the Treaty partners in the territory of the other. Investments can be made either directly or indirectly through one or more subsidiaries, including those of third countries. Control is not specifically defined in the Treaty. Ownership of over 50 percent of the voting stock of a company would normally convey control, but in many cases the requirement could be satisfied by less than that proportion.

The definition provides a non-exclusive list of assets, claims and rights that constitute investment. These include both tangible and intangible property, interests in a company or its assets, "a claim to money or performance having economic value, and associated with an investment," intellectual property rights, and any rights conferred by law or contract (such as government-issued licenses and permits). The requirement that a "claim to money" be associated with an investment excludes claims arising solely from trade transactions, such as a transaction involving only a cross-border sale of goods, from being considered investments covered by the Treaty.

Under paragraph 2 of Article I, either country may deny the benefits of the Treaty to investments by companies established in the other that are owned or controlled by nationals of a third country if (1) the company is a mere shell, without substantial business activities in the home country, or (2) the third country is one with which the denying Party does not maintain normal economic relations. For example, at this time the United States does not maintain normal economic relations with, inter alia, Cuba or Libya.

Paragraph 3 confirms that any alteration in the form in which an asset is invested or reinvested shall not affect its character as investment. For example, a change in the corporate form of an investment will not deprive it of protection under the Treaty.

Company

The definition of "company" is broad in order to cover virtually any type of legal entity, including any corporation, company, association, or other entity that is organized under the laws and regulations of a Party. The definition also ensures that companies of the Party that establish investments in the territory of the other Party have their investments covered by the Treaty, even if the parent company is ultimately owned by non-Party nationals, although the other Party may deny the benefits of the Treaty in the limited circumstances set forth in Article I, paragraph 2. Likewise, a company of a third country that is owned or controlled by nationals or company of a Party will also be covered. The definition also cover charitable and non-profit entities, as well as entities that are owned or controlled by the state.

National

The Treaty defines "national" as a natural person who is a national of a Party under its own laws. Under U.S. law, the term "national" is broader than the term "citizen;" for example, a native of American Samoa is a national of the United States, but not a citizen.

Return

"Return" is defined as "an amount derived from or associated with an investment." The Treaty provides a non-exclusive list of examples, including: profits; dividends; interest; capital gains; royalty payments, management, technical assistance or other fees; and returns in kind. The scope of this definition provides breadth to the Treaty's transfer provisions in Article IV.

Associated activities

The Treaty recognizes that the operation of an investment requires protections extending beyond the investment to numerous related activities. This definition provides an illustrative list of such investor activities, including operating a business facility, borrowing money, disposing of property, issuing stock and purchasing foreign exchange for imports. These activities are covered by Article II, paragraph 1, which guarantees the better of national or MFN treatment for investments and associated activities.

State enterprise

"State enterprise" is defined as an enterprise owned, or controlled through ownership interests, by a Party.

Delegation

"Delegation" is defined to include a legislative grant, government order, directive or other act which transfers governmental authority to a state enterprise or authorizes a state enterprise to exercise such authority.

The definitions of "state enterprise" and "delegation" are included to clarify the scope of the obligations of Article II, paragraph 2, which provides that any governmental authority delegated to a state enterprise by a Party must be exercised in a manner consistent with the Party's obligations under the Treaty.

Article II (Treatment)

Article II contains the Treaty's major obligations with respect to the treatment of investment.

Paragraph I generally ensures the better of MFN or national treatment in both the entry and post-entry phases of investment. It thus prohibits both the screening of proposed foreign investment on the basis of nationality and discriminatory measures once the investment has been made, subject to specific exceptions provided for in a separate Annex. The United States and Ukraine have both reserved certain exceptions in the Annex to the Treaty, the provisions of which are discussed in the section entitled "Annex."

Paragraph 2 is designed to ensure that a Party cannot utilize state-owned or controlled enterprises to circumvent its obligations under the Treaty. To this end, it requires each Party to observe its treaty obligations even when it chooses, for administrative or other reasons, to assign some portion of its authority to a state enterprise, such as the power to expropriate, grant licenses, approve commercial transactions, or impose quotas, fees or other charges. Paragraph 2 also supports competitive equality for investments by requiring that a Party ensure that state enterprises accord the better of national or MFN treatment in the sale of its goods or services in the Party's territory.

Paragraph 3 guarantees that investment shall be granted "fair and equitable" treatment. It also prohibits Parties from impairing through arbitrary or discriminatory means, the management, operation, maintenance, use, enjoyment, acquisition, expansion or disposal of investment. This paragraph sets out a minimum standard of treatment based on customary international law.

