UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                          1:20-cv-23278-MGC

REAL PROPERTY LOCATED AT 7505 AND 7171
FOREST LANE, DALLAS, TEXAS 75230 et al.,

    Defendant.
_____/

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                          1:20-cv-23279-MGC

ALL RIGHT TO AND INTEREST IN PNC CORPORATE
PLAZA HOLDINGS LLC HELD, CONTROLLED, OR
ACQUIRED, DIRECTLY OR INDIRECTLY, BY OPTIMA
CBD INVESTMENTS LLC AND/OR CBD 500 LLC, et al.,

    Defendant.
_____/

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                          1:20-cv-25313-MGC

REAL PROPERTY LOCATED AT 55 PUBLIC SQUARE,
CLEVELAND, OHIO, et al.

    Defendant.
_____/

**UNITED STATES' OPPOSITION TO MOTIONS TO COMPEL ARBITRATION**

    Mordechai Korf, Uriel Laber, Optima Ventures LLC, Optima 7171 LLC, and Optima 55 Public Square LLC ("Claimants") have asked this Court to divest itself of jurisdiction over civil forfeiture actions brought by the United States pursuant to 18 U.S.C. § 981 because two

investors in Optima Ventures, a Miami-based company, happen to be Ukrainian. *See* 20-23278 ECF 36, 37; 20-25313 ECF 26, 27 ("Motions to Compel"). That request—which would have this Court eviscerate the United States' power to enforce its own laws and the federal courts' authority to adjudicate them—should be rejected for a host of reasons.

As a preliminary matter, consideration of the Motions to Compel is not timely. Under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), the United States is not required to respond to a motion to dismiss until *after* it has had the opportunity to serve, and Claimants have responded to, special interrogatories. *See* Supplemental Rule G(6)(c). Claimants themselves argue that the Motions to Compel must be treated as motions to dismiss; therefore, the procedures of Rule G(6) apply. Consistent with that statutory framework, the United States has separately moved for an order extending the deadline to respond to the motions until after the special interrogatory process has been completed (including the possibility of striking claims), and has served special interrogatories on Claimants. 20-23278 ECF 45.

If the Court were to reach the merits of the Motions to Compel, it should deny them, because they are based on deeply flawed legal analyses. Their premise is that the Treaty Between the United States of America and Ukraine Concerning the Encouragement and Reciprocal Protection of Investment (the "US-Ukraine BIT" or the "Treaty")—a treaty designed to promote investment and economic cooperation between the countries—implicitly revokes this Court's jurisdiction to adjudicate the civil forfeiture provisions of Title 18 because Ukrainians invested in the companies that own the property subject to forfeiture. That is wrong. Federal statutes make clear that the district court is the proper—and, indeed, exclusive—forum to adjudicate civil forfeiture actions premised on violations of United States law. Neither the Federal Arbitration Act ("FAA") nor the Treaty alter that legal certainty. Nor can Claimants evade enforcement of United States civil forfeiture law through their appeal to principles of international comity. Those arguments are red herrings and ignore that the United States has asked this Court to adjudicate a forfeiture of property *in the United States*, which constitutes proceeds of criminal activity *under the laws of the United States*.

## FACTUAL BACKGROUND

The United States has filed three Verified Complaints for Forfeiture *in Rem* initiating these actions. 20-23278 ECF 1; 20-23279 ECF1; 20-25313 ECF 1 (the "Complaints"). The

allegations at the heart of the Complaints are simple: the Defendant Assets, which are located in the United States, are subject to forfeiture because they constitute, are derived from, and are traceable to violations of United States laws.

As alleged in the Complaints, Ukrainian oligarchs Ihor Kolomoisky and Gennadiy Boholiubov owned and controlled PrivatBank in Ukraine. 20-23278 ECF 1 ¶¶ 11-12. Each owned roughly 45% of the bank's shares, *id*. ¶ 22, and they were thus able to control key decisions of the bank, *id*. ¶ 23. They also controlled the supervisory board of the bank, which allowed them to select the bank's senior management. *Id*. ¶ 24-27. Kolomoisky and Boholiubov used their authority to install loyal subordinates. *Id*. ¶ 28.

Kolomoisky and Boholiubov leveraged their control of PrivatBank to enrich themselves at the expense of ordinary depositors. *Id*. ¶ 33. They embezzled from and defrauded the bank of more than $5 billion dollars. *Id*. ¶ 10. To take the money, Kolomoisky and Boholiubov caused "loans," often lines of credit, to be issued to companies they owned in Ukraine. *Id*. ¶¶ 35-38. The loan applications included material misrepresentations—for instance, they generally claimed to be for the ongoing activities of steel plants and other of Kolomoisky and Boholiubov's industrial interests in Ukraine. *See id*. ¶¶ 42-44. Yet the loan funds were ultimately used by completely different companies to acquire real estate and businesses in the United States. *Id*. Thus, a loan for $20 million issued to Kolomoisky's company in Ukraine for replenishment of its manganese ore stocks was instead laundered through numerous shell companies in Ukraine and Cyprus before it was transferred to entities in the United States to purchase Kentucky Electric Steel, a steel plant in Kentucky. *Id*. ¶ 44.