In paragraph 3(c), each Party pledges to respect any obligations it may have entered into with respect to investments. Thus, in dispute settlement under Articles VI or VII, a Party would be foreclosed from arguing, on the basis of sovereignty, that it may unilaterally ignore its obligations to such investments.

Paragraph 4 allows, subject to each Party's immigration laws and regulations, the entry of each Party's nationals into the territory of the other for purposes linked to investment and involving the commitment of a "substantial amount of capital." This paragraph serves to render nationals of a BIT partner eligible for treaty-investor visas under U.S. immigration law and guarantees similar treatment for U.S. investors.

Paragraph 5 guarantees companies the right to engage top managerial personnel of their choice, regardless of nationality.

Under paragraph 6, neither Party may impose performance requirements such as those conditioning investment on the export of goods produced or the local purchase of goods or services. Such requirements are major burdens on investors.

Paragraph 7 provides that each Party must provide effective means of asserting rights and claims with respect to investment, investment agreements and any investment authorizations. Under paragraph 8, each Party must make publicly available all laws, administrative practices and adjudicatory procedures pertaining to or affecting investments,

Paragraph 9 recognizes that under the U.S. federal system States of the United States may, in some instances, treat out-of-State residents and corporations in a different manner than they treat in-State residents and corporations. The Treaty provides that the national treatment commitment, with respect to the States, means treatment no less favorable than that provided to U.S. out-of-State residents and corporations.

Paragraph 10 limits the Article's MFN obligation by providing that it will not apply to advantages accorded by either Party to third countries by virtue of a Party's membership in a free trade area or customs union or a future multilateral agreement under the auspices of the General Agreement on Tariffs and Trade (GATT). The free trade area exception in this Treaty is analogous to the exception provided for with respect to trade in the GATT.

Paragraph 11 is designed to avoid problems that U.S. businesses may face in emerging market economies. This provision spells out that nationals and companies of either Party receive the better of national or MFN treatment with respect to a detailed list of activities associated with their investments.

Article III (Expropriation)

Article III incorporates into the Treaty the international law standards for expropriation and compensation.

Paragraph 1 describes the general rights of investors and obligations of the Parties with respect to expropriation and nationalization. These rights also apply to direct or indirect state measures "tantamount to expropriation or nationalization," and thus apply to "creeping expropriations" that result in a substantial deprivation of the benefit of an investment without taking of the title to the investment.

Paragraph 1 further bars all expropriations or nationalizations except those that are for a public purpose, carried out in a non-discriminatory manner; subject to prompt, adequate, and effective compensation"; subject to due process; and accorded the treatment provided in the standards of Article II (3). (These standards guarantee fair and equitable treatment and prohibit the arbitrary and discriminatory impairment of investment in its broadest sense.)

The second sentence of paragraph 1 clarifies the meaning of "prompt, adequate, and effective compensation." Compensation must be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken or became known (whichever is earlier); be paid without delay; include interest at a commercially reasonable rate from the date of expropriation; be fully realizable; be freely transferable; and be calculated in a freely usable currency on the basis of the prevailing market rate of ex change.

Paragraph 2 entitles an investor claiming that an expropriation has occurred to prompt judicial or administrative review of the claim in the host country, including a determination of whether the expropriation and any compensation conform to international law.

Paragraph 3 entitles investors to the better of national or MFN treatment with respect to losses related to war or civil disturbances, but, unlike paragraph 1, does not specify an absolute obligation to pay compensation for such losses.

Article IV (Transfers)

Article IV protects investors from certain government exchange controls limiting current account and capital account transfers.

In paragraph 1, the Parties agree to permit "transfers related to an investment to be made freely and without delay into and out of its territory." Paragraph I also provides a non-exclusive list of transfers that must be allowed, including returns (as defined in Article I); payments made in compensation for expropriation (as defined in Article III); payments arising out of an investment dispute; payments made under a contract, including the amortization of principal and interest payments on a loan; proceeds from the liquidation or sale of all or part of an investment; and additional contributions to capital for the maintenance or development of an investment.

Paragraph 2 provides that transfers are to be made in a "freely usable currency" at the prevailing market rate of exchange on the date of transfer with respect to spot transactions in the currency to be transferred. "Freely usable" is a standard of the International Monetary Fund; at present there are five such "freely usable" currencies: the U.S. dollar, Japanese yen, German mark, French franc and British pound sterling.