The loan applications included lies not just about the loans' purposes, but also about the methods of repayment. *Id*. ¶ 46. Although the loan applications stated that the loans would be repaid with income from the current operations of the companies that applied for them, they were instead repaid, frequently, with the proceeds of *new loans*. *Id*. ¶ 47. In effect, Kolomoisky and Boholiubov kicked the can down the road and did not repay large portions of the loans at all. In 2016, when Ukraine began investigating the scheme, PrivatBank was left with a shortfall from that fraudulent activity of more than $5 billion, and the bank had to be nationalized and bailed out to prevent a catastrophic loss to depositors. *Id*. ¶ 46.

The funds misappropriated from PrivatBank did not stay in Ukraine. The second part of the scheme was the laundering and concealment of the funds. Although the loans were

distributed to the applicant companies, within minutes of the funds' receipt, they were transferred again to the accounts of other companies, generally held at PrivatBank's Cyprus branch. *Id*. ¶¶ 74-79. The money was sent through, in some cases, dozens of shell companies to obscure their nature and source. *Id*.

The final, equally important aspect of the scheme involved the laundering and investment of the misappropriated money in the United States. Kolomoisky and Boholiubov transferred hundreds of millions of dollars of loan funds they fraudulently obtained from PrivatBank to entities in the United States created by their business partners, Mordechai Korf and Uriel Laber. *Id*. ¶¶ 84, 87. To launder the funds, Korf and Laber incorporated dozens of entities in the United States under the name "Optima," which they used to invest the misappropriated funds. *Id*. Korf and Laber opened bank accounts in the name of the Optima entities at financial institutions in the United States, so that they could transfer and use the misappropriated funds. Korf and Laber each owned approximately 17% of the "top level" Optima entity, Optima Ventures LLC. Kolomoisky and Boholiubov each owned about 33%, though they did so through a number of shell companies registered in locations such as Jersey, Cyprus, and the British Virgin Islands.[1] That ownership structure gave them yet another layer of insulation between the initial theft and the eventual use of the proceeds by Optima. Korf and Laber parked the misappropriated money in buildings and business across the country—steel mills in Kentucky; commercial real estate in Ohio, Kentucky, and Texas; and manufacturing facilities in Illinois, among other things. *Id*. ¶ 86.

Korf and Laber used those shell companies and the properties they owned to further launder the misappropriated funds. Korf and Laber used the buildings to generate additional income, they took out equity from the buildings, and they freely transferred funds among the various Optima entities as if they were one aggregate pool of money. *Id*. ¶ 87-91. Korf and Laber's actions were an integral part of the scheme, and they had real consequences. The entities repeatedly defaulted on mortgages, harming banks, investors, and tenants in the United States. 20-23279 ECF 1 at ¶ 135. They shuttered manufacturers and steel mills. They left buildings in dire need of repairs and maintenance, and severely undercapitalized them.

---

[1] The United States does not concede that any of that granted Kolomoisky or Boholiubov rights under the Treaty.

Meanwhile, they took the proceeds out for themselves, and even transferred some back to Ukraine. 20-23278 ECF 1 at ¶ 124.

One such property mismanaged by Korf and Laber, which they acquired using funds misappropriated from PrivatBank, is the CompuCom Campus in Dallas, Texas. *Id*. ¶ 97. Korf and Laber created Optima 7171 LLC, which was wholly owned by Optima Ventures LLC, and thus indirectly by Kolomoisky and Boholiubov's shell companies. In 2010, Korf and Laber acquired the CompuCom Campus for approximately $47.4 million. *Id*. ¶ 100. They assumed an underlying mortgage for approximately $32 million and paid approximately $15 million in cash. *Id*. ¶¶ 102-03. The cash was misappropriated from PrivatBank through four loans that were issued on the basis of applications that contained fraudulent misrepresentations. *Id*. ¶¶ 105-12. The funds were laundered through the same pattern as the rest, through a web of accounts at PrivatBank's Cyprus branch, before they came to the United States. *Id*. ¶¶ 113-19.

After initially investing roughly $15 million of fraudulent loan proceeds into the CompuCom Campus, Korf and Laber took almost $13 million out of the CompuCom Campus from 2011 to 2016, representing rent payments from the tenant. *Id*. ¶ 124. A portion of those funds—which constitute profits from the initial theft from PrivatBank—went to Kolomoisky himself. *Id*. Funds from other Optima entities were used to pay off the mortgage on the CompuCom Campus. *Id*. ¶ 126. The building has been vacant for some time. 23278 ECF 29 at 11. It is currently under contract for sale for approximately $23 million.

Korf and Laber similarly purchased 55 Public Square in Cleveland with money misappropriated from PrivatBank. 25313 ECF 1 ¶ 92. They followed the same pattern—Kolomoisky and Boholiubov had loans issued to their companies in Ukraine, using fraudulent applications; the money was then laundered in Cyprus and sent to Optima Ventures for spending by Korf and Laber. *Id*. ¶¶ 99-110. After defaulting on the most recent mortgages—which were taken not to support the building itself, but to pay for *other* properties obtained using fraudulent loans—the building was recently sold for net proceeds of only approximately $600,000. *See id*. ¶¶ 118-127.

After asking for extensions to respond to the forfeiture actions for nearly six months, Claimants filed the instant Motions to Compel on February 5 and 19, 2021. Claimants Optima Ventures and Optima 7171 filed a Notice of Arbitration under the Treaty on February

8, 2021, in which they claim, among other things, that United States civil forfeiture law violates their human rights. 20-23278 ECF 36-2 at 35. Although Claimants attached a similar Notice as an exhibit to their Motion in the 55 Public Square matter (20-25313), the United States does not believe it has been officially filed with the arbitral tribunal.