Paragraph 3 recognizes that notwithstanding these guarantees, Parties may maintain certain laws or obligations that could affect transfers with respect to investments. It provides that the Parties may require reports of currency transfers and impose income tax by such means as a withholding tax on dividends. It also recognizes that Parties may protect the rights of creditors and ensure the satisfaction of judgments in adjudicatory proceedings through the laws, even if such measures interfere with transfers. Such laws must be applied in an equitable, nondiscriminatory and good faith manner.

Article V (State-State consultations)

Article V provides for prompt consultation between the Parties at either Party's request, on any matter relating to the interpretation or application of the Treaty.

Article VI (State-investor dispute resolution)

Article VI sets forth several means by which disputes between investor and the host country may be settled.

Article VI procedures apply to an "investment dispute," a term which covers any dispute arising out of or relating to an investment authorization, an agreement between the investor and host government, or to rights granted by the Treaty with respect to an investment.

When a dispute arises Article VI paragraph 2, provides that disputants should initially seek to resolve the dispute by consultation and negotiation, which may include non-binding third party procedures. Should such consultations fail, paragraphs 2 and 3 set forth the investor's range of choices of dispute settlement. Paragraph 2 permits the investor to make an exclusive and irrevocable choice to: (1) Employ one of the several arbitration procedures outlined in the Treaty; (2) submit the dispute to procedures previously agreed upon by the investor and the host country government for an investment agreement or otherwise; or (3) submit the dispute to the local courts or administrative tribunals of the host country.

Under paragraph 3, if the investor has not submitted the dispute under the procedures in paragraph 2 and six months have elapsed from the date the dispute arose, the investor may consent of submission of the dispute for binding arbitration by either the International Centre for the Settlement of Investment Disputes (ICSID)(if the host country has Joined the Centre--otherwise the ICSID Additional Facility is available) or ad hoc arbitration using the arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL). Paragraph 3 also recognizes that, by mutual agreement, the parties to the dispute may choose another arbitral institution or set of arbitral rules.

Paragraph 4 contains the consent of the United States and Ukraine to the submission of investment disputes for binding arbitration in accordance with the choice of the investor.

Paragraph 5 provides that a non-ICSID arbitration shall take place in a country that is a party to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards. This requirement enhances the ability of investors to enforce their arbitral awards. In addition, paragraph 6 includes a separate commitment by each Party to enforce arbitral awards rendered pursuant to Article VI procedures.

Paragraph 7 provides that in any dispute settlement procedure, a Party may not invoke as a defense, counterclaim, set-off or in any other manner the fact that the company or national has received or will be reimbursed for the same damages under an insurance or guarantee contract.

Paragraph 8 is included in the Treaty to ensure that ICSID arbitration will be available for investors making investments in the form of companies created under the laws of the Party with which there is a dispute.

Article VII (State-State arbitration)

Article VII provides for binding arbitration of disputes between the United States and Ukraine that are not resolved through consultations or other diplomatic channels. The article constitutes each Party's prior consent to arbitration. It provides for the selection of arbitrators, establishes time limits for submissions, and requires the Parties to bear the costs equally unless otherwise directed by the Tribunal.

Article VIII (Preservation of rights)

Article VIII clarifies that the Treaty is meant only to establish a floor for the treatment of foreign investment. An investor may be entitled to more favorable treatment through domestic legislation, other international legal obligations, or a specific obligation assumed by a Party with respect to that

investor. This provision ensures that the Treaty will not be interpreted to derogate from any entitlement to such more favorable treatment.

Article IX (Measures not precluded)

Paragraph 1 of Article IX reserves the right of a Party to take measures for the maintenance of public order and the fulfillment of its obligations with respect to international peace and security, as well as those measures it regards as necessary for the protection of its own essential security interests. These provisions are common in international investment agreements.

The maintenance of public order would include measures taken pursuant to a Party's police powers to ensure public health and safety. International obligations with respect to peace and security would include, for example, obligations arising out of Chapter VII of the United Nations Charter. Measures permitted by the provision on the protection of a Party's essential security interests would include security-related actions taken in a time of war or national emergency; actions not arising from a state of war or national emergency must have a clear and direct relationship to the essential security interest of the Party involved.

The second paragraph allows a Party to promulgate special formalities in connection with the establishment of investment, provided that the formalities do not impair the substance of any Treaty rights. Such formalities would include, for example, U.S. reporting requirements for certain inward investment.

Article X (Tax policies)

Paragraph 1 exhorts both countries to provide fair and equitable treatment to investors with respect to tax policies. However, matters are generally excluded from the coverage of the Treaty based on the assumption that tax matters are properly covered by bilateral tax treaties.