The government, pursuant to 18 U.S.C. § 981(g)(1), has asked this Court to stay these actions. 20-23278 ECF 46, 47. The government has also asked that, in the alternative, this Court adhere to the procedures set forth in Rule G, and neither require substantive briefing in response to the Motions to Compel nor decide them until Claimants respond to special interrogatories served pursuant to Rule G(6). 20-23278 ECF 45.

## ARGUMENT

The Motions to Compel should be denied. Simply put, Rule G does not allow the Court to consider these motions at this time. Rule G mandates that the government be afforded the opportunity to serve special interrogatories, and that Claimants respond to those interrogatories, before the government is required to respond to motions such as these, so that the government can first validate each Claimant's standing. And, in any event, the Court should stay the entirety of the proceedings pursuant to 18 U.S.C. § 981(g)(1), because further action at this time would adversely affect an ongoing criminal investigation.

If the Court does see fit to reach the merits of the Motions, it should deny them. The federal courts have exclusive jurisdiction over civil forfeiture actions, and neither the US-Ukraine BIT nor principles of international comity alter that jurisdictional reality.

I. **The Court Should Not Address The Motions To Compel Until After The Special Interrogatory Process Has Been Completed Under Rule G**

The Court should not address Claimants' Motions to Compel until Claimants first respond to the government's special interrogatories, and the government has an opportunity to evaluate the responses and move to strike claims. The issue is described in detail in the government's Motion for an Extension, ECF 45.

Rule G(6) creates a special procedure for early discovery in *in rem* forfeiture actions that is distinct from the rest of the Federal Rules of Civil Procedure. Rule G(6) provides that the government may serve special interrogatories to probe a claimant's standing, and that the claimant must provide answers, *before* the government is required to respond to any motion to dismiss. *See* Supplemental Rule G(6)(a)-(c). Special interrogatories "are not run-of-the mill

6

discovery, but rather are an important tool for the government to sort out colorable from fraudulent claims and to determine a claimant's standing—a threshold issue in civil forfeiture actions." *Real Prop. Known as 6556 Skyline Drive*, 2015 WL 13776786, at *2 (internal quotation marks and citation omitted).  They "serve an essential function in the asset forfeiture context by allowing the government to test a claimant's bare assertion of standing against an evidentiary basis." *United States v. One Hundred & Sixty Four Thousand Four Hundred & Sixty Five Dollars in United States Currency ($164,465.00)*, No. 16-CV-80339, 2016 WL 11201757, at *3 (S.D. Fla. June 21, 2016).  As the Second Circuit has explained:

> Establishing standing in the context of a forfeiture action before considering the merits of a motion to dismiss simply makes sense; the defendant in such an action is the res, not the claimant.  Without standing, the claimant lacks the right to bring any motion, regardless of the basis.  It is thus incumbent on a court to establish whether the claimant 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'

*United States v. Vazquez-Alvarez*, 760 F.3d 193, 197 (2d Cir. 2014) (internal citations omitted).

As Claimants acknowledge, their Motions to Compel are motions to dismiss for lack of subject matter jurisdiction.  *See* Optima Motion to Compel, 20-23278 ECF 36 at 21 (quoting *Babcock v. Neutron Holdings, Inc.*, 454 F. Supp. 3d 1222, 1228 (S.D. Fla. 2020), for the proposition that a motion to compel arbitration is treated as a Rule 12(b)(1) motion to dismiss); Korf and Laber's Motion to Compel, 20-23278 ECF 37 at 5.  Consistent with the requirements of Rule G(6), the government served special interrogatories on Claimants on February 26, 2021, which was 21 days after Claimants filed their Motions to Compel.[2]  Under Rule G(6)(b), Claimants have 21 days to respond to the Special Interrogatories, and the government has 21 days from service of those answers to respond to the Motions (or to move to strike claims).  The Court must follow the sequence set out in Rule G and require that Claimants respond to the special interrogatories before the government is required to respond to the Motions to Compel.

---

[2] Because Claimants in the 55 Public Square matter, 20-25313, did not file their motions until February 19, special interrogatories are not due until March 12, 2021, but will be filed at that tie if a stay has not yet entered.

7

## II. The Motions To Compel Should Be Stayed With The Rest Of The Proceedings

Even if it were proper for the Court to address the Motions to Compel at this time, it should not; it should instead stay the proceedings pursuant to 18 U.S.C. § 981(g)(1). The government's position is laid out in detail in its Motion to Stay and the accompanying sealed declaration, 20-23278 ECF 46, 47, but the core is this: Section 981(g)(1) provides for the mandatory stay of a civil forfeiture proceeding where the United States moves for the entry of a stay and demonstrates that continuation of the proceedings "will adversely affect the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case." 18 U.S.C. § 981(g)(1); *see also United States v. Funds, In Amount of $1,699,675.00*, No. 1:13-CV-21459, 2014 WL 687553, at *2 (S.D. Fla. Jan. 16, 2014) (section 981(g)(1) provides for a "mandatory stay" where the government demonstrates an adverse effect).