The Treaty, and particularly the dispute settlement provisions do apply to tax matters in three areas, to the extent they are not subject to the dispute settlement provisions of a tax treaty, or if so subject, have been raised under a tax treaty dispute settlement procedures and are not resolved in a reasonable period of time.

Pursuant to paragraph 2, the three areas where the Treaty could apply to tax matters are expropriation (Article III), transfers (Article IV) and the observance and enforcement of terms of an investment agreement or authorization (Article VI(1) (a) or (b)). These three areas are important for investors, and two of the three--expropriatory taxation and tax provisions contained in an investment agreement or authorization---are not typically addressed by tax treaties.

Article XI (Application to political subdivisions)

Article XI makes clear that the obligations of the Treaty are applicable to all political subdivisions of the Parties, such as provincial, state and local governments.

Article XII (Entry into force, duration and termination)

The Treaty enters into force thirty days after exchange of instruments of ratification and continues in force for a period of ten years. From the date of its entry into force, the Treaty applies to existing and future investments. After the ten-year term, the Treaty will continue in force unless terminated by either Party upon one year's notice. If the Treaty is terminated, all existing investments would continue to be protected under the Treaty for ten years thereafter.

Annex

U.S. bilateral investment treaties allow for sectoral exceptions from national and MFN treatment. The US. exceptions are designed to protect governmental regulatory interests and to accommodate the derogations from national treatment and, in some cases, MFN treatment in existing federal law.

The U.S. portion of the Annex contains a list of sectors and matters in which, for legal and historical reasons, the federal government or the States may not necessarily treat investments of nationals or companies of the other Party as they do U.S. investments or investments from a third country. The U.S. exceptions from national treatment are: air transportation; ocean and coast shipping; banking; insurance; government grants; government insurance and loan programs; energy and power production; custom house brokers; ownership of real property; ownership and operation of broadcast or common carrier radio and television stations; ownership of shares in the Communications Satellite Corporation; the provision of common carrier telephone and telegraph services; the provision of

submarine cable services; use of land and natural resources; mining on the public domain; maritime and maritime-related services; and primary dealership in U.S. government securities.

Ownership of real property, mining on the public domain, maritime and maritime-related services and primary dealership in U.S. government securities are excluded from MFN as well as national treatment commitments. The last three sectors are exempted by the United States from MFN treatment obligations because of U.S. laws that require reciprocity. Enforcement of reciprocity provisions could deny both national and MFN treatment.

The listing of a sector does not necessarily signify that domestic laws have entirely reserved it for nationals. Future restrictions or limitations on foreign investment are only permitted in the sectors listed; must be made on an MFN basis, unless otherwise specified in the Annex; and must be appropriately notified. Any additional restrictions or limitations which a Party may adopt with respect to listed sectors may not affect existing investments.

Ukraine's exceptions to national treatment are: production of equipment used exclusively for nuclear power plants; maritime transportation, including ocean and coastal shipping; air transportation; nuclear electric energy generation; privatization of those educational, sports, medical and scientific facilities financed by the national budget; mining of salt; mining and processing of rare earth, uranium and other radioactive elements; ownership and operation of television and radio broadcasting stations; and ownership of land. These exceptions were based on provisions of investment measures currently in force or under active consideration by the Government of Ukraine. Ukraine has not reserved any sectoral exceptions to MFN treatment in the Annex.

Exchange of letters

In an exchange of letters at the time the Treaty was signed, Ukraine explicitly designates the Administration for Investment Cooperation of the Ministry of Foreign Economic Relations of Ukraine and the Department of Foreign Investments and Credits in the Ministry of Economy of Ukraine to assist U.S. nationals and companies in obtaining the full benefits of the Treaty.

The other U.S. Government agencies which negotiated the Treaty join me in recommending that it be transmitted to the Senate at an early date.

Respectfully submitted,

WARREN CHRISTOPHER

TREATY BETWEEN THE UNITED STATES OF AMERICA AND

UKRAINE

CONCERNING THE ENCOURAGEMENT

AND RECIPROCAL PROTECTION OF INVESTMENT

The United States of America and the Ukraine (hereinafter the "Parties");

Desiring to promote greater economic cooperation between them, with respect to investment by nationals and companies of one Party in the territory of the other Party;

Recognizing that agreement upon the treatment to be accorded such investment will stimulate the flow of private capital and the economic development of the Parties;

Agreeing that fair and equitable treatment of investment is desirable in order to maintain a stable framework for investment and maximum effective utilization of economic resources;

Recognizing that the development of economic and business ties can contribute to the well-being of workers in both Parties and promote respect for internationally recognized worker rights; and

Having resolved to conclude a Treaty concerning the encouragement and reciprocal protection of investment;