The threshold for a stay is low. *See United States v. One 2008 Audi R8 Coupe Quattro*, 866 F. Supp. 2d 1180, 1183 (C.D. Cal. 2011). "Where civil discovery would subject the government's criminal investigation to early and broader civil discovery than would otherwise be possible in the context of the criminal proceeding," a stay must be granted. *United States v. VIN: WP1AD2A26DLA72280*, No. 2:13-CV-636-FTM-38, 2014 WL 289379, at *1 (M.D. Fla. Jan. 27, 2014) (internal quotation marks omitted). Stays are "routinely issued," *One 2008 Audi R8 Coupe Quattro*, 866 F. Supp. 2d at 1184, even if there is only an "anticipated adverse impact." *United States v. GAF Fin. Servs., Inc.*, 335 F. Supp. 2d 1371, 1373 (S.D. Fla. 2004).

As demonstrated more fully in the government's Motion to Stay, there is an ongoing criminal investigation related to the civil forfeiture actions here. The investigation involves similar parties, witnesses, circumstances, and underlying facts. 20-23278 ECF 46 at 6. And, if the proceedings continue, the related investigation would be adversely affected by, among other things, revealing investigative strategies, exposing the identities of witnesses, and undermining the ability to collect additional evidence. *Id*. at 7-8. *See also United States v. All Funds on Deposit in Suntrust Account No. XXXXXXXX8359, in Name of Gold & Silver Reserve, Inc.*, 456 F. Supp. 2d 64, 66 (D.D.C. 2006) (a stay is warranted if further action in the civil forfeiture case "could compromise any existing confidential informants and/or interfere with the Government's ability to obtain confidential information from others"). Because it should

grant the Motion to Stay, the Court should not address Claimants' Motions to Compel at this time.

### III. If It Reaches The Merits, The Court Should Deny The Motions to Compel

The Court should not decide Claimants' Motions to Compel at this time. But, if it does, it should deny them for several reasons. Congress has authorized the government to initiate *in rem* civil forfeiture actions like these, and it has expressly vested the federal courts with jurisdiction to adjudicate such actions. The Treaty does not alter that statutory scheme. Claimants' argument to the contrary—namely, that the Treaty divests this Court of jurisdiction to adjudicate the claims in these actions—wrongly conflates the remedy they seek in this action (title to the Defendant Assets) with remedies properly sought under the Treaty (damages for an alleged breach of the Treaty). However, those claims and remedies are wholly distinct, and must be pursued in separate forums. Claimants' arguments regarding principles of international comity are similarly unavailing.

#### A. This Court has exclusive jurisdiction over these *in rem* civil forfeiture actions

Civil forfeiture is an essential tool for the enforcement of the United States' police powers. *Civil Asset Forfeiture: Purposes, Protections, and Prosecutors*, 67 DOJ J. Fed. L. & Prac. 3, 5 (2019) ("civil forfeiture is a critical tool in disrupting the most serious criminal threats this nation faces"). Although civil in nature, such actions inherently stem from violations of federal criminal laws. *See United States v. La Vengeance*, 3 U.S. 297 (1796) (holding that violations of criminal laws gave rise to a civil forfeiture action). Civil forfeiture has a long lineage—one of the first actions of the first Congress of the United States was the enactment of a statute subjecting vessels and cargoes to civil forfeiture for violations of customs laws. *See* Act of July 31, 1789, §§ 12, 36, 1 Stat. 29, 39, 47. *See also* Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 Yale L.J. 2446, 2452 (2016). Civil forfeiture allows the government to block the use of property in a criminal manner. "Like imprisonment, which incapacitates convicted criminals, forfeiture may be said to incapacitate contraband." *von Hofe v. United States*, 492 F.3d 175, 184 (2d Cir. 2007)

Federal civil forfeiture law is codified at 18 U.S.C. § 981, titled "Civil Forfeiture." The statute makes the link between civil forfeiture and underlying violations of federal criminal law clear—Title 18 is the portion of the United States Code addressing "Crimes and Criminal Procedures." Section 981(a)(1) identifies particular classes of "property [ ] subject to forfeiture

9

to the United States." Those classes comprise property that is the proceeds of, or was used to facilitate, violations of specified criminal laws.

As relevant here, Section 981(a)(1)(A) provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property," is "subject to forfeiture to the United States." 18 U.S.C. § 981(a)(1)(A). Similarly, "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense," is forfeitable to the United States. 18 U.S.C. § 981(a)(1)(C). Those provisions make clear that the *reason* property is forfeitable is because it is criminally tainted—it was either derived from, or used to commit, a violation of the criminal laws of the United States. Civil forfeiture is thus not entirely civil; it is predicated on violations of criminal law, the enforcement of which is a central function of the government.

Civil forfeiture actions are a unique type of civil action because they are "*in rem*" actions. The *in rem* vehicle allows the government to proceed against property itself, rather than a particular person, based on its connection to criminal activity. That distinction is critical: civil forfeiture does not require adjudication of the guilt of any person, but rather a determination of whether the subject of the forfeiture, the *res*, is forfeitable.

Thus, unlike most civil cases, which concern only the rights and interests of parties to the action, *in rem* forfeiture cases are brought against the property itself, and seek a judicial order recognizing the government's ownership of the property, and extinguishing the rights of every other person or entity with a potential legal interest in it. *In rem* actions are actions "against all the world," because any person with an interest in the property can intervene to challenge the forfeiture by filing a claim, and the court evaluates the rights of all claimants when determining the United States' forfeiture claims. Restatement (Second) of Judgments § 6 (1982); *see also United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA*, 545 F.3d 1134, 1144 (9th Cir. 2008).