Have agreed as follows:

ARTICLE I

1. For the purposes of this Treaty,

(a) "investment" means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes:

(i) tangible and intangible property, including rights, such as mortgages, liens and pledges;

(ii) a company or shares of stock or other interests in a company or interests in the assets thereof;

(iii) a claim to money or a claim to performance having economic value, and associated with an investment;

(iv) intellectual property which includes, inter alia, rights relating to:

literary and artistic works, including sound recordings, inventions in all fields of human endeavor, industrial designs, semiconductor mask works, trade secrets, know-how, and confidential business information, and trademarks, service marks, and trade names; and

(v) any right conferred by law or contract, and any licenses and permits pursuant to law;

(b) "company" of a Party means any kind of corporation, company, association, enterprise, partnership, or other organization, legally constituted under the laws and regulations of a Party or a political subdivision thereof whether or not organized for pecuniary gain, or privately or governmentally owned or controlled;

(c) "national," of a Party means a natural person who is a national of a Party under its applicable law;

(d) "return" means an amount derived from or associated with an investment, including profit; dividend; interest; capital gain; royalty payment; management, technical assistance or other fee; or returns in kind;

(e) "associated activities" include the organization, control, operation, maintenance and disposition of companies, branches, agencies, offices, factories or other facilities for the conduct of business; the making, performance and enforcement of contracts; the acquisition, use, protection and disposition of property of all kinds including intellectual property rights; the borrowing of funds; the purchase, issuance, and sale of equity shares and other securities; and the purchase of foreign exchange for imports;

(f) "state enterprise" means an enterprise owned, or controlled through ownership interests, by a Party; and

(g) "delegation" includes a legislative grant, and a government order, directive or other act transferring to a state enterprise or monopoly, or authorizing the exercise by a state enterprise or monopoly of, governmental authority.

2. Each Party reserves the right to deny to any company the advantages of this Treaty if nationals of any third country control such company and, in the case of a company of the other Party, that company has no substantial business activities in the territory of the other Party or is controlled by nationals of a third country with which the denying Party does not maintain normal economic relations.

3. Any alteration of the form in which assets are invested or reinvested shall not affect their character as investment.

ARTICLE II

1. Each Party shall permit and treat investment, and activities associated therewith, on a basis no less favorable than that accorded in like situations to investment or associated activities of its own nationals or companies, or of nationals or companies of any third country, whichever is the most favorable, subject to the right of each Party to make or maintain exceptions falling within one of the sectors or matters listed in the Annex to this Treaty. Each Party agrees to notify the other Party before or on the date of entry into force of this Treaty of all such laws and regulations of which it is aware concerning the sectors or matters listed in the Annex. Moreover, each Party agrees to notify the other of any future exception with respect to the sectors or matters listed in the Annex, and to limit such exceptions to a minimum. Any future exception by either Party shall not apply to investment existing in that sector or matter at the time the exception becomes effective. The treatment accorded pursuant to any exceptions shall, unless specified otherwise in the Annex, be not less favorable than that accorded in like situations to investments and associated activities of nationals or companies of any third country.

2. (a) Nothing in this Treaty shall be construed to prevent a Party from maintaining or establishing a state enterprise.

(b) Each Party shall ensure that any state enterprise that it maintains or establishes acts in a manner that is not inconsistent with the Party's obligations under this Treaty wherever such enterprise exercises any regulatory, administrative or other governmental authority that the Party has delegated to it, such as the power to expropriate, grant licenses, approve commercial transactions, or impose quotas, fees or other charges.

(c) Each Party shall ensure that any state enterprise that it maintains or establishes accords the better of national or most favored nation treatment in the sale of its goods or services in the Party's territory.

3. (a) Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law.

(b) Neither Party shall in any way impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal of investments. For purposes of dispute resolution under Article 3 VI and VII, a measure may be arbitrary or discriminatory notwithstanding the fact that a Party has had or has exercised the opportunity to review such measure in the courts or administrative tribunals of a Party.

(c) Each Party shall observe any obligation it may have entered into with regard to investments.

4. Subject to the laws relating to the entry and sojourn of aliens, nationals of either Party shall be permitted to enter and to remain in the territory of the other Party for the purpose of establishing, developing, administering or advising on the operation of an investment to which they, or a company of the first Party that, employs them, have committed or are in the process of committing a substantial amount of capital or other resources.

5. Companies which are legally constituted under the applicable laws or regulations of one Party, and which are investments, shall be permitted to engage top managerial personnel of their choice, regardless of nationality.