The district courts are vested with exclusive jurisdiction over actions arising under Section 981. *See* 28 U.S.C. § 1355(a) ("The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any

Act of Congress . . ."). Section 981 itself makes clear that any property seized or detained pursuant to that section remains in the custody of the government "subject only to the orders and decrees of the court or the official having jurisdiction thereof." 18 U.S.C. § 981(c).

Consistent with the purpose of the *in rem* action to adjudicate the legal ownership of the asset, all claims to property subject to an *in rem* action must be adjudicated in the context of that action. "Under the scheme established by Congress, the filing of a claim by an aggrieved party is the *exclusive means* by which a claimant can have a judicial determination as to [a] forfeiture's validity." *Lee v. Forfeiture Counsel*, No. 2:13-CV-806-FTM-29CM, 2014 WL 4071680, at *3 (M.D. Fla. Aug. 18, 2014) (emphasis added); *see also Mesa Valderrama v. United States*, 417 F.3d 1189, 1195 (11th Cir. 2005). "Once a civil forfeiture proceeding has commenced, 'the proper place to litigate the legality of the seizure is in the forfeiture proceedings.'" *Bizato v. United States*, No. 1:14CV167-HSO-RHW, 2014 WL 4694860, at *2 (S.D. Miss. Aug. 18, 2014) (dismissing a separate civil action to recover property that was the subject of a civil forfeiture action).

Any other approach would be chaotic and unworkable. A competing action could easily "result in determinations at odds with the forfeiture action's resolution of claims and potentially prejudice the interests of other claims[.]" *McRaith v. Leading Edge Grp. Holdings, Inc.,* No. CIV.A. 10-3351 SRC, 2010 WL 4446852, at *3 (D.N.J. Nov. 1, 2010). Exclusivity is necessary to prevent the "inefficient and piecemeal litigation" that would result if a court or arbitration tribunal presiding over a competing action sought to adjudicate legal rights to the same property. *Id*. That is why the "clear language" of the civil forfeiture provisions "vest[s] exclusive jurisdiction over seized funds to the court presiding over the civil forfeiture action." *Id*.; *see also id.* ("The civil forfeiture action provides an appropriate, and indeed exclusive, forum to resolve disputes over [the defendant asset] and to adjudicate all claims to the [defendant asset] seized, not merely those of one claimant [. . .] to the exclusion of any others[.]"). "It is well-settled that the proper method for recovery of property which has been subject to civil forfeiture is . . . filing a claim in the civil forfeiture action." *United States v. Castro*, 883 F.2d 1018, 1019 (11th Cir. 1989).

**B.  The Treaty does not divest this Court of jurisdiction over these actions**

Nothing in the Treaty divests this Court of its exclusive jurisdiction over civil forfeiture actions or transfers jurisdiction over these actions to an arbitral tribunal simply because one

11

of the claimants asserts rights under the Treaty. Claimants' argument to the contrary reflects a strained interpretation of the Treaty that is both internally inconsistent and irreconcilable with the statutory scheme of the United States' civil asset forfeiture laws.

      1. *The Treaty does not affect the Court's jurisdiction to adjudicate these disputes.*

Despite Claimants' insistence throughout their Motions to Compel that these forfeiture actions are subject to arbitration, they offer no textual support for that contention, and closer scrutiny of the Treaty reveals that there is none. Nowhere in the Treaty does the United States—or, for that matter, Ukraine—surrender its sovereign authority to enforce its laws against foreign investors. Nor does any provision of the Treaty otherwise suspend the normal operation of either country's laws or divest its courts of jurisdiction to adjudicate those laws against a foreign investor.

The Treaty establishes an obligation on behalf of each "Party" to the Treaty—*i.e.,* the United States and Ukraine—to accord to investments of "nationals or companies" of the other Party certain treatment, including "fair and equitable treatment," as defined by international law. The Treaty also establishes an obligation not to expropriate or nationalize such investments. *See* Treaty, Arts. II(3)(a) and III(1), 20-23278 ECF 36-1 at 11-12. The Treaty further provides that when there is an "alleged breach of any right *conferred or created by this Treaty* with respect to an investment"—an event that is defined as an "investment dispute"—the affected national or company may, assuming it meets various prerequisites, "choose to submit the dispute for resolution" by an arbitral tribunal. Treaty, Art. VI(1)-(3). *Id*. at 13 (emphasis added). That distinction—relegating only rights "*conferred or created by the Treaty*" to arbitration—is crucial. Domestic law matters, in this case, the adjudication of civil forfeiture actions brought under Section 981, are decidedly not rights created by the Treaty.

Claimants' Motions to Compel urge the Court to construe the BIT as creating a far broader form of relief. They ask the Court to find that the Treaty authorizes foreign investors to submit to arbitration the very domestic enforcement action that they claim violates their BIT rights. In effect, they say that the Treaty divests domestic courts of jurisdiction to adjudicate actions to enforce domestic law against foreign nationals, and instead transfers jurisdiction over all such actions to an international arbitral tribunal. That fanciful view of the rights and remedies afforded by the Treaty—an end run around US forfeiture law—finds no support in the Treaty itself.