6. Neither Party shall impose performance requirements as condition of, establishment, expansion or maintenance of investments, which require or enforce commitments to export goods produced, or which specify that goods or services must purchased locally, or which impose any other similar requirements.

7. Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations.

8. Each Party shall make public all laws, regulations, administrative practices and procedures, and adjudicatory decisions that pertain to or affect investments.

9. The treatment accorded by the United States of America to investments and associated activities of nationals and companies of Ukraine under the provisions of this Article shall in any State, Territory or possession of the United States of America be no less favorable than the treatment accorded therein to investments and associated activities of nationals of the United States of America resident in, and companies legally constituted under the laws and regulations of other States, Territories or possessions of the United States of America.

10. The most favored nation provisions of this Treaty shall not apply to advantages accorded by either Party to nationals or companies of any third country by virtue of:

(a) that Party's binding obligations that derive from full membership in a free trade area or customs union; or

(b) that Party's binding obligations under any multilateral international agreement under the framework of the General Agreement on Tariffs and Trade that enters into force subsequent to the signature of this Treaty.

11. The Parties acknowledge and agree that "associated" activities, include without limitation, such activities as:

(a) the granting of franchises or rights under licenses;

(b) access to registrations, licenses, permits and other approvals (which shall in any event be issued expeditiously);

(c) access to financial institutions and credit markets;

(d) access to their funds held in financial institutions;

(e) the importation and installation of equipment necessary for the normal conduct of business affairs, including but not limited to, office equipment and automobiles, and the export of any equipment and automobiles so imported;

(f) the dissemination of commercial information;

(g) the conduct of market studies;

(h) the appointment of commercial representatives, including agents, consultants and distributors and their participation in trade fairs and promotion events;

(i) the marketing of goods and services, including through internal distribution and marketing systems, as well as by advertising and direct contact with individuals and companies;

(j) access to public utilities, public services and commercial rental space at nondiscriminatory prices, if the prices are set or controlled by the government; and

(k) access to raw materials, inputs-and services of all types at nondiscriminatory prices, if the prices are set or controlled by the government.

ARTICLE III

1. Investments shall not be expropriated or nationalized either directly or indirectly through measures tantamount to expropriation or nationalization ("expropriation") except: for public purpose; in a nondiscriminatory manner; upon payment of prompt, adequate and effective compensation; and in accordance with due process of law and the general principles of treatment provided for in Article II(2). Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken or became known, whichever is earlier; be calculated in a freely usable currency on the basis of the prevailing market rate of exchange at that time; be paid without delay; include interest at a commercially reasonable rate, such as LIBOR plus an appropriate margin,from the date of expropriation; be fully realizable; and be freely transferable.

2. A national, or company of either Party that asserts that all or part of its investment has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of the other Party to determine whether any such expropriation has occurred and, if so, whether such expropriation, and any associated compensation, conforms to the principles of international law.

3. Nationals or companies of either Party whose investments suffer losses in the territory of the other Party owing to war or other armed conflict, revolution, state of national emergency, insurrection, civil disturbance or other similar events shall be accorded treatment by such other Party no less favorable than that accorded to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, as regards any measures it adopts in relation to such losses.

ARTICLE IV

1. Each Party shall permit all transfers related to an investment to be made freely and without delay into and out of its territory. Such transfers include: (a) returns; (b) compensation pursuant to Article III; (c) payments arising out of an investment dispute; (d) payments made under a contract, including amortization of principal and accrued interest payments made pursuant to a loan agreement; (e) proceeds from the sale or liquidation of all or any part of an investment; and (f) additional contributions to capital for the maintenance or development of an investment.

2. Transfers shall be made in a freely usable currency at the prevailing market rate of exchange on the date of transfer with respect to spot transactions in the currency to be transferred.

3. Notwithstanding the provisions of paragraphs I and 2, either Party may maintain laws and regulations (a) requiring reports of currency transfer; and (b) imposing income taxes by such means as a withholding tax applicable to dividends or other transfers. Furthermore, either Party may protect the rights of creditors, or ensure the satisfaction of judgments in adjudicatory proceedings, through the equitable, nondiscriminatory and good faith application of its law.

ARTICLE V

The Parties agree to consult promptly, on the request of either, to resolve any disputes in connection with the Treaty, or to discuss any matter relating to the interpretation or application of the Treaty.

ARTICLE VI

1. For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; (b) an investment authorization granted by that Party's foreign investment authority to such national or company; or (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment.

2. In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation. If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute for resolution:

(a) to the courts or administrative tribunals of the Party that in a Party to the dispute; or

(b) in accordance with any applicable, previously agreed dispute-settlement procedures; or

(c) in accordance with the terms of paragraph 3.