12

The implications of Claimants' unfounded position are far-reaching. It would allow *every* civil forfeiture action involving property purportedly owned or controlled, in any amount, by Ukrainian "investors" to be removed from the United States courts for adjudication by a panel of arbitrators. And it would not stop there. The United States is a party to almost 40 similar BITs, and nearly a dozen free trade agreements with similar arbitral resolution of disputes. *See* United States Bilateral Investment Treaties, https://www.state.gov/investment-affairs/bilateral-investment-treaties-and-related-agreements/united-states-bilateral-investment-treaties; United States Free Trade Agreements, https://ustr.gov/trade-agreements/free-trade-agreements. If this Court were to endorse Claimants' construction of the Treaty, purported investors from Albania to Uruguay could evade the jurisdiction of the federal courts in exchange for arbitration under the BITs.

The implications of that two-tiered system of justice—one for foreign nationals covered by a BIT and one for everyone else—cannot be overstated. Arbitrators who are not United States judges—who have no obligation to uphold United States laws, to afford the procedural rights of the Supplemental Rules or the Federal Rules of Civil Procedure, or to follow the precedent of the United States courts—would be charged with deciding fundamental issues of American law and controlling the exercise of the government's police powers. Nothing in the Treaty contemplates such a gerrymandering of the United States justice system.

An order granting Claimants' Motions to Compel would give foreign nationals a roadmap for evading United States civil forfeiture laws. Indeed, a drug trafficker, a money launderer, or a scammer from a country with a BIT could easily file a Notice of Arbitration and throw federal proceedings into disarray. Thousands of cases a year could be affected, and the efficient process for adjudicating civil asset forfeiture actions would be severely undermined.

That absurd result is not even contemplated—let alone mandated—by the Treaty. The purpose of the BITs is to create a process for foreign nationals to challenge the actions of a host country that violates their rights under the Treaty. The purpose is *not* to prevent enforcement of the criminal or civil forfeiture laws of the United States by conferring on foreign national claimants to criminally-derived property a special right to have those claims adjudicated by an arbitral tribunal. The BIT does not, expressly or implicitly, divest the

United States courts of their jurisdiction, granted by United States statutes, to adjudicate civil asset forfeiture actions. For this reason alone, the Motions to Compel must be denied.

### 2. *In rem civil forfeiture actions are not "investment disputes" subject to arbitration.*

Claimants' position is based on the false premise that a civil forfeiture action is an "investment dispute" between the United States and "a national or company" of Ukraine. 20-23278 ECF 36 at 10. But an *in rem* action is *not* a dispute between the United States and anyone, much less a particular investor. It is an action against specific property, in which an investor, as well as others, may intervene. The legal question at issue in such a case is simple; the Court must determine whether the United States or one of the claimants is the property's titleholder. By contrast, the question at issue in an arbitration of an alleged Treaty violation is entirely different: whether the United States or Ukraine has violated its treaty obligations in the context of a particular foreign investor.

An *in rem* civil forfeiture action and arbitration of a Treaty violation are, thus, entirely distinct actions. A Treaty claim may be brought by one or more specific foreign investors against the government of the host country, but the arbitration proceeding does not (and cannot) adjudicate title to an asset, because unlike *in rem* proceedings, it is not possible for all potential claimants to the asset, including valid lienholders, to intervene in that proceeding. If the Court compelled arbitration of these forfeiture actions, it would invite exactly the harms that have led other courts to recognize the exclusive nature of *in rem* actions, including by prejudicing the interests of claimants who cannot intercede in the arbitration, and resulting in "inefficient and piecemeal litigation" that would not finally resolve the adjudication of all claims to the *res* in a forfeiture case. *McRaith*, 2010 WL 4446852, at *3.

These cases demonstrate that point. In the action related to 55 Public Square, 20-25313, there are *eight* different claimants. Only two, Optima Ventures and Optima 7171, both United States entities incorporated, headquartered, and managed by United States citizens, have invoked the Treaty.[3] It is not even arguable that other claimants could. Korf and Laber are United States citizens, not nationals or companies of Ukraine. The Law Offices of Cleveland Inc. is an Ohio entity owned by United States citizens and would not qualify as a

---

[3] As noted above, the government does not concede that *any* Claimant has the right to invoke the Treaty.

national or company of Ukraine. That diversity of claimants illustrates why a civil forfeiture action must be adjudicated in a single forum, as required by the statutes and recognized by numerous federal court decisions.[4]

Further, the arbitration tribunal is not empowered to issue the form of relief sought in these forfeiture actions. Generally speaking, the ICSID Convention provides only for the enforceability of pecuniary remedies (*i.e.*, monetary damages). *See* ICSID Convention, Art. 54(1). But the subject of these civil asset forfeiture actions is not monetary damages; far from it, the question is whether title to the Defendant Assets vests in the United States because the properties are criminally tainted. If the arbitration tribunal determines that the United States' commencement of these civil asset forfeiture actions violated Claimants' rights under the BIT, it may award monetary damages; however, such an order will have no bearing on title to the Defendant Assets as a matter of US law.