3. (a) Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b) and that six months have elapsed from the date on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration:

(i) to the International Centre for the Settlement of Investment Disputes ("Centre") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States, done at Washington, March 18, 1965 ("ICSID Convention"), provided that the Party is a Party to such Convention; or

(ii) to the Additional Facility of the Centre, if the Centre is not available; or

(iii) in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL); or

(iv) to any other arbitration institution, or in accordance with any other arbitration rules, as may be mutually agreed between the parties to the dispute.

(b) once the national or company concerned has so consented, either Party to the dispute may initiate arbitration in accordance with the choice so specified in the consent.

4. Each Party hereby consents to the submission of any investment dispute for settlement by binding arbitration in accordance with the choice specified in the written consent of the national or company under paragraph 3. Such consent, together with the written consent of the national or company when given under paragraph 3 shall satisfy the requirement for:

(a) written consent of the parties to the dispute for purposes of Chapter II of the ICSID Convention (Jurisdiction of the Center) and for purposes of the Additional Facility Rules; and

(b) an "agreement in writing," for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958 ("New York Convention").

5. Any arbitration under paragraph 3(a)(ii), (iii) or (iv) of this Article shall be held in a state that is a Party to the New York Convention.

6. Any arbitral award rendered pursuant to this Article shall be final and binding on the parties to the dispute. Each Party undertakes to carry out without delay the provisions of any such award and to provide in its territory for its enforcement.

7. In any proceeding involving an investment dispute, a Party shall not assert, as a defense, counterclaim, right of set-off or otherwise, that the national or company concern ad has received or will receive, pursuant to an insurance or guarantee contract, indemnification or other compensation for all or part of its alleged damages.

8. For purposes of an arbitration held under paragraph 3 of this Article, any company legally constituted under the applicable laws and regulations of a Party or a political subdivision thereof but that, immediately before the occurrence of the event or events giving rise to the dispute, was an

investment of nationals or companies of the other Party, shall be treated as a national or company of such other Party in accordance with Article 25(2)(b) of the ICSID Convention.

ARTICLE VII

1. Any dispute between the Parties concerning the interpretation or application of the Treaty which is not resolved through consultations or other diplomatic channels, shall be submitted, upon the request of either Party, to an arbitral tribunal for binding decision in accordance with the applicable rules of international law. In the absence of an agreement by the Parties to the contrary, the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL), except to the extent modified by the Parties or by the arbitrators, shall govern.

2. Within two months of receipt of a request, each Party shall appoint an arbitrator. The two arbitrators shall select a third arbitrator as Chairman, who is a national of a third State. The UNCITRAL Rules for appointing members of three member panels shall apply mutatis mutandis to the appointment of the arbitral panel except that the appointing authority referenced in those rules shall be the Secretary General of the Centre.

3. Unless otherwise agreed, all submissions shall be made and all hearings shall be completed within six months of the date of selection of the third arbitrator, and the Tribunal shall render its decisions within two months of the date of the final submissions or the date of the closing of the hearings, whichever is later.

4. Expenses incurred by the Chairman, the other arbitrators, and other costs of the proceedings shall be paid for equally by the Parties. The Tribunal may, however, at its discretion, direct that a higher proportion of the costs be paid by one of the Parties.

ARTICLE VIII

This Treaty shall not derogate from:

(a) laws and regulations, administrative practices or procedures, or administrative or adjudicatory decisions of either Party;

(b) international legal obligations; or

(c) obligations assumed by either Party, including those contained in an investment agreement or an investment authorization, that entitle investments or associated activities to treatment more favorable than that accorded by this Treaty in like situations.

ARTICLE IX

1. This Treaty shall not preclude the application by either Party of measures necessary for the maintenance of public order, the fulfillment of its obligations with respect to the maintenance or restoration of international peace or security, or the protection of its own essential security interests.

2. This Treaty shall not preclude either Party from prescribing special formalities in connection with the establishment of investments, but such formalities shall not impair the substance of any of the rights set forth in this Treaty.

ARTICLE X

1. With respect to its tax policies, each Party should strive to accord fairness and equity in the treatment of investment of nationals and companies of the other Party.

2. Nevertheless, the provisions of this Treaty, and in particular Article VI and VII, shall apply to matters of taxation only with respect to the following:

(a) expropriation, pursuant to Article III;

(b) transfers, pursuant to Article IV; or

(c) the observance and enforcement of terms of an investment agreement or authorization as referred to in Article VI (1) (a) or (b), to the extent they are not subject to the dispute settlement provisions of a Convention for the avoidance of double taxation between the two Parties, or have been raised under such settlement provisions and are not resolved within a reasonable period of time.