It is therefore nonsensical to suggest that an arbitration tribunal could adjudicate these civil asset forfeiture actions. The claims and remedies available in the arbitration proceeding and the civil forfeiture actions in this Court neither overlap nor conflict: this court's adjudication of the forfeiture actions does not determine any Treaty rights, and the arbitral panel is in no position to determine ownership of the Defendant Assets and therefore would not be able to provide notice to any potential claimant as due process requires. It is thus entirely consistent with the statutory scheme of civil asset forfeiture and the design of the Treaty dispute resolution process for the civil forfeiture action to proceed in this Court, while the arbitration of Claimants' BIT grievances proceeds separately.[5]

      3. *The FAA does not compel arbitration of civil forfeiture actions.*

Claimants' argument that the Federal Arbitration Act mandates arbitration here is likewise incorrect. Claimants assert that the civil forfeiture actions must be submitted to arbitration because the FAA requires courts of contracting states to give effect to agreements to arbitrate when they satisfy the requirements of the New York Convention. 20-23278 ECF

---

[4] Moreover, had the property not been sold per the Court's order, creditors, including state tax authorities and Claimants' unpaid lender, would potentially have had valid claims to the property that would have been impossible to assert in BIT arbitration.

[5] The United States takes no position in this filing on any claims or defenses, jurisdictional or otherwise, that it may raise in any arbitration under the Treaty.

36 at 12. Claimants submit that the Treaty meets these requirements—and this Court should therefore compel arbitration of the civil forfeiture actions—because the Treaty is a written agreement; it provides for arbitration in the territory of a signatory; it arises out of a commercial legal relationship; and a party to the agreement is not an American citizen or the commercial relationship has some reasonable relation with one or more foreign states. *Id.* at 13.

The fatal flaw in Claimants' reasoning is that the core issue of these actions is not the subject of the Treaty's arbitration provision at all. First, the obligation to give effect to arbitration agreements cannot legally or logically require courts to compel arbitration of issues that are outside the scope of the arbitration provision. As discussed above, these *in rem* civil forfeiture actions are simply not "investment disputes" intended for arbitration as defined by the Treaty. Indeed, nothing in the text of the Treaty suggests that a Party agrees to submit to an arbitration tribunal to adjudicate the *substance* of a domestic law enforcement action; rather, the Treaty only contemplates arbitration of the investor's claim that such an action violates their Treaty rights and, if so, what damages may be owed for that breach.

Moreover, the nature of *in rem* actions demonstrates that forfeiture actions cannot be submitted to arbitration under a BIT, because they proceed against the property itself (not against any individual), which gives everyone in the world an opportunity to intervene and challenge the United States' forfeiture claims. Since they are not *in personam* actions, it is nonsensical to propose that civil forfeiture actions could be subject to a binding arbitration agreement in a contract; *in rem* actions are not focused on litigation against any individual, but against the asset itself.

Even assuming that the United States had entered a Treaty which provided for binding arbitration of disputes with one of the claimants over title to a property, it would still be illogical to compel arbitration of the entire *in rem* action. In an *in rem* case, there are myriad potential claimants who are not parties to any such agreement, and the rights of those parties could not be adjudicated pursuant to an arbitration provision to which they never consented, in an *in personam* arbitration proceeding in which they would not be parties.[6]

---

[6] Claimants Korf and Laber's Motions to Compel illustrate the point—they suggest that the arbitration would settle various rights, but they themselves cannot claim to be subject to the Treaty.

Further, the FAA does not apply to the government's routine exercises of police powers. *See Breazeale v. Victim Servs., Inc.*, 198 F. Supp. 3d 1070, 1076 (N.D. Cal. 2016), *aff'd,* 878 F.3d 759 (9th Cir. 2017) (the defendant "points to no case (nor is the Court aware of one) suggesting the FAA applies to *any* situation in which a state is exercising *any* of its "police powers"—that is, any of its power to regulate behavior for the purpose of promoting the health, welfare, and safety of its residents"); *see also Iskanian v. CLS Transportation Los Angeles, LLC*, 327 P.3d 129, 150 (Cal. 2014) ("There is no indication that the FAA was intended to govern disputes between the government in its law enforcement capacity and private individuals.").

In sum, the Treaty does not compel, or even allow, arbitration of the sorts of claims at issue here. There is no basis in the Treaty for this Court to divest itself of jurisdiction over the actions.

### C. It is immaterial that the initial theft from PrivatBank occurred in Ukraine

The gestalt of Claimants' motions is that these forfeiture actions are somehow an "overreach" by the government, 20-23278 ECF 36 at 2, and that this Court should not exercise jurisdiction because really anyone else—perhaps an arbitral panel, perhaps a Ukrainian court—should adjudicate whatever is going on in Ukraine. *Id*. at 3. Claimants go as far as to call these actions a "patently improper and transparent effort by the United States to enforce Ukrainian law." *Id*. That is nothing more than a quixotic effort by Claimants to relieve themselves of the jurisdiction of this Court and evade the enforcement of United States law.

These actions are an effort by the United States government to enforce the laws of the United States in the United States courts. Federal law prohibits money laundering. It criminalizes "engag[ing] in a monetary transaction in criminally derived property." 18 U.S.C. § 1957. And it criminalizes knowingly transacting in criminal proceeds with the intent to promote criminal activity or knowing that the transaction is designed to disguise those criminal proceeds. 18 U.S.C. § 1956. The United States has a strong interest in preventing criminally derived property from being used or hidden in this country. The integrity of our business and financial systems depends on it. These laws "reflect the 'strong public policies' of the United States government, and the government is not required to tolerate activity that it defines as illegal merely because it affects someone who may live in a country where the activity is legal." *United States v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 660 (3d Cir. 2002).