ARTICLE XI

This Treaty shall apply to the political subdivisions of the Parties.

ARTICLE XII

1. This Treaty shall enter into force thirty days after the date of exchange of instruments of ratification. It shall remain in force for a period of ten years and shall continue in force unless terminated in accordance with paragraph 2 of this Article. It shall apply to investments existing at the time of entry into force as well as to investments made or acquired thereafter.

2. Either Party may, by giving one year's written notice to the other Party, terminate this Treaty at the end of the initial ten year period or at any time thereafter.

3. With respect to investments made or acquired prior to the date of termination of this Treaty and to which this Treaty otherwise applies, the provisions of all of the other Articles of this Treaty shall thereafter continue to be effective for a further period of ten years from such date of termination.

4. The Annex shall form an integral part of the Treaty.

IN WITNESS WHEREOF, the respective plenipotentiaries have signed this Treaty.

DONE in duplicate at Washington, this fourth day of March, 1994 in the English and Ukranian languages, both texts being equally authentic.

FOR THE UNITED STATES OF AMERICA:

FOR THE REPUBLIC OF UKRAINE

ANNEX

1. The United States reserves the right to make or maintain limited exceptions to national treatment, as provided in Article II, paragraph 1, in the sectors or matters it has indicated below:

air transportation; ocean and coastal shipping; banking; insurance; government-grants; government insurance and loan programs; energy and power production; custom house brokers; ownership of real property; ownership and operation of broadcast or common carrier radio and television stations; ownership of shares in the Communications Satellite Corporation; the provision of common carrier telephone and telegraph services; the provision of submarine cable services; use of land and natural resources; mining on the public domain; maritime services and maritime-related services; and primary dealership in United States government securities.

2. The United States reserves the right to make or maintain limited exceptions to most favored nation treatment, as provided in Article II, paragraph 1, in the sectors or matters it has indicated below:

ownership of real property; mining on the public domain; maritime services and maritime-related services; and primary dealership in United States government securities.

3. Ukraine reserves the right to make or maintain limited exceptions to national treatment, as provided in Article II, paragraph 1, in the sectors or matters it has indicated below:

production of equipment used exclusively for nuclear power plants; maritime transportation including ocean and coastal shipping; air transportation; nuclear electric energy generation; privatization of those educational, sports, medical and scientific facilities financed by the national budget; mining of salt; mining and processing of rare earch, and of uranium and other television and radioactive elements; ownership and operation of television and radio broadcasting stations; and ownership of land.

DEPUTY UNITED STATES TRADE REPRESENTATIVE

EXECUTIVE OFFICE OF THE PRESIDENT

WASHINGTON, DC 20506

March 4, 1994

Dear Mr. Minister:

I have the honor to confirm receipt of your letter which reads as follows:

"I have the honor to confirm the following understanding which was reached between the Government of the United States of America and the Government of Ukraine in the course of negotiations of the Treaty Concerning the Encouragement and Reciprocal Protection of Investment (the "Treaty"):

The Government of Ukraine agrees to designate an office to assist U.S. nationals and companies in deriving the full benefits of the Treaty in connection with their investment and related activities.

--The office will serve as the coordinator and problem solver for investors experiencing difficulties with registration, licensing, access to utilities, regulatory and other matters.

-- The office will provide the following types of services:

-- Information on current national and local business/investment regulations, including licensing and registration procedures, taxation, labor regulations, accounting standards, and access to credit.

-- A notification procedure on proposed regulatory or legal changes affecting investors with circulation of notices on regulatory changes put into force.

-- Coordination with Ukraine Government agencies at the national and local level to facilitate investment and resolve disputes.

-- Identification and dissemination of information on investment projects and their sources of finance.

-- Assistance to investors experiencing difficulties with repatriating profits and obtaining foreign exchange.

His Excellency

Roman Shpek

Minister of Economy of Ukraine

I understand that the offices designated by the Government of Ukraine to assist U.S. nationals and companies in accordance with this letter are the Administration for Investment Cooperation of the Ministry of Foreign Economic Relations of Ukraine and the Department of Foreign Investments and Credits of the Ministry of the Economy of Ukraine.

I have the honor to propose that this understanding be treated as an integral part of the Treaty.

I would be grateful if you would confirm that this understanding is shared by your government.

I have the further honor to confirm that this understanding is shared by my Government and constitutes an integral part of the Treaty.

Sincerely,

Rufus Yerxa