As the Complaints allege, Korf and Laber (United States citizens) used Optima (a United States company) and bank accounts held at Regions Bank (a financial institution in the United States) to spend stolen money in the United States. Korf and Laber conspired to launder stolen money. ECF 1 ¶ 84. Korf and Laber incorporated and registered companies in Delaware, Ohio, Illinois, Kentucky, Michigan, and Texas to receive and spend misappropriated funds. *Id*. Korf and Laber *requested* funds from their Ukrainian counterparts and interacted with PrivatBank's management. *Id*. ¶ 93. Korf and Laber withdrew money from the properties they purchased with the stolen funds, failed to repay loans from United States banks and private lenders, and failed to pay taxes. 25131 ECF 1 ¶¶ 118, 125. And Korf and Laber received and spent proceeds of the scheme. 23278 ECF 1 ¶ 94. All of that conduct happened in, and had pernicious effects on, the United States.

Claimants counter that US law is irrelevant if the predicate offense occurred overseas. They insist that the "nexus of the alleged scheme was rooted in Ukraine" and call everything that occurred in the United States "after-the-fact use" of stolen funds. ECF 36 at 9-10. That misses the point; the statute specifically identifies *foreign* bank fraud as a crime that supports a domestic money laundering prosecution. 18 U.S.C. §1956(c)(7)(B)(iii).

The scheme to defraud and embezzle from PrivatBank could not have succeeded without the elaborate operation to launder hundreds of millions of dollars of the proceeds to and through the United States. The perpetrators abused the financial system of the United States to hide criminal proceeds, promote criminal conduct, and keep the misappropriated funds safely in their hands. That conduct violated the laws of the United States, and it is indisputably within the authority of the United States government to enforce those laws, and emphatically the province of the United States courts to adjudicate them.

Claimants further argue that these actions are improper based on principles of international comity because they supposedly "regulate" conduct in Ukraine. ECF 36 at 3. That is not the case. Principles of international comity do not "prevent[] a district court from having the power to address wrongdoing that impacts a domestic court." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 75 (3d Cir. 1994). Comity "must yield to domestic policy." *Id*. These forfeiture actions represent the exercise of the United States' sovereign authority to enforce its own laws and to pursue forfeiture of assets based on criminal conduct occurring within its own borders. Principles of comity do not require the courts to

disregard United States law because a portion of the misconduct occurred overseas. *See United States v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 660 (3d Cir. 2002). It is simply absurd to suggest that the United States cannot enforce laws against laundering criminal proceeds using (and corrupting) the US financial system if the crime that gave rise to the proceeds occurred elsewhere.

Moreover, where the United States is a plaintiff, abstention on grounds of comity is particularly inappropriate. "Where, as here, the executive branch has decided that a forfeiture action is in the interests of the United States, declining jurisdiction out of deference to the interests of a foreign nation would be inappropriate." *United States v. All Assets Held at Bank Julius Baer & Co.*, 772 F. Supp. 2d 205, 210 (D.D.C. 2011).

Claimants' refrain that neither Kolomoisky nor Boholiubov has been charged in Ukraine is similarly beside the point. Civil forfeiture is not conditioned on proof of the purported property owner's culpability under United States law, much less under foreign law. *See United States v. Cherry*, 330 F.3d 658, 669 (4th Cir. 2003) ("the owner's culpability is irrelevant in deciding whether property should be forfeited."); *United States v. Sandini,* 816 F.2d 869, 872 (3d Cir. 1987) ("The innocence of the owner is irrelevant—it is enough that the property was involved in a violation to which forfeiture attaches."). A civil forfeiture action may proceed even if a claimant *has been acquitted* under US law. *See One Lot Emerald Cut Stones & One Ring v. United States*, 409 U.S. 232, 235 (1972).

## CONCLUSION

The Court should not address the Motions to Compel at this time; to do so would plainly violate Rule G(6). Claimants must first respond to the governments' Special Interrogatories, and the government must have the opportunity to strike claims. Even if it were proper for the Court to address these motions, it should not, because it should stay the actions pursuant to Section 981(g)(1), If the Court reaches the merits of the Motions, it should reject the invitation to strip the federal courts of their express jurisdiction to adjudicate civil forfeiture cases and deny the Motions in full.

                                      Respectfully submitted,

Dated: March 1, 2021         DEBORAH CONNOR, CHIEF
                                      MONEY LAUNDERING & ASSET
                                          RECOVERY SECTION

                      By:    /s/ *Shai D. Bronshtein*
                                      Shai D. Bronshtein (ID No. A5502665)
                                      Rachel E. Goldstein
                                      Trial Attorneys
                                      Criminal Division
                                      United States Department of Justice
                                      1400 New York Avenue NW
                                      Washington, DC 20005
                                      Telephone: (202) 616-5950
                                      Shai.Bronshtein@usdoj.gov

                                      ARIANA FAJARDO ORSHAN
                                      UNITED STATES ATTORNEY

                                      /s/ *Adrienne E. Rosen*
                                      Adrienne E. Rosen (ID No. A5502297)
                                      Assistant United States Attorney
                                      US Attorney's Office
                                      99 Northeast Fourth Street, 7th Floor
                                      Miami, Florida 33132
                                      Telephone: (305) 961-9338
                                      Adrienne.Rosen@usdoj.gov